# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA

05 JAN 25 PM 4:11

| | |
|---|---|
| James Wilbert Walker, Jr., ) | |
| ) | |
| Defendant/Petitioner, ) | |
| ) | |
| vs., ) | CASE NO. _____ |
| ) | |
| Billy Mitchum, warden, ) | CV-05-BE-0150-S |
| ) | |
| Respondent. ) | |

## MEMORANDUM IN SUPPORT OF PETITION FOR
## HABEAS CORPUS

Lindsay B. Erwin
Counsel for Petitioner
101 Brisstol Lane
Birmingham, Alabama 35242
(205) 408-0928

2

TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA:

Comes now JAMES WILBERT WALKER, JR. (Hereinafter referred to as "WALKER"), petitioner in the above-styled cause, and pursuant to 28 U.S.C. § 2254, moves this Court for a writ of Habeas Corpus and to the relief to which he may be entitled in this proceeding. In support of said petition, WALKER states as follows:

## PROCEDURAL BACKGROUND

Having exhausted all appellate remedies within the State of Alabama upon his denial of his Motion for Writ of Certiorari by the Alabama Supreme Court of his direct appeal on conviction dated August 31, 2001, WALKER filed a petition for relief from conviction under Ala. R. Crim. P. 32 with the Chilton County Circuit Court on January 23, 2002, citing that his conviction was in violation of his due process constitutional rights in that: 1) the State had deliberately suppressed evidence prior to trial that not only had his daughter, the alleged victim, recanted her story but also that she had been threatened with a possibility of perjury by the prosecution if she dared to change her story in court; and 2) his attorney committed a number of errors that contributed to the negative result.

WALKER filed a pro se Motion for Writ of Habeas Corpus on April 10, 2002. In this motion WALKER petitioned the trial court to release him on the grounds of justice in that his daughter Jennifer, the alleged victim, had already confessed under oath that she had lied when she accused him of molesting her.

On April 16, 2002 WALKER filed a second pro se motion with the Chilton County Circuit

2

Court, asking for an injunction in order to obtain "a fast and fair" hearing before the court on the pending matters.

In response to the motions filed by WALKER in this matter, the Chilton County District Attorney filed a motion to dismiss the Rule 32 petition on June 24, 2002, claiming: 1) that the issues had already been raised and ruled upon during the appellate process; 2) that there had been no showing of ineffective assistance of counsel to the level that court action was necessary; and 3) that there existed no issue upon which relief could be granted.

On June 27, 2002 the Chilton County Circuit Court held an evidentiary hearing. At that time Jennifer Walker Mims, the alleged victim, testified that she had lied originally and that her father did not commit the acts for which he was convicted. Crystal Walker Williams, the younger sister of Jennifer Walker Mims, testified that she was aware of the friction between her sister and their parents involving Jennifer's boyfriend, death row inmate Mark Anthony Duke, and that she was totally unaware of anything that would indicate her father's guilt of the alleged crimes. Elizabeth Moorehead, the Guardian ad Litem appointed to represent Jennifer Walker Mims by the Chilton County Juvenile Court, confirmed the fact that Jennifer had recanted prior to trial and that she personally notified the Chilton County Juvenile Court and DHR investigators about the recantation prior to trial. David Karn, WALKER's trial attorney, then testified concerning his actions before and during trial, elaborating further on the efforts of the prosecutor to suppress evidence of Jennifer's recantation and also on the offer to allow a state conducted polygraph examination of WALKER. Tarrant Police Chief Jesse Sprayberry, a state licensed polygraph examiner, then took the stand and testified concerning the examination he personally performed on WALKER, from which he concluded that WALKER was truthful when he denied having molested Jennifer. At no point during this

proceeding did Jennifer Jordan, the prosecutor of this case, come forward to deny the allegations that were enumerated against her. She was absent throughout these proceedings. At the conclusion of legal arguments presented by both sides, the trial court adjourned, taking the case under advisement at that time.

After a lengthy period of consideration, the trial court entered an order on September 2, 2002, denying WALKER's rule 32 petition.

