FILED
Butler
2005 Mar-10  PM 02:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

---

## IN THE SUPREME COURT OF ALABAMA

---

| | |
|---|---|
| EX PARTE JAMES WILBERT WALKER, JR., | CASE NO._____ |
| (In re: James Wilbert Walker, Jr., | On Appeal from the Circuit Court of Chilton County, Alabama |
| Defendant/Petitioner, | |
| vs. | |
| State of Alabama, | CC 97-239.60 |
| Respondent). | |

---

## PETITION FOR WRIT OF CERTIORARI
## TO THE ALABAMA COURT OF CRIMINAL APPEALS

---

William R. Hill, Jr.
Counsel for Petitioner
P. O. Box 1106
Clanton AL 35046
(205) 280-3117
(205) 280-3103



EXHIBIT

ᴍ

## IN THE SUPREME COURT OF ALABAMA

EX PARTE JAMES WILBERT WALKER, JR.,   )
                                      )   CASE NO._____
(In re: James Wilbert Walker, Jr.,   )
                                      )   On Appeal from the
                                      )   Circuit Court of
              Defendant/Petitioner,   )   Chilton County,
                                      )   Alabama
vs.                                      )
                                      )   CC 97-239.60
State of Alabama,               )
                                      )
              Respondent).     )

## PETITION FOR WRIT OF CERTIORARI
## TO THE ALABAMA COURT OF CRIMINAL APPEALS

TO THE SUPREME COURT OF ALABAMA:

Comes now JAMES WILBERT WALKER, JR. (hereinafter referred to as "WALKER"), petitioner in the above-styled cause, and pursuant to ARAP 39, moves this Court for a writ of certiorari to the Alabama Court of Criminal Appeals. In support of said petition, WALKER states as follows:

### Procedural Background

Having exhausted all appellate remedies upon denial of his Motion for Writ of Certiorari by the Alabama Supreme Court of his direct appeal on conviction dated August 31, 2001, WALKER

filed a petition for relief from conviction under Ala.R.Crim.P. 32 with the Chilton County Circuit Court on January 23, 2002 [C.1,3-10], citing that his conviction was in violation of his due process constitutional rights in that: 1) the State had deliberately suppressed evidence prior to trial that not only had his daughter, the alleged victim, recanted her story but also that she had been threatened with a possible perjury prosecution if she dared to change her story in court; and 2) his attorney committed a number of errors that contributed to the negative result.

WALKER filed a pro se Motion for Writ of Habeas Corpus on April 10, 2002 [C.1,13-6]. In this motion WALKER petitioned the trial court to release him on the grounds of justice in that his daughter Jennifer, the alleged victim, had already confessed under oath that she had lied when she accused him of molesting her.

On April 16, 2002 WALKER filed a second pro se motion with the Chilton County Circuit Court, asking for an injunction in order to obtain "a fast and fair" hearing before the court on the pending matters [C.1,17-8].

2

In response to the motions filed by WALKER in this matter, the Chiton County District Attorney filed a motion to dismiss the Rule 32 petition on June 24, 2002, claiming: 1) that the issues had already been raised and ruled upon during the appellate process; 2) that there had been no showing of ineffective assistance of counsel to the level that court action was necessary; and 3) that there existed no issue upon which relief could be granted [C.1,19].

On June 27, 2002 the Chilton County Circuit Court held an evidentiary hearing [C.1;R.4-108]. At that time Jennifer Walker Mims, the alleged victim, testified that she had lied originally and that her father did not commit the acts for which he was convicted [R.5-41]. Crystal Walker Williams, younger sister of Jennifer Mims, testified that she was aware of the friction between her sister and their parents involving Mark Duke and that she was totally unaware of anything that would indicate her father's guilt of the alleged crimes [R.42-50]. Elizabeth Moorehead, the Guardian ad Litem appointed to represent Jennifer by the Chilton County Juvenile Court, confirmed the fact that Jennifer had recanted prior to trial and that she personally notified the Chilton County Juvenile

Court and DHR investigators about the recantation prior to trial [R.51-55]. David Karn, WALKER's trial attorney, then testified concerning his actions before and during trial, elaborating further on the efforts of the prosecutor to suppress evidence of Jennifer's recantation and also on the offer to allow a state conducted polygraph examination of WALKER [R.56-81]. Tarrant Police Chief Jesse Sprayberry, a state licensed polygraph examiner, then took the stand and testified concerning the examination he personally performed on WALKER, from which he concluded that WALKER was truthful when he denied having molested Jennifer [R.82-9]. And, finally, WALKER called Dr. Kimberly Ackerson, a clinical forensic psychologist, to testify regarding an examination she conducted of Jennifer Walker Mims [R.90-102]. At the conclusion of legal arguments presented by both sides, the trial court adjourned, taking the case under advisement at that time [R.108].