On March 14, 2003, the Alabama Court of Criminal Appeals in a memorandum decision affirmed the Chilton County Circuit Court's dismissal of WALKER's Rule 32 petition (a copy of the memorandum order dated March 14, 2003 issued by the Court of Criminal Appeals is attached hereto as Exhibit "A"). In so doing, the Court of Criminal Appeals held that WALKER essentially failed to raise the issues before the trial court and refused to rule on any of the merits raised in his appeal. On March 28, 2003 WALKER timely filed an application for Rehearing accompanied with a Motion to Amend Finding of Facts, which was denied by the Court of Criminal Appeals on April 18, 2003 (a copy of the order denying WALKER's Application for Rehearing issued by the Court of Criminal Appeals is attached hereto as Exhibit "B").

On August 15, 2003, the Supreme Court of Alabama affirmed the Alabama Court of Criminal Appeals in a Certificate of Judgment (a copy of the order denying the petition for Writ of Certiorari to the Court of Criminal Appeals is attached hereto as Exhibit "C").

## STATEMENT OF THE ISSUE

I.  IS WALKER'S CONVICTION DUE TO BE OVERTURNED BECAUSE IT WAS OBTAINED THROUGH THE UNCONSTITUTIONAL FAILURE OF THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO WALKER PRIOR TO TRIAL IN VIOLATION OF <u>BRADY VS. MARYLAND</u> AND ITS PROGENY?

## STATEMENT OF FACTS

In support of his appeal of the trial court's denial of his Ala. R. Crim. P. 32 Petition, WALKER adopted the Statement of Facts presented to the Alabama Court of Criminal Appeals in his direct appeal of the conviction (which is stated in its entirety below), Case No. CR 99-1730, along with the following undisputed information brought before the trial court during the Rule 32 evidentiary hearing.

The statement of facts contained in the initial direct appeal reads as follows:

"The following statement of facts is based on the testimony presented at trial, witness by witness. The statement of facts is only a broad and summary statement intended to be sufficient to acquaint this Court with the general nature of the case. A specific and detailed statement of facts as applicable and relevant to each issue is found under the treatment of each particular issue in this brief.

"Jennifer Walker ('Jennifer') was the only witness to provide independent testimony or evidence that the crimes charged actually occurred. Jennifer testified to the effect that she was 19 years old at the time of the trial, and her father was the defendant. [R 7]. Mr. Walker 'sexually abused her.' [R 7]. It started right before she turned 13, when she and her parents lived in Dallas County, Alabama. [R 7,8]. Jennifer stated that 'it started out little. He would just touch me between my legs or have me fondle him.' [R 10]. She testified that Mr. Walker also 'would mess with my breast and my butt.' [R 12].

"Jennifer testified to three incidents of sexual intercourse. [R 20]. Jennifer stated that the first incident in Chilton County occurred in the middle of the night when Mr. Walker came into the bedroom she shared with her sister, woke her up, and asked her to come into the living room where they had sexual 'intercourse on the couch.' [R 12, 24, 25]. On this occasion, there was nobody else in the house. [R 25].

"Jennifer testified that on another occasion Mr. Walker 'took me up to my mom and dad's bedroom' where they had intercourse. [R 13, 15].

"A third occasion occurred when Jennifer's mother was pregnant and Mr. Walker promised that 'it would not happen again. And the same thing over again happened in the bedroom while my mother was not there.' [R 15].

"Jennifer also testified that Mr. Walker asked her to perform oral sex on him but she refused. [R 14]. However, her father would perform oral sex on her. [R 20].

"When this abuse occurred, Jennifer's mother was 'never around,' although Jennifer's sister was home 'most of the time,' and 'at times her brother would be there.' [R 15].

"In 1996, DHR removed both Jennifer and her sister from her home about four hours after Jennifer told her school counselor she was being abused. [R 16-17]. On that occasion, Jennifer, by her own admission, put pressure on her sister Crystal to support and corroborate her allegations of abuse. [R 37]. Since that time, Jennifer 'had a lot of problems with [her] placements in foster homes and 'correctional like' facilities for teenagers. [R 17-18]. The problems that kept her from being reunited with her family had to do with the 'problems [she] continued to have' and not from the sexual abuse. [R 35].

"Jennifer claimed that she 'was made aware that my father had mentioned it [the alleged sexual abuse] to her [mother]. But on several accounts, I told my mother to make him stop.' [R 21].