After a lengthy period of consideration, the trial court entered an order on September 2, 2002, denying WALKER's Rule 32 petition [C.1, 21].

On March 14, 2003, the Alabama Court of Criminal Appeals in a memorandum decision affirmed the Chilton County Circuit Court's dismissal of WALKER's Rule 32 petition (a copy of the memorandum order dated March 14, 2003 issued by the Court of Criminal Appeals is attached hereto as Exhibit "A"). In so doing, the Court of Criminal Appeals held that WALKER essentially failed raise the issues before the trial court and refused to rule on any of the merits raised in his appeal. On March 28, 2003 WALKER timely filed an application for Rehearing accompanied with a Motion to Amend Finding of Facts, which was denied by the Court of Criminal Appeals on April 18, 2003 (a copy of the order denying WALKER's Application for Rehearing issued by the Court of Criminal Appeals is attached hereto as Exhibit "B".)

## Statement of Facts

In support of his appeal of the trial court' denial of his ALA.R.CRIM.P. 32 petition, WALKER adopted the Statement of Facts presented to the Alabama Court of Criminal Appeals in his direct appeal of the conviction (which is stated in its entirety below), Case No. CR 99-1730, along with the following undisputed information brought before the trial court during the Rule 32 evidentiary hearing.

5

The statement of facts contained in the initial direct appeal reads as follows:

"The following statement of facts is based on the testimony presented at trial, witness by witness. The statement of facts is only a broad and summary statement intended to be sufficient to acquaint this Court with the general nature of the case. A specific and detailed statement of facts as applicable and relevant to each issue is found under the treatment of each particular issue in this brief.

"Jennifer Walker ('Jennifer') was the only witness to provide independent testimony or evidence that the crimes charged actually occurred. Jennifer testified to the effect that she was 16 years old at the time of the trial, and he father was the defendant.[R 7] Mr. Walker 'sexually abused her.' [R 7] It started right before she turned 13, when she and her parents lived in Dallas County, Alabama. [R 7,8] Jennifer stated that '[i]t started out little. He would just touch me between my legs or have me fondle him.' [R 10] She testified that Mr. Walker also 'would mess with my breast and my butt.' [R 12]

"Jennifer testified to three incidents of sexual intercourse. [R 20] Jennifer stated that the first incident in Chilton County occurred in the middle of the night when Mr. Walker came into the bedroom she shared with her sister, woke her up, and asked her to come into the living room where they had sexual 'intercourse on the couch.' [R 12,24,25] On this occasion, there was nobody else in the house. [R 25]

"Jennifer testified that on another occasion Mr. Walker 'took me up to my mom and dad's bedroom' where they had intercourse. [R 13,15]

"A third occasion occurred when Jennifer's mother was pregnant and Mr. Walker promised that 'it would not happen again. And the same thing over again

6

happened in the bedroom while my mother was not there.' [R 15-15]

"Jennifer also testified that Mr. Walker asked her to perform oral sex on him but she refused. [R 14] However, her father would perform oral sex on her. [R 20]

"When this abuse occurred, Jennifer's mother was 'never around,' although Jennifer's sister was home 'most of the time,' and 'at times [her] brother would be there.' [R 15]

"In 1996, DHR removed both Jennifer and her sister from her home about four hours after Jennifer told her school counselor she was being abused. [R 16-17] On that occasion, Jennifer, by her own admission, put pressure on her sister Crystal to support and corroborate her allegations of abuse. [R 37] Since that time, Jennifer 'had a lot of problems with [her] placements in foster homes and 'correctional like' facilities for teenagers. [R 17-18] The problems that kept her from being reunited with her family had to do with the 'problems [she] continued to have' and not from the sexual abuse. [R 35]

"Jennifer claimed that she 'was made aware that my father had mentioned it [the alleged sexual abuse] to her [mother]. But on several accounts, I told my mother to make him stop.' 21

"She also testified that about one year after she had been removed from her home by DHR, she 'backed off' her original story of abuse because she was scared of hurting her mother, and because her sister put pressure on her to recant but not because the sexual abuse did not occur.' [R 28,29,35] Jennifer testified that she changed her original story '[b]ecause I was scared of hurting my mother. ... Because I knew she loved my father very much and that she didn't want the family to be torn apart.' [R 28,31]