"She also testified that about one year after she had been removed from her home by DHR, she 'backed off' her original story of abuse because she was scared of hurting her mother, and because her sister put pressure on her to recant but not because the sexual abuse did not occur.' [R 28,29,35]. Jennifer testified that she changed her original story 'because I was scared of hurting my mother....Because I knew she loved my father very much and that she didn't want the family to be torn apart.' [R 28,31].

"Jennifer testified that she tried to recant and even wrote a letter to the DA, the Judge, and the lawyers. [R 31]. Defendant's Exhibit One was a hand written letter dated April 7, 1997, from Jennifer 'to whom it may concern' [R 37] in which she admitted that she 'lied' about her father's sexual abuse in order to get 'out of the house [C 93]. (A copy of the letter dated April 7, 1997 written by Jennifer Walker is attached hereto as Exhibit "D"). However, Jennifer testified that her mother was with her when she wrote the letter to "whom it may concern", and that she wrote the letter 'because I had received a letter through my mother from my father saying that he was sorry for everything. And I got upset because my mother was trying to defend him again.' [R 54-55,56]. Jennifer did not keep a copy of the letter her father sent her because her 'mother wouldn't allow [her] to get out of the van unless [she] gave it back to her.' [57].

"On cross-examination, Jennifer admitted that approximately one year before this latest complaint to the school counselor of sexual abuse, she had made similar accusations against her father. On that prior occasion, she admitted to the DHR caseworker that she was lying [R 38] and the allegations were found to have no basis.

"When DHR removed Jennifer from her home, her boyfriend was Mark Anthony Duke ['Duke']. [R 42]. She admitted that Mr. Walker objected to her dating Duke but denied that she made the accusations of sexual abuse against her father for that reason. [R

43]. Jennifer claimed that she 'never snuck out' of her house but admitted that she continued to see Duke in spite of her father's instructions. [R 43].

"Jennifer had Duke in her house on one occasion and locked her brother out 'because [she] had plans with Mark' and she 'wanted some time alone with him.' [R 46].

"Jennifer denied telling a Mr. Horton, one of her foster parents, that she made 'all of this up,' and stated that if Mr. Horton testified otherwise he would be lying. [R 47-48].

"Jennifer admitted that, while she was in foster care and while Duke was incarcerated, she wrote a letter to Duke in which she admitted she was upset enough with her father to want him dead, and that she was upset because her father interfered with her 'love life' with Duke. [R 48, 53; C 15]. (Letter dated May 15, 1997 from Jennifer Walker to Mark Anthony Duke is attached hereto as Exhibit "E"). She did not mention her father's sexual abuse in the letter to Duke because she 'had told him before [she] left home about the sexual abuse.' [R 55].

"DHR social worker Kay Massler testified that she first received a report concerning Jennifer on March 15, 1996. [R 59]. She testified that on that same date, Jennifer was removed from her home and placed in a foster family home with the Hortons. [R 60]. Ms. Massler interviewed Jennifer's sister, Crystal confirmed Jennifer's allegations with Jennifer sitting in the same questioning room. [R 64]. Ms. Massler was aware that 'there had been an abuse report basically of the same nature made in September' of 1995 and that Jennifer had 'recanted that [earlier] incident.' [R 67].

"Megan Beasley testified that Jennifer confided in her about Mr. Walker's sexual abuse. [R 69]. She testified that Jennifer had 'lied before to us. But I don't know if she is lying now.' [R 70].

"Dawn Key was the residential counselor at Family Connections where both Jennifer and Crystal were residents for a time. [R 71-72]. Jennifer remained there for eight or nine months which was longer than the usual maximum stay of three months. [R 73]. Jennifer exhibited behaviors typical for children that have different kinds of family conflicts: 'Defiant behavior, inability to follow rules or unwillingness to follow rules, lying, not doing very well in school, truancy.' [R 74]. In her counseling sessions, Jennifer spoke 'in general, like general terms' about the sexual abuse but she never discussed it specifically. [R 74]. 'Jennifer said she had been sexually abused by her dad...She didn't give me the details as far as how it happened or those kinds of things.' [R 75]. She never said anything indicating that she was recanting her story and her story remained consistent during the months that she remained at Family Connections. [R 74].

"Ms. Key testified that Crystal 'would criticize Jennifer and blame Jennifer for the fact that they were in placement.' [R 77]. She further admitted that this could have been because Crystal knew that Jennifer's allegations were false. [R 79].