7

"Jennifer testified that she tried to recant and even wrote a letter to the DA, the judge, and the lawyers. [R 31] Defendant's Exhibit One was a hand written letter dated April 7, 1997, from Jennifer 'to whom it may concern' [R 37; C 93-94] in which she admitted that she 'lied' about her father's sexual abuse in order to get 'out of the house:' [C 93]

'My name is Jennifer Walker and I am writing this letter with concerns to my well being. I have been in DHR's custody since March of 1996 because I accused my father of sexually abusing me. At the time of this I didn't want to stay at home because I felt that I was being treated unfairly since I never got my way at the house. I wanted out of the house so bad that I was willing to do anything so I lied to do so. I thought that once I was out of my parents custody that I would be allowed to have more freedom. Things have not went the way I thought they would, and now I have realized that I was wrong for what I had done to my family. I am also tired of being put on medications because doctors & counselors think it will help and being sent to so many places every two or three months, especially if I don't need to be there. I had spoke with Ms. Holiday and Ms. Hilyer in January and I had told them I had lied and why. Everyone keeps telling me that the things that have happened to me since I've been in DHR's custody have happened because they feel that it is for the best for me and my interest, but their again no one will listen to what I need to say.

'No one will even try to understand that I want to go home and that I miss watching my brothers growing up and my sister, and especially my mother & father.

8

But since everyone doesn't care about how I'm feeling and won't give me a chance to talk, it's not just tearing me apart but also my family. I didn't realize at the time I had accused my father for sexually abusing me, that I was really hurting myself by hurting my family. I am deeply sorry for what will be over soon. I just want to go home that's all? Please try to understand.

"[C 92-93]

"Jennifer testified that her mother told her that if she would recant her story and say that she lied, 'they could get everything over with. There wouldn't be no trial and I could come back home. And on occasions my sister would do the same.' {R 30 35]

"Jennifer denied 'dating' Jeremy Beasley, claiming that he 'used to be a friend.' [R 38-39,44]

"On cross-examination, Jennifer admitted that approximately one year before this latest complaint to the school counselor of sexual abuse, she had made similar accusations against her father. On that prior occasion, she admitted to the DHR caseworker that she was lying [R 38] and the allegations were found to have no basis.

"When DHR removed Jennifer from her home, her boyfriend was Mark Anthony Duke ['Duke']. [R 42] She admitted that Mr. Walker objected to her dating Duke but denied that she made the accusations of sexual abuse against her father for that reason. [R 43] Jennifer claimed that she 'never snuck out' of her house but admitted that she continued to see Duke in spite of her father's instructions. [R 43]

"Jennifer had Duke in her house on one occasion and locked her brother out 'because [she] had plans with Mark' and she 'wanted some time alone with him.' [R 46]

9

"Jennifer denied telling a Mr. Horton, one of her foster parents, that she made 'all of this up,' and stated that if Mr. Horton testified otherwise he would be lying. [R 47-48]

"Jennifer admitted that, while she was in foster care and while Duke was incarcerated, she wrote a letter to Duke in which she admitted she was upset enough with her father to want him dead, and that she was upset because her father interfered with her 'love life' with Duke. [R 48,53] However, Jennifer testified that her mother was with her when she wrote the letter to Duke, and that she wrote the letter 'because I had received a letter through my mother from my father saying that he was sorry for everything. And I got upset because my mother was trying to defend him again.' [R 54-55,56] She did not mention her father's sexual abuse in the letter to Duke because she 'had told him before [she] left home about the sexual abuse.' [R 55] Jennifer did not keep a copy of the letter her father send her because her 'mother wouldn't allow [her] to get out of the van unless [she] gave it back to her.' [R 57]

"DHR social worker Kay Massler testified that she first received a report concerning Jennifer on March 15, 1996. [R 59] She testified that on that same date, Jennifer was removed from her home and placed in a foster family home with the Hortons. [R 60] Ms. Massler interviewed Jennifer's sister, Crystal, who confirmed Jennifer's allegations. [R 64] Ms. Massler was aware that 'there had been an abuse report basically of the same nature made in September' of 1995 and that Jennifer had 'recanted that [earlier] incident.' [R 67]

"Megan Beasley testified that Jennifer confided in her about her Mr. Walker's sexual abuse. [R 69] She testified that Jennifer had 'lied before to us. But I don;t know if she is lying now.' [R 70]

"Dawn Key was the residential counselor at Family Connections where both Jennifer and Crystal