"The prosecution based its case on the testimony of these four witnesses - Jennifer Walker, Kay Massler, Megan Beasley, and Dawn Key.

"The defense first presented six of Jennifer's classmates or contemporaries, who, for the most part testified to Jennifer's character and lack of credibility. Jeremy Beasley was the first witness to testify for the defense. [R 82]. He testified that Jennifer's 'been known to lie about things.' [R 83]. He would not believe her if she testified under oath. [R 83].

"Heather McCloud testified that Jennifer's 'reputation is basically being a liar and some few other things,' [R 85]. She 'really did not know' if she could believe Jennifer under oath. [R 85].

"Catheryn Fowlyer testified that Jennifer 'would go out with different guys and stuff like that and then she just got to where she was constantly lying about things.' [R 87]. She really did not know if she would believe her under oath. [R 87]. Jennifer lived with Ms. Fowler for two weeks. Ms. Fowler testified that when Jennifer left 'she stole a bunch of my things and left with some bad opinions about she had tried to accuse my husband of something.' [R 87]. On cross examination, Ms. Fowler admitted that Jennifer did discuss this allegation of sexual abuse with her and that 'at first' she told Ms. Fowler she was afraid. [R 88].

"Catheryn Hardiman testified that Jennifer has 'been known to lie,' and that    would not believe her under oath. [R 90].

"Regina Short testified that she 'thought...sometimes Jennifer did' tell the truth, and that, if Jennifer testified under oath she would believe her. [R 93]. Ms. Short also testified that Jennifer told her about the sexual abuse, and that she never told her anything but that it was true. [R 94]. Ms. Short, a defense witness, was the only witness who testified that she would believe Jennifer under oath.

"Jada Holley testified that Jennifer lied to her 'a lot and then [told] the truth about other things.' [R 95]. If Jennifer testified in court, Jada would not believe her. [R 95].

"Leslie Clackler testified that Jennifer has 'been known not to be very truthful,' and that she would not believe her if Jennifer testified under oath. [R 99-100]. She further testified that Jennifer had told her that 'her daddy messed with her.' [R 101].

"Reverend Morris Horton and his wife were the foster parents Jennifer and Crystal had been placed with by DHR immediately after being removed from the Walker home. Rev. Horton testified: 'And I asked Jennifer point blank, I said, did your daddy mess with you? And she said, no, I just wanted to get out of the house... She just said it didn't happen.' [R 107]. Rev. Horton testified: 'Well, her statement was she just wanted to get away from home.' [R 110]. 'She was real imaginative in her stories. I considered them falsehoods a lot

9

of times.' [R 107, 110]. Jennifer 'acted up so much until... we called the Department of Human Resources and told them to come get her. We couldn't handle her.' [R 111]. Rev. Horton testified that Jennifer 'wanted to go out and stay out all the time, sometimes under the pretense of walking, going to walk around the block but would be gone two hours or three.' [R 108]. He indicated that he suspected that she snuck out of the house at night a 'bunch' to be with boys. [R 109].

"Rev. Horton also testified that 'We talked about it more than one time and talked with Crystal about it. Crystal told us again that her daddy never molested her. That she only said what she said to go along with Jennifer because Jennifer wanted her to be with her.' [R 122].

"The defendant's wife, Sue Walker testified repeatedly that she did not believe Jennifer, and that 'I just couldn't imagine James doing that.' [R 126, 135, 140, 141, 146]. She was never away from the house for an over night period. She testified that Jennifer made the allegations because 'she wanted out of the house.... Because she thought we were too strict on her...[over] dating boys, school work.' [R 129]. 'She was mad over us not letting her see Mark Anthony Duke.' [R 132].

"Mrs. Walker testified that in 1993, her niece, Amber Cashman, accused Mrs. Walker's father of toucher her, and Amber 'got removed out of the grandparents house and couldn't go back.' Jennifer knew about that incident [R 131]. It was the petitioner, James Walker, who reported that incident to DHR. [R 132].