10

were residents for a time. [R 71-72] Jennifer remained there for eight or nine months which was longer than the usual maximum stay of three months. [R 73] Jennifer exhibited behaviors typical for children that have different kinds of family conflicts: 'Defiant behavior, inability to follow rules or unwillingness to follow rules, lying, not doing very well in school, truancy.' [R 74] In her counseling sessions, Jennifer spoke 'in general, like general terms' about the sexual abuse but she never discussed it specifically. [R 74] 'Jennifer said she had been sexually abused by her dad. ... She didn't give me the details as far as how it happened or those kinds of things.' [R 75] She never said anything indicating that she was recanting her story and her story remained consistent during the months that she remained at Family Connections. [R 74]

"Ms. Key testified that Crystal 'would criticize Jennifer and blame Jennifer for the fact that they were in placement.' [R 77] She further admitted that this could have been because Crystal knew that Jennifer's allegations were false. [R 79]

"The prosecution based its case on the testimony of these four witnesses - Jennifer Walker, Kay Massler, Megan Beasley, and Dawn Key.

"The defense first presented six of Jennifer's classmates or contemporaries, who, for the most part, testified to Jennifer's character and lack of credibility. Jeremy Beasley was the first witness to testify for the defense. [R 82] He testified that Jennifer's 'been known to lie about things.' [R 83] He would not believe her if she testified under oath. [R 83]

"Heather McCloud testified that Jennifer's 'reputation is basically being a liar and some few other things.' [R 85] She 'really did not know' if she could believe Jennifer under oath. [R 85]

"Catheryn Fowler testified that Jennifer 'would go out with different guys and stuff like that and then she just got to where she was constantly lying about things. [R 87] She really did not know if she would believe her under oath. [R 87] Jennifer lived with Ms. Fowler for two weeks. Ms. Fowler testified that when Jennifer left 'she stole a bunch of my things and left with some bad opinions about she had tried to accuse my husband of something.' [R 87] On cross examination, Ms. Fowler admitted that Jennifer did discuss this allegation of sexual abuse with her and that 'at first' she told Ms. Fowler she was afraid. [R 88]

"Catheryn Hardiman testified that Jennifer has 'been know to lie,' and that she would not believe her under oath. [R 90]

"Regina Short testified that she 'thought ... sometimes Jennifer] did' tell the truth, and that, if Jennifer testified under oath she would believe her. [R 93] Ms. Short also testified that Jennifer told her about the sexual abuse, and that she never told her anything but that it was true. [R 94] Ms. Short, a defense witness, was the only witness who testified that she would believe Jennifer under oath.

"Jada Holley testified that Jennifer lied to her 'a lot and then [told] the truth about other things.' [R 95] If Jennifer testified in court, Jada would not believe her. [R 95]

"Leslie Clackler testified that Jennifer has 'been known not to be very truthful,' and that she would not believe her if Jennifer testified under oath. [R 99-100] She further testified that Jennifer had told her that 'her daddy messed with her.' [R 101].

"Reverend Morris Horton and his wife were the foster parents Jennifer and Crystal had been placed with by DHR immediately after being removed from the Walker home. Rev. Horton testified: 'And I asked

Jennifer point blank, I said, did your daddy mess with you? And she said, no, I just wanted to get out of the house. ... She just said it didn't happen.' [R 107] Rev. Horton testified: 'Well, her statement was she just wanted to get away from home.' [R 110] 'She was real imaginative in her stories. I considered them falsehoods a lot of times.' [R 107,110] Jennifer 'acted up so much until ... [w]e called the Department of Human Resources and told them to come get her. We couldn't handle her.' [R 111] Rev. Horton testified that Jennifer 'wanted to go out and stay out all the time, sometimes under the pretense of walking, going to walk around the block but would be gone two hours or three.' [R 108] He indicated that he suspected that she snuck out of the house at night a 'bunch' to be with boys. [R 109]

"Rev. Horton also testified that '[w]e talked about it more than one time and talked with Crystal about it. Crystal told us again that her daddy never molested her. That she only said what she said to go along with Jennifer because Jennifer wanted her to be with her.' [R 122]

"The defendant's wife, Sue Walker testified repeatedly that she did not believe Jennifer, and that 'I just couldn't imagine James doing that.' [R 126,135,140,141,146] She testified that Jennifer made the allegations because '[s]he wanted out of the house. ... B]ecause she though we were too strict on her. ... [over] [d]ating biys, school work.' [R 129] 'She was mad over us not letting her see Mark Duke.' [R 132].