"When Jennifer first accused her father of sexual abuse, DHR investigated, and 'Jennifer told them that she had lied and it was dropped.' [R 132]. In 1996, Jennifer was 13 years old and Mr. And Mrs. Walker did not allow her to date. They did not allow Jennifer to see Mark Anthony Duke because Mrs. Walker had seen Duke drunk at the skating rink. [R 133]. Later, they learned that Jennifer 'had been sneaking out to see him or calling him and she was still having contact with him.' [R 135]. Jennifer was also having problems at school and was being late for class and making bad grades. Mrs. Walker testified that Jennifer 'was defiant about anything that we said.' [R 133].

"Mrs. Walker denied that Jennifer had ever complained to her of any sexual abuse. [R 134]. Mrs. Walker was never away from home all night during the time period that Jennifer testified that she was sexually assaulted, and Mr. Walker had never been home by himself overnight. [R 136, 137].

"On cross-examination, Mrs. Walker testified that she never made any promises to Jennifer so Jennifer would drop the charges. [R 144]. Mrs. Walker denied that she ever directed Jennifer to draft any letter of recantation. [R 151]. She denied ever giving Jennifer any note written by the Petitioner. [R 154].

"Mr. Walker testified on his own behalf. He positively denied ever abusing Jennifer and testified at length to the disciplinary problems he was having with her. [R 159]. Among the issues were the problems Jennifer was having with boys, 'kissing and that kind of stuff going on.' [R 161]. Mr. Walker testified that Jennifer's disciplinary problems 'gradually got worse: Just total defiance, you know, as far as yelling at us, cursing us out, calling us names. There was nothing we could do about it. Just leave her alone and stay out of her life. It was just, you know, like this little devil kid hatched.' [R 163].

"Soon after Jennifer began seeing Mark Duke, Mr. Walker found out that Duke was involved in gang activities, 'drinking, coming in drunk, causing problems, razor blades hid in his mouth.' [R 164]. When Mr. Walker attempted to prohibit Jennifer from seeing Duke, Jennifer made 'threats of physical abuse, verbally abusing me and her mother, you know, threatening to report me for verbal abuse to DHR...She just turned into a grenade.' [R 165].

"On one occasion in late January or early February 1996, Mr. Walker came home early from work and discovered Jennifer and Duke alone. He 'ran' Duke out of his house. [R 167]. On another occasion, Mr. Walker's other children told him that Jennifer locked them out of the house 'until her and Duke finished what they were doing.' [R 167].

"The trial court denied the defense motion to admit into evidence the results of a polygraph test conducted by Jesse E. Sprayberry, despite the prosecutor's stipulation that the examiner was qualified. [R 178-179]. That report concludes that Mr. Walker answered truthfully when he denied ever having sexual intercourse, oral sex, sodomizing, or 'sexually abusing Jennifer in any way.' [R 178]. (Results of Polygraph Test that was conducted on May 14, 1998 by Sprayberry Polygraph Investigators is attached hereto as Exhibit "F").

In addition to those facts as presented to both the Alabama Court of Criminal Appeals and in this Memorandum, Walker put forth the following additional factual evidence during the Rule 32 hearing:

Subsequent to leveling accusations of sexual abuse against her father in 1996, Jennifer Renee Walker recanted her story on a number of occasions to various individuals.

First, Jennifer admitted that the story was a lie and that she hated her father so much that she wished he was dead in a letter she wrote to her then boyfriend Mark Duke who was in custody of the Shelby County authorities on a murder charge. [R. 27, 29-30]. (See Exhibit "E").

Second, while at the Gateway Home in Birmingham, Jennifer confessed to her counselor, Tim

Bowen, that the sexual abuse allegations she made against her father were false. [C. 15; R.26] (See Affidavit of Jennifer Renee Walker attached hereto as Exhibit "G").

Third, while talking with Elizabeth Moorehead, the attorney appointed her Guardian ad Litem by the Chilton County Juvenile Court, Jennifer admitted that her sexual abuse accusations against her father were false. [C.15; R.37, 53, 54]. According to Jennifer, Ms. Moorehead warned her that changing her testimony could result in a possible perjury charge and that Jennifer would more than likely find herself in jail as a result. [C.15; R.37]. Ms. Moorehead then informed both the Chilton County Juvenile Court and the Chilton County DHR that Jennifer wanted to recant at that time. [R.54-55] (See Exhibit "G").