"Mrs. Walker testified that in 1993, her niece, Amber Cashman, accused Mrs. Walker's father of touching her, and Amber 'got removed out of the grandparents house and couldn't go back.' Jennifer knew about that incident. [R 131] It was Mr. Walker who reported that incident to DHR. [R 132]

"When Jennifer first accused her father of sexual abuse, DHR investigated, and 'Jennifer told

them that she had lied and it was dropped.' {R 132]
In 1996, Jennifer was 13 years old and Mr. and Mrs.
Walker did not allow her to date. They did not allow
Jennifer to see Mark Duke because Mrs. Walker had
seen Duke drunk at the skating rink. [R 133] Later,
they learned that Jennifer 'had been sneaking [out]
to see him or calling him and she was still having
contact with him.' [R 135]. Jennifer was also having
problems at school and was being late for class and
making bad grades. Mrs. Walker testified that
Jennifer 'was defiant about anything that we said.'
[R 133]

"Mrs. Walker denied that Jennifer had ever
complained to her of any sexual abuse. [R 134] Mrs.
Walker was never away from home all night, and Mr.
Walker had never been home by himself overnight. [R.
136,137]

"On cross-examination, Mrs. Walker testified
that she was 14 years old when she married Mr. Walker
and that Mr. Walker was 19 years old. [R 142] She
admitted that she had been sexually abused by her
father. [R 143] She denied that she made any promises
to Jennifer so Jennifer would drop the charges. [R
144]

"Mrs. Walker denied that she ever directed
Jennifer to draft any letter of recantation. [R 151]
She denied ever giving Jennifer any note written by
Mr. Walker. [R 154]

"When Jennifer made these allegations of sexual
abuse against her father, Mrs. Walker 'was already
mad because of what Jennifer done the evening
before.' [R 146] Mrs. Walker explained that Jennifer
had forged a note, apparently for the school bus, and
had gone to a friend's home and met Mark Duke. [R
155]

"Mr. Walker testified on his own behalf. He
positively denied ever abusing Jennifer and testified
at length to the disciplinary problems he was having

14

with her. [R 159] Among the issues were the problems Jennifer was having with boys, 'kissing and that kind of stuff going on.' [R 161] Mr. Walker testified that Jennifer's disciplinary problems 'gradually got worse':

> "'Just total defiance, you know, as far as yelling at us, cursing us out, calling us names. There was nothing we could do about it. Just leave her alone and stay out of her life. It was just, you know, like this little devil kid hatched.'

"[R 163]

"Soon after Jennifer began seeing Mark Duke, Mr. Walker found out that Duke was involved in gang activities, 'drinking, coming in drunk, causing problems, razor blades hid in his mouth.' [R 164] When Mr. Walker attempted to prohibit Jennifer from seeing Duke, Jennifer made 'threats of physical abuse, verbally abusing me and her mother, you know, threatening to report me for verbal abuse to DHR. ... She just turned into a grenade.' [R 165]

"On one occasion in late January or early February 1996, Mr. Walker came home early from work and discovered Jennifer and Duke alone. He 'ran' Duke out of his house and 'told him if I ever catch you here at the house again and I'm not here or anyone here I don't care how old they are, I will beat him to death.' [R 167] On another occasion, Mr. Walker's other children told him that Jennifer locked them out of the house 'until her and Duke finished what they were doing.' [R 167]

"The trial court denied the defense motion to admit into evidence the results of a polygraph test conducted by Jesse E. Sprayberry, despite the prosecutor's stipulation that the examiner was qualified. [R 178-179] That report concludes that Mr. Walker answered truthfully when he denied ever having sexual intercourse, oral sex, sodomizing, or

15

'sexually abusing Jennifer in any way.' See Defense Exhibit No. 4. [R 178]"

Brief of Appellant in <u>Walker v. Alabama</u>, Court of Criminal Appeals Case No. CR 99-1730, pp. 10-23.

In addition to those facts as presented to both the Alabama Court of Criminal Appeals and this Court on direct appeal, WALKER put forth the following additional factual evidence during the Rule 32 hearing:

Subsequent to leveling accusations of sexual abuse against her father in 1996 Jennifer Renee Walker recanted her story on a number of occasions to various individuals.

First, Jennifer admitted that the story was a lie and that she hated her father so much that she wished he was dead in a letter she wrote to her then boyfriend Mark Duke who was in custody of the Shelby County authorities on a murder charge [R.27,29-30].

Second, while at the Gateway Home in Birmingham, Jennifer confessed to her counselor, Tim Bowen, that the sexual abuse

allegations she made against her father were false [C. 15; R.26].

Third, while talking with Elizabeth Moorehead, the attorney appointed her Guardian ad Litem by the Chilton County Juvenile Court, Jennifer admitted that her sexual abuse accusations against her father were false [C.15;R.37;53-4]. According to Jennifer Ms. Moorehead warned her that changing her testimony could result in a possible perjury charge and that Jennifer would more than likely find herself in jail as a result [C.15;R.37]. Ms. Moorehead then informed both the Chilton County Juvenile Court and the Chilton County DHR that Jennifer wanted to recant at that time [R.54-5].