Fourth, Jennifer recanted her accusations to the Assistant District Attorney prosecuting the case before the trial [C.15; R.37-38]. Rather than showing concern for the situation or even bothering to investigate the recantation, Assistant District Attorney Jennifer Jordan bluntly informed Jennifer Walker that she stay with her allegations of abuse or that she would be prosecuted for perjury. [C.15; R.37-38]. (See Exhibit "G"). Jennifer Jordan has yet to deny such charges.

## STATEMENT OF THE STANDARD OF REVIEW

The United States Supreme Court in *Brady v. Maryland* established the standard for determining whether a new trial is warranted because of the prosecution's suppression of exculpatory evidence:

> [T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to the guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87, 83 S. Ct. at 1196. In *United States v. Bagley*, the Supreme Court held that: (1) evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different;" and (2) A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). See also, *Ex parte Dickerson*, 517 So. 2d 628 (Ala. 1987).

In order to establish a possible *Brady* violation in the instant case, WALKER must establish the following: 1.) that the prosecution suppressed the evidence; 2) that the evidence was of a character favorable to his defense; and 3) that the evidence was material. See, *Ex parte Cammon*, 578 So. 2d 1089 (Ala. 1991); *Ex parte Brown*, 548 So. 2d 993 (Ala. 1989).

## ARGUMENT

I. WALKER'S CONVICTION IS DUE TO BE OVERTURNED BECAUSE IT WAS OBTAINED THROUGH THE UNCONSTITUTIONAL FAILURE OF THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO WALKER PRIOR TO TRIAL IN VIOLATION OF *BRADY V. MARYLAND* AND ITS PROGENY.

Prior to WALKER's trial on the charges whereby he was convicted and now serving, two materially specific and crucial pieces of information came to be known by the prosecution which were withheld from the defense in violation of *Brady v. Maryland* in order that a high profile sex offender conviction could be obtained. First, the alleged victim, Jennifer Renee Walker, had in fact recanted the allegations she had made against WALKER in a juvenile court hearing at which time both her attorney and the district attorney advised her that she faced a possible prosecution for perjury for doing so. Despite this occurrence, the District Attorney knowingly failed or refused to inform WALKER, his counsel or the trial court of this recantation before trial. Second, Jennifer Walker had written a letter to her then boyfriend, Mark Anthony Duke, in which she not only admitted that the charges of sexual abuse against WALKER were false, but she also showed a seething hatred for her father that would lead her to make up the charges for which he was convicted. While the Chilton County prosecutor was aware of this letter's existence, it took defense counsel issuing a subpoena to the Shelby County District Attorney's office for a copy to be obtained and even then he did not receive it until immediately before trial, during which the trial court ignored the import and incorrectly ruled it inadmissible.

The United States Supreme court in *Brady v. Maryland* established the standard for determining whether a new trial is warranted because of the prosecution's suppression of exculpatory

evidence:

> [T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to the guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87, 83 S. Ct. at 1196. In *United States v. Bagley* the Supreme Court held that: (1) evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different;" and (2) a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). See also, *Ex parte Dickerson*, 517 So. 2d 628 (Ala. 1987).

In order to establish a possible *Brady* violation in the instant case, WALKER must establish the following: 1. that the prosecution suppressed the evidence; 2. that the evidence was of a character favorable to his defense; and 3. that the evidence was material. See, *Ex parte Cammon*, 578 So. 2d 1089 (Ala. 1991); *Ex parte Brown*, 548 So. 2d 993 (Ala. 1989).

Prior to WALKER's trial on charges whereby he was convicted and now serving, two crucial pieces of evidence came to the attention of the prosecutor, who chose to suppress the information in violation of *Brady v. Maryland* despite its tending to indicate WALKER was not guilty of the crimes charged. First, the alleged victim had in fact recanted the allegations she had made against WALKER in a juvenile court hearing at which time both her attorney and the District Attorney advised her that she faced a possible prosecution for perjury for doing so. Despite this occurrence, the district attorney knowingly failed or refused to inform WALKER, his counsel or the trial court of this recantation before trial. The sheer lack of evidence beyond the word of the victim in the instant case makes the State's suppression of her personal recantation to the prosecutor even more

15

crucial since such information undermined the credibility of the State's entire case against WALKER.