Fourth, Jennifer recanted her accusations to the Assistant District Attorney prosecuting the case before the trial [C. 15; R. 37-8]. Rather than showing concern for the situation or even bothering to investigate the recant, Assistant District Attorney Jennifer Jordan bluntly informed Jennifer Walker that she stay with her allegations of abuse or that she would be prosecuted for perjury [C.15;R.37-8].

Another undisputed fact placed before the trial court during the evidentiary hearing was that WALKER voluntarily took a polygraph exam conducted by Tarrant Police Chief Jesse Sprayberry, a state licensed polygraph examiner, on May 14, 1998 [R.86-8]. Based upon the results of the comprehensive polygraph examination conducted, Chief Sprayberry concluded that WALKER was truthful when he denied committing the acts for which he is now serving in the state penitentiary [R.67-9,88]. Upon hearing these results, defense counsel David Karn informed the prosecutor of the test and results, even offering to have WALKER take another examination conducted by an expert of the State's choosing which was declined [R.69-71,78].

Pursuant to ARAP 39(d) counsel hereby states to the Honorable Court that the Statement of Facts as recited above is a verbatim recitation of the statement of facts presented to the Alabama Court of Criminal Appeals on appeal and also contained in the Motion to Amend Finding of Facts filed with the Alabama Court of Criminal Appeals on March 28, 2003.

WILLIAM R. HILL, JR.
Counsel for Petitioner

### Reasons Why the Writ Should Be Granted

WALKER alleges as grounds for the issuance of the writ the following:

The basis of this petition for the writ is that the Court of Criminal Appeals affirmation of the Circuit Court's decision violates WALKER's constitutionally guaranteed right to a fair trial as guaranteed by U.S. Const. amend. VI and Ala. Const. art. I § 6.

Prior to WALKER's trial on the charges whereby he was convicted and now serving, two crucial pieces of evidence came to the attention of the prosecutor, who chose to suppress the information in violation of <u>Brady v. Maryland</u> despite its tending to indicate the WALKER was not guilty of the crimes charged. First, the alleged victim had in fact recanted the allegations she had made against WALKER in a juvenile court hearing at which time both her attorney and the district attorney advised her that she faced a possible prosecution for perjury for doing so. Despite this occurrence, the district attorney knowingly failed or refused to inform WALKER, his

counsel or the trial court of this recantation before trial. Second, the prosecution knew of a letter Jennifer wrote to Mark Duke in which she not only admitted that the charges were false but also detailed her reasons for lying about her father.

Furthermore, it is a matter of statutory law that a trial court is obligated to make specific findings of fact relating to each material issue of fact presented by a petitioner in support of his claim that he is entitled to post-conviction remedies under ALA.R.CRIM.P. 32.9(d). The order issued by the Chilton County Circuit Court on September 2, 2002 does not meet this required standard and is therefore due to be remanded for a more specific finding of facts upon which the trial court based its decision.

## CONCLUSION

This Court should grant the Petition for Writ of Certiorari and review the decision of the Court of Criminal Appeals in this case. This case was incorrectly decided contrary to U.S. CONST. amend. VI, ALA. CONST. art. I § 6, Brady v. Maryland and its progeny as well as ALA.R.CRIM.P. 32.9(d).

WALKER respectfully requests that after a preliminary examination of this matter, the writ of certiorari be granted and that this Court proceed under its rules to review the issues in this case. Walker further relies upon his brief in support of the Petition for Writ of Certiorari which is filed herewith.


RESPECTFULLY SUBMITTED on this the 30ᵗʰ day of April, 2003.


_____
WILLIAM R. HILL, JR.
Counsel for Petitioner
P. O. Box 1106
Clanton AL 35046
(205) 280-3117
(205) 280-3103

21

IN THE SUPREME COURT OF ALABAMA

EX PARTE JAMES WILBERT WALKER, JR., )
                                     )    CASE NO._____
(In re: James Wilbert Walker, Jr.,   )
                                     )    On Appeal from the
                                     )    Circuit Court of
            Defendant/Petitioner,    )    Chilton County,
                                     )    Alabama
vs.                                  )
                                     )    CC 97-239.60
State of Alabama,                    )
                                     )
            Respondent).             )

## BRIEF IN SUPPORT OF
## PETITION FOR WRIT OF CERTIORARI

COMES NOW the above-named Petitioner, JAMES WILBERT WALKER, JR., ("WALKER"), in and by counsel of record and files this brief in support of his Petition for Writ of Certiorari to issue to the Alabama Court of Criminal Appeals. In support of his Petition, WALKER avers as follows:

**I.      WALKER'S CONVICTION IS DUE TO BE OVERTURNED BASED UPON THE BLATANTLY UNCONSTITUTIONAL ACTIONS COMMITTED BY THE STATE IN ITS EFFORTS TO OBTAIN A CONVICTION.**

In dismissing WALKER's Rule 32 petition, the trial court totally ignored the illegal and unconstitutional efforts put

forth by the State in order to obtain the underlying conviction. The undisputed evidence presented by WALKER to the Chilton County trial court shows that the prosecutor handling the trial not only knew that the alleged victim had recanted to a whole host of individuals, but also personally heard Jennifer Walker recant. Furthermore, not only did Ms. Jordan fail or refuse to mention this material fact to defense counsel, but in her desire to obtain a conviction at all costs went even further, forcing Jennifer Walker to withhold this information from the court during trial under threat of prosecution for perjury [C.15; R.37-8]. Not only is this action a mere suppression of evidence in violation of <u>Brady</u> and denial of WALKER's due process rights, but it is also a egregious violation of ARPC §§ 3.3(a)(3) [prohibition against an attorney offering evidence known to be false], 3.4(a) {prohibition against an attorney actively concealing or obstructing the obtaining of evidence] &(b) [prohibition against an attorney inducing a witness to testify falsely], and 3.8(1)(d) [prohibition against a prosecutor willfully failing to make a timely disclosure of any information negating the guilt of an accused], as well as ALA. CODE § 13A-10-124(a)(1) [witness tampering].

23

While it may be true that prior counsel for WALKER was fortunate enough to discover on his own that Jennifer Walker had recanted her story to other individuals, such fortune does not eliminate the taint of the actions of the State immediately prior to and during trial of this matter. As noted throughout the testimony during the Rule 32 evidentiary hearing, Jennifer Walker's original intent was to recant during trial [C.15-6;R.19-20]but that she was bullied and threatened with a perjury prosecution by the State not to change her original story [C.15-6;R.36-8].

Furthermore, WALKER respectfully would point out to this Court that the <u>Carr</u> holding would not apply to the actions committed by the State in suppressing any recantation. As noted by the Court in its memorandum order dated March 14, 2003, <u>Carr</u> states that there can be no suppression by the State "of evidence already known by and available to the defendant prior to trial." <u>Carr v. State</u>, 505 So.2d 1294, 1297 (Ala. Crim. App. 1987). WALKER would further respectfully point out, however, that there is no possible way he knew or should have known of Ms. Jordan's improper attempts to prevent his daughter from recanting her story during the trial unless the State admitted

such to either him or his attorney which they did not do. The undisputed evidence before the trial court showed that WALKER was completely unaware of these acts until his daughter admitted such to him a subsequent time after his conviction.

RESPECTFULLY SUBMITTED on this the 30th day of April, 2003.

_____
William R. Hill, Jr.
*Counsel for Appellant*

25

IN THE SUPREME COURT OF ALABAMA

EX PARTE JAMES WILBERT WALKER, JR.,  )
                                         )    CASE NO. _____
(In re: James Wilbert Walker, Jr.,  )
                                         )    On Appeal from the
                                         )    Circuit Court of
             Defendant/Petitioner,  )    Chilton County,
                                       )    Alabama
vs.                                 )
                                       )    CC 97-239.60
State of Alabama,                )
                                       )
             Respondent).        )

## CERTIFICATE OF SERVICE

     I hereby certify that I have this date caused to be served a copy of the foregoing petition upon all parties in this cause by placing a copy of same in the United States mail, postage prepaid, addressed as follows on this the 30th day of April , 2003:

Hon. Lane Mann, Clerk
Alabama Court of Criminal Appeals
300 Dexter Avenue
Montgomery AL 36104-3741


Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery AL 36130

WILLIAM R. HILL, JR.

26

# Court of Criminal Appeals
State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

MEMORANDUM

CR-01-2524                    Chilton Circuit Court CC-97-239.60

James Wilbert Walker, Jr. v. State of Alabama

SHAW, Judge.

James Wilbert Walker, Jr. appeals the circuit court's denial of his Rule 32, Ala.R.Crim.P., petition for postconviction relief, in which he attacked his 1999 convictions for rape in the second degree and sodomy in the first degree. Walker was sentenced to 15 years' imprisonment for each conviction, to run concurrently. This Court affirmed his convictions and sentences on direct appeal in an unpublished memorandum issued on April 20, 2001. See Walker v. State, (CR-99-1730) ___ So. 2d ___ (Ala. Crim. App. 2001)(table). The Alabama Supreme Court denied certiorari review and a certificate of judgment was issued on August 31, 2001.