It is not the fact that the alleged victim might have recanted once, but she recanted to a whole host of individuals, including:

1. Mark Duke, her then boyfriend who was the ultimate cause of tensions between her and WALKER leading to the allegations of sexual abuse against WALKER [R.27-30];

2. her younger sister Crystal [R.44];

3. Tim Bowen, her counselor at the Gateway home [C.15; R.26];

4. Elizabeth Moorehead, the Guardian ad Litem appointed by the Chilton County Juvenile Court [C.15; R.37, 53-54];

5. the Chilton County DHR investigators handling the Walker case [R.55]; and

6. Assistant District Attorney Jennifer Jordan who personally prosecuted the case [C.15-16; R.36-38].

The undisputed evidence presented by WALKER to the Chilton County trial court shows that the prosecutor handling the trial personally heard Jennifer Walker recant. But not only did Ms. Jordan fail or refuse to mention this to defense counsel, but in her desire to obtain a conviction at all costs went even further, forcing Jennifer Walker to withhold this information from the court during trial under threat of prosecution for perjury. Not only is this action a mere suppression of evidence in violation of *Brady* and denial of WALKER's due process rights, but it is also an egregious violation of ARPC § 3.3(a)(3) and (b) [prohibition against an attorney actively concealing or obstructing the obtaining of evidence, and prohibition against an attorney inducing a witness to testify falsely], and 3.8(1)(d) [prohibition against a prosecutor willfully failing to make a timely disclosure of any information negating the guilt of an accused].

Prior counsel for WALKER was fortunate enough to discover on his own that Jennifer Walker had recanted her story to other individuals, but such fortune does not eliminate the taint of the actions of the State immediately prior to and during trial of this matter. As noted previously, Jennifer Walker's original intent was to recant during trial [C.15-16; R. 19-20], but that she was bullied and threatened with a perjury prosecution by the State not to change her original story [C.15-16; R. 36-38]. The very fact that the State found it necessary to make such threats to its own witness in order to forge on with a tenuous case should have been brought to the trial court's attention as such information is clearly relevant and material to the case.

Furthermore, the prosecution further violated *Brady* by suppressing the letter Jennifer Walker wrote to Mark Anthony Duke in which she not only admitted that the sexual abuse allegations were false, but even went so far as to say that the pair would have been better off had they "offed" him instead. [R.28]. (See Exhibit "E") The undisputed evidence presented shows that the State was well aware that Jennifer was emotionally unstable and that she hated her father because he would not allow her to date an older boy named Mark Anthony Duke [C.15-16; R. 11-14, 16, 20, 44]. In connection with this relationship, it became known that Jennifer had written a letter to Duke while he was in the Shelby Count Jail awaiting prosecution on a murder charge. While the Chilton County District Attorney was aware of the letter's existence [R.61-64], it remained in possession of the Shelby County District Attorney's office, despite its obvious relevance to the prosecution of WALKER. In the letter Jennifer Walker in no uncertain terms admitted that she had fabricated the sexual abuse charges as a means of revenge against her father because he would not allow the pair to be together. [R. 27-30, 61-64]. When confronted with the information that defense counsel knew of the letter the prosecutor deftly avoided the subject and failed or refused to provide a copy. [R. 63-64]. It was only

17

after defense counsel served a subpoena requiring a copy be provided that the Shelby County District Attorney produced one, choosing to fax it to counsel's office during the weekend before the trial that was scheduled to start on Monday [R. 61-64]. Then, after deliberately stalling the provision of this crucial evidence, the State fought tooth and nail against admission of the letter despite its importance in proving both motive and bias on Jennifer's part, clearly being admissible under Ala. R. Evid. 613(b) and 616.

## CONCLUSION

Based upon the forgoing memorandum, WALKER submits that his bench conviction was improper and in violation of his due process rights. The prosecution suppressed the evidence (the only evidence the state had), that Jennifer Walker had recanted before trial and would have recanted during trial had she not feared prosecution of herself. This evidence is highly favorable to the defendant and material to the outcome of the case.

WHEREFORE, petitioner prays that the Court grant petitioner the right to a new trial or relief to which he may be entitled in this proceeding.

RESPECTFULLY SUBMITTED on this the 25 day of January, 2005.

Lindsay B. Erwin
ERW005
Attorney for Petitioner
101 Brisstol Lane
Birmingham, Alabama 35242
(205) 408-0928