Walker filed the present petition on January 23, 2002. In his petition, Walker alleged that the State suppressed exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and that his trial counsel was ineffective. After receiving a response from the State, the circuit court

*Exhibit "A"*

held an evidentiary hearing on the petition on June 27, 2002. The circuit denied the petition on September 3, 2002.

Initially, we note that Walker does not pursue his ineffective-assistance-of-trial-counsel claim on appeal. Therefore, that claim is deemed abandoned. See, e.g., Brownlee v. State, 666 So. 2d 91, 93 (Ala. Crim. App. 1995)("We will not review issues not listed and argued in brief.").

As for the Brady claim, Walker argues that the State improperly suppressed the fact that the victim had recanted her allegations of rape and sodomy to several people before the trial, including her attorney, her then-boyfriend, her younger sister, her counselor at a group home where she was placed after being removed from her parents' custody, investigators with the Department of Human Resources, and the district attorney prosecuting the case. In his brief, Walker concedes that his trial counsel, in fact, knew about the recantations before the trial; he argues that "[w]hile it may be true that prior counsel for Walker was fortunate enough to discover on his own that [the victim] had recanted her story to other individuals, such fortune does not eliminate the taint of the actions of the State." (Walker's appellate brief at p. 19.) However, contrary to Walker's contention, "[t]here can be no suppression by the State of evidence already known by and available to the defendant prior to trial." Carr v. State, 505 So. 2d 1294, 1297 (Ala. Crim. App. 1987). In addition to Walker's concession on appeal, at the Rule 32 hearing, Walker's trial counsel testified that he knew that the victim had recanted her allegations to various people before trial, that he could not recall whether the district attorney had informed him that the victim had recanted to the district attorney personally, but that he had discussed the other recantations with the district attorney before trial. The record of Walker's direct appeal reflects that the victim testified, on direct examination by the district attorney, that she had told several people, including her "counselors ... the DA, the Judge, [and] lawyers" that her initial allegations against her father were not true, and that Walker's trial counsel vigorously cross-examined her about those recantations. (Record on Direct Appeal, 31.) Because Walker clearly knew about the recantations, there was no suppression and, thus, no Brady violation. Moreover, with

2

respect to the letter the victim wrote to her boyfriend before trial in which she recanted, the record from Walker's direct appeal reflects that Walker raised this particular claim at trial and on direct appeal; the claim was decided adversely to him because he had possession of the letter before trial. Therefore, any _Brady_ claim regarding the letter is procedurally barred by Rules 32.2(a)(2) and (a)(4), Ala.R.Crim.P., because it was raised and addressed at trial and on appeal.

Walker also contends that the circuit court's order denying his petition was deficient because, he says, it did not include specific findings of fact regarding the merits of his claims. However, Walker did not raise this issue in the circuit court; therefore, it is deemed to be waived. See _Whitehead v. State_, 593 So. 2d 126 (Ala. Crim. App. 1991).

Based on the foregoing, the judgment of the circuit court denying Walker's Rule 32 petition is affirmed.

Affirmed by memorandum.

McMillan, P.J., and Cobb, Baschab, and Wise, JJ., concur.

3

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA
### JUDICIAL BUILDING, 300 DEXTER AVENUE
### P.O. BOX 301555
### MONTGOMERY, AL 36130-1555

**H. W. "Bucky" McMILLAN**
**Presiding Judge**
**SUE BELL COBB**
**PAMELA W. BASCHAB**
**GREG SHAW**
**A. KELLI WISE**
**Judges**

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

**Hon. Mike Smith, Circuit Clerk**
**Hon. Joseph G. L. Marston, III, Asst. Atty.**
**Gen.**
**Hon. William R. Hill, Jr., Attorney**

RE:  CR-01-2524
James Wilbert Walker, Jr. v. State of Alabama (Appeal
from Chilton Circuit Court: CC97-239.60).

Dear Sir or Madam:

You are hereby notified that on April 18th, 2003 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for rehearing overruled.

Lane W. Mann
**Clerk**
**Court of Criminal Appeals**

LWM/ lk

NOTE: If you are filing a petition for certiorari with the Alabama Supreme Court, Rule 39(e), Alabama Rules of Appellate Procedure, states that a copy of the petition shall be filed with this Court.  Please be advised that your failure to comply with this requirement could result in the issuance of a premature Certificate of Judgment.

Exhibit "B"