COURT OF CRIMINAL APPEALS NO. _CR-01- 2524_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _Chilton_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC-97-239.60_

CIRCUIT JUDGE _Sibley Reynolds_

Type of Conviction / Order Appealed From: _Rule 32_

Sentence Imposed: _Denied_

Defendant Indigent: [X] YES  [ ] NO

_James W. Walker Jr._

NAME OF APPELLANT

_William Hill_ · _205-280-3117_
(Appellant's Attorney)                (Telephone No.)

_P.O. Box 1106_
(Address)

_Clanton_ , _AL._  _35046_
(City)        (State)        (Zip Code)

### V.

STATE OF ALABAMA

NAME OF APPELLEE

State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter name and address of municipal attorney below.

(For Court of Criminal Appeals Use Only)



60044
1 VD1

# CLERK'S INDEX TO TRANSCRIPT

- CASE ACTION SUMMARY                                              1-2
- PETITION FROM RELIEF (RULE 32)                                   3-10
- MOTION TO CONTINUE                                               11-12
- MOTION FOR WRIT OF HABEUS CORPUS                                 13-16
- MOTION FOR INJUNCTION                                            17-18
- MOTION TO DISMISS                                                19
- ORDER FOR TRANSPORT                                              20
- ORDER ON RULE 32 PETITION                                        21
- NOTICE OF APPEAL                                                 22-23
- MOTION FOR STATE TO PROVIDE TRANSCRIPT OF RECORD                 24-26
- CLERKS NOTICE OF APPEAL                                          27
- REPORTERS TRANSCRIPT ORDER                                       28
- DOCKETING STATEMENT                                              29-30
- ORDER                                                            31
- REQUEST FOR LOCAL EXTENSION                                      32
- MEMO FROM COURT OF CRIMINAL APPEALS                              33
- REPORTERS TRANSCRIPT OF APPEAL                                   1-108
- REPORTER CERTIFICATE OF COMPLETION                               109
- CERTIFICATE OF COMPLETION BY COURT CLERK                         110

```
ACR0372                ALABAMA JUDICIAL INFORMATION SYSTEM    CASE: CC 1997 000239.60
OPER: TEC                    CASE ACTION SUMMARY
PAGE:   1                      CIRCUIT  CRIMINAL                RUN DATE: 01/24/2002
========================================================================
IN THE CIRCUIT COURT OF  CHILTON                                      JUDGE: SGR
```

STATE OF ALABAMA                    VS        WALKER JAMES WILBERT,JR.
                                              CHILTON COUNTY JAIL Prison
CASE: CC 1997 000239.60                              Kilby Prison
                                              CLANTON, AL  35045 0000

DOB: 12/16/1960          SEX: M  RACE: W  HT: 6 00  WT: 180   HR: BRO EYES: BRO
SSN: 419902102  ALIAS NAMES:
========================================================================
CHARGE01: RULE 32-FELONY          CODE01: RULE  LIT: RULE 32-FELONY TYP: F #: 001
OFFENSE DATE:                             AGENCY/OFFICER: 0140000

DATE WAR/CAP ISS:                         DATE ARRESTED:
DATE     INDICTED: 08/14/1997             DATE    FILED: 01/23/2002
DATE     RELEASED:                        DATE  HEARING:
BOND     AMOUNT:           5.00              SURETIES:

DATE 1:            DESC:                   TIME: 0000
DATE 2:            DESC:                   TIME: 0000

TRACKING NOS: Billy Hill            /                        /

   DEF/ATY: BOWEN WILLIAM M JR            TYPE: R                      TYPE:
            WHITE, DUNN & BOOKER
            2025 3RD AVE N  #600
            BIRMINGHAM    AL 35205                          00000

PROSECUTOR:

========================================================================
OTH CSE:  000000000000 CHK/TICKET NO:                    GRAND JURY: F97108
COURT REPORTER:              SID NO:       000000000
DEF STATUS: PRISON          DEMAND:                          OPER: TEC
NOTE: POSSIBLE AW: CC199700023900
========================================================================
DATE        ACTIONS, JUDGEMENTS, AND NOTES
========================================================================
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 1-23-02 | Rule 32 Filed by Attorney Hill. Copy sent to DA |
| 2-22-02 | Case set for Rule 32 Hearing at 1:30 p.m. on 6-7-02 (SR) |
| 2-26-02 | Copy of CAS sent to Att. Hill & DA |
| 3-1-02 | Motion to Continue Filed by Att. Hill |
| 3-4-02 | Rule 32 as set 6-7-02 is reset for 1:30 pm 6-27-02 (SR) |
| 3-11-02 | Copy of CAS sent to DA & Att. Hill. |
| 4-10-02 | Motion for Writ of Habeas Corpus Filed by Deft. |
| 4-12-02 | Writ of Habeas Corpus set for 1:30 pm on 6-27-02 (SR) |
| 4-16-02 | Motion for Injunction filed by Deft. |
| 4-16-02 | Order for Inmate return sent to DOC & Jail |
| 4-16-02 | Motion for Injunction filed by Deft. |
| 6-24-02 | Motion to Dismiss Filed by DA |
| 6-24-02 | Order for Transport Filed 6-19-02 |
| 6-27-02 | Rule 32 And Petition for Habeas Corpus hearing held and testimony taken, frcc taken under advisement (SR) Motion to dismiss argued and taken under advisement (SR) |
| 9-2-02 | Order on Rule 32 |

2

ACR0369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 1997 000239.60
JUDGE ID:  SGR

STATE OF ALABAMA                    VS    WALKER JAMES WILBERT,JR.

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 9-3-02 | Copy of Order sent to Atty. Hill, DA + Deft. |
| 9-16-02 | Notice of Appeal filed by Atty. Hill. |
| 9-16-02 | Motion for State of Alabama to provide transcript of record filed by Atty. Hill. |
| 9-17-02 | Clerk's Notice of Appeal sent to CCA, AG, DA Court Reporter + Atty. Hill |
| 10-25-02 | Reporter's Transcript Order + Docketing Statement filed. Copies sent to CCA, DA, Court Reporter + Atty. Hill |
| 10-25-02 | Delayed entry - Order filed by CCA on 10-18-02. |
| 11-12-02 | Request for Local Extension filed by Court Reporter. |
| 11-14-02 | Extension granted by CCA filed. |



Case Number
1997
ID      YR
(To be Completed
by Court Clerk)

239 60
NUMBER

### PETITION FOR RELIEF FROM
### CONVICTION OR SENTENCE
(Pursuant to Rule 32,
Alabama Rules of Criminal Procedure)

IN THE ___CIRCUIT___ COURT OF _____CHILTON_____, ALABAMA

___JAMES WILBERT WALKER, JR.___ v. _____STATE OF ALABAMA_____

Petitioner (Full Name)

Respondent
[Indicate either the "State" or, if filed in municipal court, the name of the "Municipality"]

Prison Number ____N/A____ Place of Confinement ___Chilton County Jail___

County of Conviction ___CHILTON___

## NOTICE: BEFORE COMPLETING THIS FORM, READ CAREFULLY THE ACCOMPANYING INSTRUCTIONS.

1. Name and location (city and county) of court which entered the judgment of conviction or sentence under attack CHILTON COUNTY CIRCUIT COURT

2. Date of judgment of conviction . December 13, 1999

3. Length of sentence 15 years concurrent on all counts

4. Nature of offense involved (all counts). 2 cts Rape II, 2 cts Incest, 1 ct Sodomy II

5. What was your plea? (Check one)
    (a) Guilty___
    (b) Not Guilty ✔ .
    (c) Not Guilty by reason of mental disease or defect.___
    (d) Not Guilty and not guilty by reason of mental disease or defect___

    If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:_____

6. Kind of trial: (Check one)
    (a) Jury——        (b) Judge only. ✔

4

7. Did you testify at the trial?
   Yes ✔        No ___

8. Did you appeal from the judgment of conviction?
   Yes ✔        No ___

9. If you did appeal, answer the following:
   (a) As to the state court to which you first appealed, give the following information:

   (1) Name of court ___Alabama Court of Criminal Appeals___

   (2) Result.___Affirmed___

   (3) Date of result___May 18, 2001___

   (b) If you appealed to any other court, then as to the second court to which you appealed, give the following information:

   (1) Name of court ___Alabama Supreme Court___

   (2) Result.___Writ of Certiorari Denied___

   (3) Date of result___August 31, 2001___

   (c) If you appealed to any other court, then as to the third court to which you appealed, give the following information:

   (1) Name of court _____

   (2) Result._____

   (3) Date of result_____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
    Yes ___        No ✔

11. If your answer to Question 10 was "yes," then give the following information in regard to the first such petition, application, or motion you filed:
    (a)     (1) Name of court_____
            (2) Nature of proceeding _____
            (3) Grounds raised _____
            _____
            _____
            _____
            _____

    (attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes ___        No ___

(5) Result—_____

(6) Date of result._____

(b) As to any second petition, application, or motion, give the same information:

(1) Name of court_____

(2) Nature of proceeding _____

(3) Grounds raised _____

_____

_____

_____

(attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes ___        No ___

(5) Result—_____

(6) Date of result._____

(c) As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

(1) Name of court_____

(2) Nature of proceeding _____

(3) Grounds raised _____

_____

_____

_____

(attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes ___        No ___

(5) Result—_____

(6) Date of result._____

(d) Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

(1) First petition, etc.              Yes___        No___

(2) Second petition, etc.            Yes ___       No ___

(3) Third petition, etc.             Yes ___       No ___

**ATTACH ADDITIONAL SHEETS GIVING THE SAME
INFORMATION FOR ANY SUBSEQUENT PETITIONS,
APPLICATIONS, OR MOTIONS.**

(e) If you did not appeal when you lost on any petition, application, or motion,
explain briefly why you did not:

_____

_____

_____

12. Specify every ground on which you claim that you are being held unlawfully, by
placing a check mark on the appropriate line(s) below and providing the required
information. Include all facts. If necessary, you may attach pages stating additional
grounds and the facts supporting them.

GROUNDS OF PETITION

Listed below are the possible grounds for relief under Rule 32. Check the ground(s)
that apply in your case, and follow the instruction under the ground(s):

✔ A. The Constitution of the United States or of the State of Alabama requires a
new trial, a new sentence proceeding, or other relief. For your information,
the following is a list of the most frequently raised claims of constitutional
violation:

(1) Conviction obtained by plea of guilty which was unlawfully induced or not
made voluntarily with understanding of the nature of the charge and the
consequences of the plea.

(2) Conviction obtained by use of coerced confession.

(3) Conviction obtained by use of evidence gained pursuant to an
unconstitutional search and seizure.

(4) Conviction obtained by use of evidence obtained pursuant to an unlawful
arrest.

(5) Conviction obtained by a violation of the privilege against self-
incrimination.

(6) Conviction obtained by the unconstitutional failure of the prosecution to
disclose to the defendant evidence favorable to the defendant.

(7) Conviction obtained by a violation of the protection against double
jeopardy.

(8) Conviction obtained by action of a grand' or petit jury which was
unconstitutionally selected and impaneled.

(9) Denial of effective assistance of counsel.

This list is not a complete listing of all possible constitutional violations.

If you checked this ground of relief, attach a separate sheet of paper with this
ground listed at the top of the page. On this separate sheet of paper list each
constitutional violation that you claim, whether or not it is one of the nine listed
above, and include under it each and every fact you feel supports this claim. Be
specific and give details.

___ B. The court was without jurisdiction to render the judgment or to impose
the sentence.

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

___ C. The sentence imposed exceeds the maximum authorized by law, or is
otherwise not authorized by law.

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

___ D. Petitioner is being held in custody after his sentence has expired.

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

___ E. Newly discovered material facts exist which require that the conviction or
sentence be vacated by the court, because:

The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence;  and

The facts are not merely cumulative to other facts that were known; and

The facts do not merely amount to impeachment evidence; and If the facts had been known at the time of trial or sentencing, the result would probably have been different; and

The facts establish that petitioner is innocent of the crime for which he was convicted or should not have received the sentence that he did.

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

___ F. The petitioner failed to appeal within the prescribed time and that
failure was without fault on petitioner's part.

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13. **IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS. RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:**

"Successive Petitions. The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner.   A second or successive petition on different grounds shall be denied unless the  petitioner shows both that good cause exists why the new ground or grounds were    not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A. Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?
Yes ___    No ✓

B. If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:
(a) Name of court _____
(b) Result_____
(c) Date of result._____
(attach additional sheets if necessary)

C. If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why the] failure to entertain [this] petition will result in a miscarriage of justice."

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ___    No ✓

15. Give the name and address, if known, of each attorney who represented you at the following stages of the case that resulted in the judgment under attack:
(a) At preliminary hearing _____
_____
(b) At arraignment and plea___Hon. David B. Karn_____
P.O. Box 108, Clanton, AL 35046_____
(c) At trial___Hon. David B. Karn_____
P.O. Box 108, Clanton, AL 35046_____
(d) At sentencing___Hon. David B. Karn_____
P.O. Box 108, Clanton, AL 35046_____
(e) On appeal___Hon. William M. Bowden, Jr._____
White, Dunn & Booker, 2025 3rd Ave N, Ste. 600, B'ham, AL 35203
(f) In any post-conviction proceeding___Hon. William E. Swatek___
230 Bearden Road, Pelham, AL 35124_____
_____
(g) On appeal from adverse ruling in a post-conviction proceeding_____
_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ✓    No ___

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ___    No ✓

a) If so, give name and location of court which imposed sentence to be served in the future: _____

(b) And give date and length of sentence to be served in the future: _____
_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ____      No ____

18. What date is this petition being mailed? _____
_____

    Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

## PETITIONER'S VERIFICATION UNDER OATH
## SUBJECT TO PENALTY FOR PERJURY

    I swear (or affirm) under penalty of perjury that the foregoing is true and correct. Executed on _____.
                  (Date)


_____
               Signature of Petitioner

    SWORN TO AND SUBSCRIBED before me this the _____ day of _____,
20___.

_____
               Notary Public

### OR*
## ATTORNEYS VERIFICATION UNDER OATH
## SUBJECT TO PENALTY FOR PERJURY

    I swear (or affirm) under penalty of perjury that, upon information and belief, the foregoing is true and correct. Executed on _1 - 22 - 02_____.
                  (Date)


_____
            Signature of Petitioner's Attorney

    SWORN TO AND SUBSCRIBED before me this the 22 day of January
20 02.

_____
               Notary Public

Name and address of attorney representing petitioner in this proceeding (if any)
William R. Hill, Jr.
P.O. Box 1106
Clanton, AL 35046

_____

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the petition.

# GROUNDS OF PETITION

I. A(6) -    <u>The conviction was obtained through the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.</u>

Prior to WALKER's trial on the charges whereby he was convicted and now serving, the alleged victim had in fact recanted the allegations she had made against WALKER in a juvenile court hearing at which time both her attorney and the district attorney advised her that she faced a possible prosecution for perjury for doing so. Despite this occurrence, the district attorney failed to inform WALKER, his counsel or the trial court of this recantation before trial in violation of *Brady v. Maryland*.

II. A(9) -    <u>Denial of Effective Assistance of Counsel</u>

WALKER was denied effective assistance of counsel in violation of *Strickland v. Washington* in numerous ways. First, trial counsel clearly failed to thoroughly investigate the circumstances surrounding the case prior to trial. Second, trial counsel failed to call the alleged victim's siblings as witnesses, both of whom could have rebutted her testimony. Third, trial counsel did not fully explore or present at trial evidence of the alleged victim's known history of emotional instability. Fourth, trial counsel failed to adequately present evidence of the alleged victim's clear bias against WALKER. Fifth, trial counsel failed to present testimonial evidence from numerous individuals who personally witnessed the alleged victim recanting the allegations she had made against WALKER. Sixth, trial counsel failed to object to the testimony of the state's purported "expert" witnesses, despite the state's failure to establish the proper predicate for their testimony. Seventh, trial counsel failed to adequately represent WALKER in that he waived a trial by jury without WALKER's informed consent. Eighth, trial counsel failed to present to the trial court polygraph evidence which established WALKER's innocence. Finally, trial counsel failed to represent WALKER in that he did not conduct a thorough cross-examination of the alleged victim, despite the fact that the state's entire case against WALKER rested upon her dubious and unsubstantiated testimony.

IN THE CIRCUIT COURT OF CHILTON COUNTY, ALABAMA

STATE OF ALABAMA,          *

                       *

vs.                    * CASE NO.: CC-1997-239

                       *

JAMES WILBERT WALKER, JR.    *

       Defendant.         *

                       *



## MOTION TO CONTINUE

COME NOW the Defendant, James Wilbert Walker, Jr., by and through his attorney of record, William R. Hill, Jr., and files this Motion to Continue the Rule 32 hearing scheduled for June 7, 2002, and as grounds for said continuance states as follows:

1. That Defendant's counsel, William R. Hill, Jr., has been accepted to attend the Gerry Spence TRIAL LAWYERS COLLEGE DEATH PENALTY SEMINAR in Jackson, Wyoming June 1, 2002 through June 8, 2002. Counsel has already paid all fees and purchased airline tickets for this seminar.

WHEREFORE, the premises considered, Defendant requests a continuance of the hearing in this cause from the June 7, 2002, 2001 setting.

Motion to Continue
Page 2 of 2
State vs. James Wilbert Walker, Jr.
CC-97-239

Respectfully submitted,

William R. Hill, Jr. (HIL004)
ATTORNEY FOR DEFENDANT
Post Office Box 1106
Clanton, AL 35046
(205) 280-3117

### CERTIFICATE OF SERVICE

I hereby certify that I have served a true and complete copy of the above and foregoing upon opposing counsel, by the following method:

_____✓_____Hand Delivery to Office
_____Personally
_____Facsimile
_____United States Mail, Postage Prepaid

DATED:_____2-20_____, 2002.

William R. Hill, Jr. (HIL004)
Attorney for Defendant

cc: Attorney General
    District Attorney

In The Circuit Court Of Chilton County
Clanton, Alabama

James W. Walker Jr. #219913

VS

State of Alabama
Office Of The District
Attorney's

Civil Action #N97000239

## Motion For Writ Of Habeus Corpus

Comes Now James W. Walker Jr. is Petitioning
to this Honorable Court for Writ of Habeus
Corpus for release from Prision on the
following Grounds.

1) On Sept. 10th, 2001 Jennifer R. Walker went to
the Law office of the Honorable William R.
Hill Jr., Attorney at Law in Clanton, Ala. and gave
a full statement saying that her original statement
to the Honorable Jennifer Jordan who is the Chilton
County Assit/DA that she in fact did lie when
she made the statement against her father
James W. Walker Jr.. Then Jennifer Jordan did in
fact scare Jennifer R. Walker with the charge
of Perjury. So (she) Jennifer R. Walker did in fact
changed her statement again after makeing
it in front of Hilda R. Brooks, Notary Public.

1 of 2
CC/1

2) Also the entire family will testify to the fact that James W. Walker Jr. is not guilty of the charges and should be released from Prision because she was just mad at her father, and mother. See Ex. A.

3) Futher more the unjust must be corrected. "It is better to release 100 GUILTY men than to keep (1) Innocent man in Prision."

Petitioner Prays that this Honorable Court Grants this Motion for Writ of Habeus Corpus.

Done This 9th day of April _____ ,2002

Respectfully Submitted,

X _James W. Walker Jr._

2 of 2

cc/1

## AFFIDAVIT OF JENNIFER RENEE WALKER

Before me the undersigned authority personally appeared Jennifer Renee Walker, who after being duly sworn, states as follows:

My name is Jennifer Renee Walker. I was the prosecuting witness in a case against my father, James W. Walker, Jr. My motivation at that time when I made a false accusation that my father sexually abused me was so that I could get out from under his supervision. I had friends who had been in DHR custody and they told me that DHR had really good foster homes and it was a good situation.

I told Tim Bowman, my counselor at Gateway, that I had made this false accusation against my father and that he did not sexually abuse me. I told my lawyer, Elizabeth Hilyer, in juvenile court that my accusation against my father was false. Ms. Hilyer told me it would be in my best interest to not change my story, as they would lock me up if they found out that I had lied. Later I got angry with my mother and told Mr. Bowman that I wanted to take back my denial of my allegation against my father.

Prior to trial of my father's case I told Jennifer Jordan, the Assistant District Attorney that was prosecuting this case, that it was not true that my father sexually assaulted me. Jennifer Jordan told me that I could be locked up for perjury if I changed my story on the stand.

I have continued to believe that my father's case would be overturned by the appeals court. I have been informed by David Karn that my father's appeal has been denied.

I want this Court to know that I lied and my father did not sexually assault me at any time. Even though my father and I still don't get along I do not wish to see him go to prison for a crime

which he did not commit.

I am giving this affidavit at the law office of William R. Hill, Jr. in Clanton, Alabama and he has explained to me that this affidavit must be of my own free will and that no threats or promises have been made to me to get me to make this statement. I have read this affidavit and swear that it is true.

FURTHER DEPONENT SAITH NOT.

_Jennifer R. Walker_
(Jennifer Renee Walker, Affiant)

State of Alabama
Chilton County

Personally appeared before me, a Notary Public in and for the State of Alabama at Large Jennifer Renee Walker, who after having read the above states that the foregoing is true and correct to the best of her knowledge

_Jennifer R. Walker_
Jennifer Renee Walker, Affiant

Sworn to and subscribed before me on this the 10th day of September, 2001

_Alida Rigsby Brooks_
Notary Public

My Commission Expires 2/19/02

17

In The Circuit Court of Chilton County
Clanton, Alabama

James W. Walker Jr.
VS.
State of Alabama

Case Action # N97000239

## MOTION FOR INJUNCTION

Comes now the Plaintiff James W. Walker Jr. is
Petitioning this Honorable Court for Motion
For Injunction in order to get Motion for
Habeus Corpus Herd.

1) Mr. James W. Walker Jr. is not Guilty of the
Crimes that he is accused of. Mr. Walker
only wishes to be presant, to be herd in Court
when he is able to get in court.

2) Mr. Walker has been unable to get into court
and ask this Honorable Court to grant this
Injunction so a fast and fair hearing can be
done and important issues can be addressed.
Petitioner prays that this Honorable Court will
grant this Injunction.
Done this 16th day of April, 2002

Respectfully Submitte
James W. Walker

18

## Hard Ship Order

James W. Walker Jr.

vs.

State of Alabama

Case Action # N97000239

I James W. Walker Jr. swear under penalty of Perjury that I have no money, stocks, bonds, houses, boats, cars, or land, or bank accounts. I am unable to pay for fileing fees

Respectfully Submitted,

James W. Walker Jr.

Done this 16th day of April 2002

IN THE CIRCUIT COURT OF CHILTON COUNTY, ALABAMA
CASE NO. CC _____



JAMES WALKER
PETITIONER
VS
STATE OF ALABAMA
RESPONDENT

MOTION TO DISMISS

Comes now the State and moves this honorable Court to dismiss the petition filed herein by Petitioner and as grounds avers:

1. That the issues raised have been adjudged on appeal and in previous hearing before the court and are without merit.

2. That there is no showing of ineffective assistance of counsel to rise to a standard which would require this court to take action.

3. That Your Honor was the trial judge over the proceedings herein and all proceedings on the trial court level, has knowledge of the facts and issues herein, and knows that there exists no issue upon which relief can be granted.

This the 24th day of June, 2002.

_____
Assistant District Attorney

I have served a copy of the foregoing on counsel of record for petitioner by placing a copy of same in their box, Circuit Court, on this the 24th day of June, 2002.

_____
Assistant District Attorney

## IN THE CIRCUIT COURT OF CHILTON COUNTY, ALABAMA

STATE OF ALABAMA,     *

           *

           *

VS.         * CASE NO.: CC-1997-239-R

           *

JAMES WILBERT WALKER, JR.,  *

           *

   DEFENDANT,    *



### ORDER FOR TRANSPORT

   The above-styled cause being set for a hearing on June 27, 2002 at 1:30 p.m. and JAMES

WILBERT WALKER, JR. is a prisoner under conviction of a crime in the State of Alabama and

is presently in the custody of the State of Alabama at Kilby Correctional Facility in Mt.

Meigs, Alabama.

   It is Ordered that the State permit the removal of JAMES WILBERT WALKER, JR. to

the Circuit Court of Chilton County at Clanton, Alabama, for the purpose of the hearing in this

matter.

   It is further Ordered that the Sheriff of Chilton County, Alabama or one of his lawful

deputies transport JAMES WILBERT WALKER, JR. to the Chilton County Circuit Courtroom,

and when the hearing is concluded return the prisoner to the State of Alabama.

   This the _18_ day of _June_____, 2002.

           _____

           Sibley G. Reynolds, Circuit Judge

IN THE CIRCUIT COURT OF CHILTON COUNTY, ALABAMA

STATE OF ALABAMA,

VS.                                                          CASE NO. CC-97-239.60

JAMES WILBERT WALKER, JR.

DEFENDANT.

## ORDER ON RULE 32 PETITION

    This cause coming on before this Court upon the Rule 32 Petition as filed by the Defendant, James Wilbert Walker on January 23, 2002 and the parties being present for testimony before this Court on June 27, 2002 and this Court entertaining the same at length from Jennifer Walker Mims, the victim and daughter of the Defendant, Crystal Walker Williams, another daughter, Hon. Elizabeth Moorehead, Hon. David Karn, Jessie Sprayberry and Kim Ackerson. Additionally the State submitted their argument for a dismissal, the same being taken under advisement by this Court.

    Upon consideration of the argument, testimony and review of the extensive pleadings, it is the opinion of this Court as follows:

    1. That the Rule 32 Petition is hereby dismissed and the requested relief is hereby denied.

ORDERED this the 2nd day of September, 2002.

_____
CIRCUIT JUDGE, SIBLEY REYNOLDS

22

IN THE CIRCUIT COURT OF CHILTON COUNTY
STATE OF ALABAMA

STATE OF ALABAMA,

VS.

CASE NO.:  CC-97-239.60

JAMES WILBERT WALKER, JR.,

Defendant.

## NOTICE OF APPEAL TO THE COURT OF CRIMINAL APPEALS

COMES NOW, the Defendant, JAMES WILBERT WALKER, JR., by and through his attorney of record, William R. Hill, Jr., and files this his written Notice of Appeal to the Court of Criminal Appeals. The Defendant would further state the following concerning his appeal:

1. That the Defendant filed a Rule 32 Petition on January 23, 2002.

2. That a hearing was held on said Rule 32 Petition on June 27, 2002.

3. That Defendant's Rule 32 Petition was denied on September 2, 2002.

Dated this the 16ᵗʰ day of _Sept._, 2002.

Respectfully submitted,

William R. Hill, Jr. (HIL004)
ATTORNEY FOR DEFENDANT
Post Office Box 1106
Clanton, AL 35046
(205) 280-3117

23

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and complete copy of the above and foregoing upon opposing counsel, by the following method:

_____XQ_____ Hand Delivery to Office
_____ Personally
_____ Facsimile
_____ United States Mail, Postage Prepaid

DATED:_____9-16_____, 2002.

William R. Hill, Jr.
Attorney for Defendant

cc: District Attorney

24

IN THE CIRCUIT COURT OF CHILTON COUNTY, ALABAMA

STATE OF ALABAMA,                   *
                                    *
                                    *
VS.                                 * CASE NO.: CC-97-239.60
                                    *
JAMES WILBERT WALKER, JR.,          *
                                    *
        DEFENDANT.                  *
                                    *



## MOTION FOR THE STATE OF ALABAMA TO PROVIDE TRANSCRIPT OF RECORD

COMES NOW the Defendant, James Wilbert Walker, Jr., by and through counsel of record, William R. Hill, Jr., and moves this Honorable Court to order the State of Alabama to provide a transcript for the Defendant in the appeal of his cause and states as grounds the following:

1. That the Defendant is presently incarcerated and does not have the assets with which to purchase said transcript.

2. That the Defendant's counsel cannot adequately represent the Defendant in his appeal without a transcription of the trial record in the above-styled cause.

3. That said Order would serve the ends of justice.

_____
William R. Hill, Jr. (HIL004)
Attorney for Defendant
P. O. Box 1106
Clanton, AL 35046
(205) 280-3117

| State of Alabama Unified Judicial System Form C-10 Page 1 of 2  Rev. 2/95 | **AFFIDAVIT of SUBSTANTIAL HARDWARE HARDSHIP and ORDER** | Case Number |
|---|---|---|

IN THE ___Circuit___ COURT OF ___Chilton County___ ALABAMA
(Circuit, District, or Municipal)        (Name of County or Municipality)

STYLE OF CASE: ___James W. Walker #219913___ v. ___State of Alabama Office of District___
                    Plaintiff(s)                    Defendant (s)        Attorney

TYPE OF PROCEEDING: _____ CHARGE(S) (if applicable): _____

☒ CIVIL CASE-- I, because of substantial hardship, am unable to pay the docket fee and service fees in this case. I request that payment of these fees be waived initially and taxed as costs at the conclusion of the case.

☐ CIVIL CASE--(such as paternity, support, termination of parental rights, dependency, etc.)-I am financially unable to hire an attorney and I request that the Court appoint one for me.

☒ CRIMINAL CASE--I am financially unable to hire an attorney and request that the Court appoint one for me.

☐ DELINQUENCY/NEED OF SUPERVISION - I am financially unable to hire an attorney and request that the Court appoint one for my child/me.

**SECTION I.**                    **A F F I D A V I T**

1. **IDENTIFICATION**
   Full Name ___James W. Walker Jr.___        Date of Birth ___12-16-60___
   Spouse's Full Name (if married) ___Sue Ellen Walker___
   Complete Home Address ___21076 8 Alabama Hwy 22 Clanton Al 35045___
   ___James W. Walker Jr 219913 P.O. Box 150 North Dorm Bed 5 Mt Meigs, Al 36057___
   Number of People Living in Household ___4___
   Home Telephone No. ___205-280-1608___
   Occupation/Job ___NONE___        Length of Employment _____
   Driver's License Number ___Alabama CDL___        * Social Security Number ___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___
   Employer ___NONE___        Employer's Telephone No. _____
   Employer's Address _____

2. **ASSISTANCE BENEFITS**
   Do you or anyone residing in your household receive benefits from any of the following sources? (if so, please check those which apply.)

   ☐ AFDC        ☐ Food Stamps        ☐ SSI        ☐ Medicaid        ☐ Other _____

3. **INCOME/EXPENSE STATEMENT**
   Monthly Gross Income:

   Monthly Gross Income        $ ___Ø___
   Spouse's Monthly Gross Income (unless a marital offense)
   Other Earnings: Commissions, Bonuses, Interest Income, etc.
   Contributions from Other People Living in Household
   Unemployment/Workmen's Compensation,
   Social Security, Retirement, etc.
   Other Income (be specific) ___NONE___

   **TOTAL MONTHLY GROSS INCOME**        $ ___Ø___

   Monthly Expenses:
   A. Living Expenses
   Rent/Mortgage        $ ___Ø___
   Total Utilities: Gas, Electricity, Water, etc.
   Food
   Clothing
   Health Care/Medical
   Insurance
   Car Payment(s)/Transportation Expenses
   Loan Payment(s)

* OPTIONAL

26e

| Form C-10 Page 2 of 2    Rev. 2/95 | AFFIDAVIT of SUBSTANTIAL HARDSHIP and ORDER | Case Number |
| --- | --- | --- |

Monthly Expenses: (cont'd from page 1)
    Credit Card Payment(s)
    Educational/Employment Expenses
    Other Expenses (be specific) _NONE_

    Sub-Total

B.  Child Support Payment(s)/Alimony      $ _____    A $ _____

    Sub-Total

C.  Exceptional Expenses      $ _____    B $ _____

    **TOTAL MONTHLY EXPENSES (add subtotals from A & B monthly only)**    $ _____

Total Gross Monthly Income less total monthly expenses:

    **DISPOSABLE MONTHLY INCOME**    $ _____

4.  **LIQUID ASSETS:**
    Cash on Hand/Bank (or otherwise available such as stocks, bonds, certificates of deposit)    $ _____

    Equity in Real Estate (value of property less what you owe)

    Equity in Personal Property, etc. (such as the value of motor vehicles, stereo, VCR, furnishings, jewelry, tools, guns less what you owe)

    Other (be specific) Do you own anything else of value? ☐ Yes ☐ No
    (land, house boat, TV, stereo, jewelry)

    If so, describe _____

    **TOTAL LIQUID ASSETS**    $ _____

5.  **Affidavit/Request**
I swear or affirm that the answers are true and reflect my current financial status. I understand that a false statement or answer to any question in the affidavit may subject me to the penalties of perjury. I authorize the Court or its authorized representative to attain records or information pertaining to my financial status from any source in order to verify information provided by me. I further understand and acknowledge that, if the Court appoints an attorney to represent me, the Court may require me to pay all or part of the fees and expenses of my court-appointed counsel.

Sworn to and subscribed before me this

_27_ day of _June_ , _2002_    X _James W. Walker Jr._
    Affiant's Signature

_Joe Duskin_    X _JAMES W. WALKER JR._
Judge/Clerk/Notary    Print or Type Name

**SECTION II.**        **ORDER OF COURT**

IT IS THEREFORE, ORDERED AND ADJUDGED BY THIS COURT AS FOLLOWS:

☐  Affiant is not indigent and request is DENIED.

☐  Affiant is partially indigent and able to contribute monetarily toward his defense; therefore, defendant is ordered to pay $ _____ toward the anticipated cost of appointed counsel. Said amount is to be paid to the Clerk of Court or as otherwise ordered and disbursed as follows: _____

☐  Affiant is indigent and request is GRANTED.

☐  The prepayment of docket fees is waived.

IT IS FURTHER ORDERED AND ADJUDGED that _____ , is hereby appointed as counsel to represent affiant.

IT IS FURTHER ORDERED AND ADJUDGED that the Court reserves the right and may order reimbursement of attorney's fees and expenses, approved by the Court and paid to the appointed counsel, and costs of court.

Done this _____ day of _____ , 19 _____ .

_____
Judge

27

FILE COPY

ACR3T:                        ALABAMA JUDICIAL DATA CENTER
                    NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                                   BY THE TRIAL COURT CLERK
                            IN THE CIRCUIT COURT OF    CHILTON COUNTY
          STATE OF ALABAMA VS WALKER JAMES WILBERT,JR.   JUDGE: SIBLEY S. REYNOLDS
-----------------------------------------------------------------------------------
   APPEAL DATE: 09/16/2002
-----------------------------------------------------------------------------------
   INDIGENCY STATUS:
      GRANTED INDIGENCY STATUS AT TRIAL COURT:              _____ YES _X__ NO
      APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:        _____ YES _X__ NO
      INDIGENT STATUS REVOKED ON APPEAL:                    _____ YES _X__ NO
      INDIGENT STATUS GRANTED ON APPEAL:                    _____ YES _X__ NO

   DEATH PENALTY: NO

   APPEAL TYPE: RULE 32 PETITION
-----------------------------------------------------------------------------------
   THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E., RULE 32 PETITION,
   WRIT OF HABEAS CORPUS, ETC) OR FROM ANY OTHER ISSUED BY THE TRIAL JUDGE:

   CO/CASE NUMBER: 14/CC 1997 000239.60

   ORDER ENTERED(DATE): 09022002 PETITION: __DISMISSED  X DENIED  __GRANTED
-----------------------------------------------------------------------------------
   POST-JUDGMENT MOTIONS FILED:    DT FILED        DT DENIED       CON BY AGREE
   ____ MOTION FOR NEW TRIAL       _____      _____      _____
   ____ MOTION FOR JUDG. OF ACQUIT _____      _____      _____
   ____ MOTION TO W/D GUILTY PLEA  _____      _____      _____
   ____ MOTION FOR ATTY TO W/DRAW  _____      _____      _____
   ____ OTHER                      _____      _____      _____
-----------------------------------------------------------------------------------
   COURT REPORTER(S):                  SHARMAN, DEBORAH M.
   ADDRESS:                            C/O HON. SIBLEY REYNOLDS
                                       CLANTON            , AL  35045

   APPELLATE COUNSEL #1:               HILL WILLIAM R JR
   ADDRESS:                            504 2ND AVENUE S
                                       P O BOX 1106
                                       CLANTON            , AL  35046.
   PHONE NUMBER:                       205-280-3117

   APPELLATE COUNSEL #2:               _____
   ADDRESS:                            _____
                                       _____
                                       _____
   PHONE NUMBER:                       _____

   APPELLANT (PRO SE):                 WALKER JAMES WILBERT,JR.
   ADDRESS:                            KILBY CORR. FAC. #219913
                                       MOUNT MEIGS       , AL  360570000
   AIS #:                              000219913

   APPELLEE (IF CITY APPEAL):          _____
   ADDRESS:                            _____
                                       _____
-----------------------------------------------------------------------------------
   I CERTIFY THAT THE INFORMATION PROVIDED                OPERATOR: TED
   ABOVE IS ACCURATE TO THE BEST OF MY           PREPARED: 09/17/2002
   KNOWLEDGE AND I HAVE SERVED A COPY OF
   THIS NOTICE OF APPEAL ON ALL PARTIES TO       Mike Smith      (TR)
   THIS ACTION ON THIS 11 DAY OF September, 2002   CIRCUIT COURT CLERK

28

| State of Alabama Unified Judicial System Form ARAP- 1C    8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL See Rules 10(c) and 11(b) of the Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number CR - 01-2524 |

**TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.**

☒ CIRCUIT COURT ☐ DISTRICT COURT ☐ JUVENILE COURT of _Chilton_ COUNTY

_James Wilbert Walker, Jr._ , Appellant

v. ☒ STATE OF ALABAMA ☐ MUNICIPALITY OF _____

| Case Number CC-97-239.60 | Date of Judgment/Sentence/Order 9-2-02 |
| Date of Notice of Appeal Oral:            Written: 9-16-02 | Indigent Status Granted: ☐ Yes ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-72-72, *CODE OF ALABAMA 1975*).

Signature _____   Date _____   Print or Type Name _____

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

**MARK PROCEEDINGS REQUESTED:**

**COURT REPORTER(S)**

A. ☒ **TRIAL PROCEEDINGS** - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

_Deborah M. Sharman_
_Chilton Co. Courthouse_
_Clanton, AL 35045_

B. ☐ **ORGANIZATION OF THE JURY** - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ **ARGUMENTS OF COUNSEL** - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

**IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):**

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
| D. _Rule 32 Hearing_ | _6-27-02_ | _Deborah M. Sharman_ |
| E. _____ | _____ | _____ |
| F. _____ | _____ | _____ |
| G. _____ | _____ | _____ |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

Signature _____   Date _10-21-02_   Print or Type Name _William R. Hill, Jr._

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: **(1)** Clerk of the Court of Criminal Appeals, **(2)** the District Attorney, **(3)** the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and **(4)** to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript

29

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 26 (front)     8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br>CR. 01. 2524 |
|---|---|---|

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _Chilton_ COUNTY

_James Wilbert Walker, Jr._ Appellant

**v.** ☒ STATE OF ALABAMA  ☐ MUNICIPALITY OF _____

| Case Number<br>CC-97-239.60 | Date of Complaint or Indictment | Date of Judgment/Sentence/Order<br>9-2-02 |
|---|---|---|
| Number of Days of Trial/Hearing _____ Days | Date of Notice of Appeal<br>Oral: _____   Written: 9-16-02 | |

Indigent Status Requested: ☒ Yes ☐ No     Indigent Status Granted: ☐ Yes ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained? ☐ Appointed ☐ Retained.     If no attorney, will appellant represent self? ☐ Yes ☐ No

| Appellant's Attorney (Appellant if pro se) *(Attach additional pages if necessary)*<br>William R. Hill, Jr. | Telephone Number<br>205-280-3117 |
|---|---|
| Address<br>P.O. Box 1106 | City<br>Clanton | State<br>AL | Zip Code<br>35046 |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
|---|---|
| Codefendant | Case Number |
| Codefendant | Case Number |

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☐ State Conviction
2 ☒ Post-Conviction Remedy
3 ☐ Probation Revocation
4 ☐ Pretrial Order
5 ☐ Contempt Adjudication
6 ☐ Municipal Conviction
7 ☐ Juvenile Transfer Order
8 ☐ Juvenile Delinquency
9 ☐ Habeas Corpus Petition
10 ☐ Other (Specify) _____

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____
2 ☐ Homicide - § _____
3 ☐ Assault - § _____
4 ☐ Kidnapping/Unlawful Imprisonment - § _____
5 ☐ Drug Possession - § _____
6 ☐ Trafficking in Drugs - § _____
7 ☐ Theft - § _____
8 ☐ Damage or Intrusion to Property - § _____
9 ☐ Escape - § _____
10 ☐ Weapons/Firearms - § _____
11 ☐ Fraudulent Practices - § _____
12 ☒ Offense Against Family - § _____
13 ☐ Traffic - DUI - § _____
14 ☐ Traffic - Other - § _____
15 ☐ Miscellaneous (Specify): _____ - § _____

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed? ☐ Yes ☒ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript? ☒ Yes ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _10-21-02_ (Date)
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk? ☐ Yes ☐ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions? ☐ Yes ☐ No

**NOTE:** If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

30

Form ARAP- 26 (back)    8/91

### COURT OF CRIMINAL APPEALS DOCKETING STATEMENT

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| 01 | 23 | 02 | Rule 32 Hrg. | 09 | 02 | 02 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

Defendant charged with sexual Abuse of his daughter.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

Ineffective assistance of Counsel.

Failure of the prosecution to disclose to the Defendant favorable evidence.

**K. SIGNATURE:**

Date    10-25-02

Signature of Attorney/ Party Filing this Form

THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT

THE ALABAMA COURT OF CRIMINAL APPEALS



CR-01-2524

James Wilbert Walker, Jr., Appellant

vs.

State of Alabama, Appellee

Appeal from Chilton Circuit Court No. CC97-239.60

#### ORDER

On September 20, 2002, counsel for the appellant in the above-referenced cause was advised of a deficiency and instructed to take immediate action to correct the same. As of this date, this Court has still not received its copy of the Reporter's Transcript Order- Criminal which counsel is required to file and serve pursuant to Rule 10(c)(2) of the Alabama Rules of Appellate Procedure.

Upon consideration of the above, the Court of Criminal Appeals **ORDERS** that in the event this Court has not received a copy of a properly completed Reporter's Transcript Order in this cause by October 29, 2002, this appeal will be dismissed, and a copy of said order will be forwarded to the Disciplinary Board of the Alabama State Bar.

Done this 15th day of October, 2002.

H. W. "BUCKY" McMILLAN, PRESIDING JUDGE

cca/sm

cc:    Hon. Sibley G. Reynolds, Judge
       Hon. Mike Smith, Clerk
       Deborah M. Sharman, Court Reporter
       William R. Hill, Jr., Esq.
       Office of the Attorney General

32

| REQUEST FOR LOCAL EXTENSION OF TIME TO COMPLETE THE REPORTER'S TRANSCRIPT | |

_James Walker_
**Appellant's Name**
v. _State of Alabama_
**Appellee**

Trial Court Case No. _CC-97-239.60_ Notice of Appeal Date _9/16/02_

On appeal from the:

[X] Circuit Court of
[ ] District Court of
[ ] Juvenile Court of

_Chilton_ County

I, _Deborah Moses Sharman_, a court reporter in the above referenced case, hereby request a _28_ day extension to complete the transcript in said cause for the reasons I have set out below. Currently this transcript is due on _11/11/02_, and with this extension the transcript will be due on _12/9/02_.

REASONS: _Heavy trial docket and unable to complete transcript._

_Deborah M. Sharman_
**Court Reporter**
_11-12-02_
**Date**

===================================================================

**TRIAL COURT ACTION**

[X] Upon consideration of the above request, I hereby grant a _28_ day extension to complete said transcript, thus extending the transcript's due date to _12/9/02_. Upon granting this request, I direct the court reporter to file this order with the Clerk of this Court and to mail or fax a copy hereof to the Clerk of the Court of Criminal Appeals at the address noted below by no later than the transcript due date in effect immediately preceding this order.

[ ] The above referenced request for a local extension is denied.

_Ashley Reynolds_
**Judge's Signature**
_11-12-02_
**Date**

Note:     Pursuant to Rule 11(c) of the Alabama Rules of Appellate Procedure, local extensions cannot total more than 28 days and cannot be to a date more than 84 days from the date of the notice of appeal.

===================================================================

The Clerk of the Court of Criminal Appeals          Fax (334) 242-4689
P. O. Box 301555
Montgomery, Alabama 36130-1555

33



COURT OF CRIMINAL APPEALS
STATE OF ALABAMA
JUDICIAL BUILDING, 300 DEXTER AVENUE
P. O. BOX 301555
MONTGOMERY, AL 36130-1555

November 12th, 2002

*H. W. "Bucky" McMILLAN*
Presiding Judge
*SUE BELL COBB*
*PAMELA W. BASCHAB*
*GREG SHAW*
*A. KELLI WISE*
Judges

*Lane W. Mann*
Clerk
*Wanda K. Ivey*
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

RE: CR-01-2524

James Wilbert Walker, Jr. v. State of Alabama (Appeal from Chilton Circuit Court:
CC97-239.60).


You are hereby notified that the Court of Criminal Appeals acknowledges that the following action was taken in the above cause by the trial court:

Additional time is granted to certify the completion of reporter's transcript to and including 12/10/2002.

LWM/sm

Lane W. Mann, Clerk
Court of Criminal Appeals


cc: Honorable Sibley G. Reynolds, Circuit Judge
    Honorable Mike Smith, Circuit Clerk
    Deborah M. "Angel" Sharman, Court Reporter
    Honorable William R. Hill, Jr., Attorney, Appellant

COPY

| State of Alabama<br>Unified Judicial System<br>Form ARAP-1C   8/91 | **REPORTER'S TRANSCRIPT ORDER -- CRIMINAL**<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br>CR - 01-2524 |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF  _Chilton_   COUNTY

James Wilbert Walker, Jr.

Appellant

v.   ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____

| Case Number<br>CC-97-239.60 | Date of Judgment/Sentence/Order<br>9-2-02 |
| Date of Notice of Appeal<br>Oral:        Written: 9-16-02 | Indigent Status Granted:<br>☐ Yes   ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

| Signature | Date | Print or Type Name |

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

**MARK PROCEEDINGS REQUESTED:**

COURT REPORTER(S)

A. ☒ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

Deborah M. Sharman
Chilton Co. Courthouse
Clanton, AL 35045

B. ☐ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. Rule 32 Hearing | 6-27-02 | Deborah M. Sharman |
| E. | | |
| F. | | |
| G. | | |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

| Signature | 10-21-02 | William R. Hill, Jr. |
| | Date | Print or Type Name |

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript

COPY

2

1

2          IN THE NINETEENTH JUDICIAL CIRCUIT

3             IN AND FOR CHILTON COUNTY

4                CLANTON, ALABAMA

5

6    STATE OF ALABAMA          *

7          v.                 *      Case No. CC-97-239.60

8    JAMES W. WALKER,          *

          Defendant.      *

9

10   _____/

11      COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS

12         Proceedings taken in the above-styled cause

13   in the Chilton County Courthouse, Clanton, Alabama,

14   on June 27th, 2002, before the Honorable Sibley G.

15   Reynolds.

16

17                     APPEARANCES

18   FOR THE STATE:       Walter Hayden, III
                          Attorney at Law
19
     FOR THE DEFENDANT:   William Hill
20                        Attorney at Law

21

22            OFFICIAL COURT REPORTER

23         Deborah M. Sharman, CSR

24

25

3

## WITNESSES ON BEHALF OF THE DEFENDANT

JENNIFER WALKER MIMS
        Direct by Mr. Hill ..................   5
        Cross by Mr. Hayden ................  39

CRYSTAL WILLIAMS
        Direct by Mr. Hill ................  42
        Cross by Mr. Hayden ................  49
        Redirect by Mr. Hill ..............  50

ELIZABETH MOOREHEAD
        Direct by Mr. Hill ................  51
        Cross by Mr. Hayden ................  55

DAVID KARN
        Direct by Mr. Hill ................  56
        Cross by Mr. Hayden ................  73
        Redirect by Mr. Hill ..............  76

JESSE E. SPRAYBERRY
        Direct by Mr. Hill ................  82
        Cross by Mr. Hayden ................  88

KIM ACKERSON
        Direct by Mr. Hill  ................  90

```
 1                    (June 27th, 2002.  The Defendant
 2                    present with Attorney William Hill.
 3                    Assistant District Attorney Walter
 4                    Hayden, III present.  The following
 5                    proceedings occurred in open
 6                    court:)
 7              THE COURT:  This is CC-97-0239.60, State
 8         of Alabama, Chilton County, versus James
 9         Wilbert Walker, Jr.  He presents today with
10         his attorney Mr. Billy Hill.  The State is
11         represented by Mr. Walter Hayden.  This case
12         is before us today on a Rule 32 petition
13         filed -- excuse me.  It's before the Court
14         today on a Habeas Corpus petition filed April
15         of '02 and for a Rule 32 petition filed by
16         Mr. Hill on January of '02.
17              Mr. Hill, present your case, please, sir.
18              MR. HILL:  Judge, first of all, we would
19         ask the Court to take judicial knowledge of
20         the file in this case, which would include the
21         transcript at trial so that it would be
22         included as part of the record of this hearing
23         if that's all right with the Court.
24              THE COURT:  Well, I recall the testimony
25         because I tried it non-jury.
```

```
 1              MR. HILL:  Yes, sir.  I just want to
 2         incorporate that into the record.
 3              We would call Jennifer Walker Mims.
 4                   * * * * * * * *
 5              JENNIFER WALKER MIMS
 6              The witness, called by the Defendant,
 7    after having first been duly sworn to speak the
 8    truth, the whole truth, and nothing but the truth,
 9    took the stand and testified as follows:
10              THE COURT:  State your name for the
11         record.
12              THE WITNESS:  Jennifer Renea Mims.
13                   DIRECT EXAMINATION
14    BY MR. HILL:
15    Q.   Mrs. Mims, where do you reside?
16    A.   2660 County Road 85.
17    Q.   Could I get you to speak up just a little bit
18         so we could hear you.
19    A.   2160 County Road 85.
20    Q.   Are you married?
21    A.   Yes.
22    Q.   And who are you married to, please, ma'am?
23    A.   Brandon Mims.
24    Q.   And do you have any children?
25    A.   Yes.  I have one daughter.
```

| | | |
|---|---|---|
| 1 | Q. | What's her name, please, ma'am? |
| 2 | A. | Breanna. |
| 3 | Q. | When was she born? |
| 4 | A. | March 27th of 2001. |
| 5 | Q. | Now, are you the same Jennifer Walker Mims who |
| 6 | | was the state's principal witness in the case |
| 7 | | in chief in this case? |
| 8 | A. | Yes. |
| 9 | Q. | And I believe at that time you testified |
| 10 | | concerning some allegations about your father |
| 11 | | sexually abusing you? |
| 12 | A. | Yes. |
| 13 | Q. | I want to go back, if we could, and sort of |
| 14 | | start at the beginning if it's all right.  Who |
| 15 | | all -- Could you first of all just tell me who |
| 16 | | all was in your household as you grew up? |
| 17 | A. | It was my mom, my dad, me, my sister, and my |
| 18 | | brother until my littlest brother was born and |
| 19 | | that was right before I left home when he was |
| 20 | | born. |
| 21 | Q. | And could you give me your sister's name? |
| 22 | A. | Crystal Elaine Williams. |
| 23 | Q. | How about your older brother -- the oldest of |
| 24 | | the two brothers? |
| 25 | A. | Chris. |

```
 1    Q.   Chris.  Okay.  Could you sort of us give us a
 2         breakdown in age, who was the oldest and that
 3         sort of thing?
 4    A.   I'm the oldest.  Crystal is about two years
 5         younger than me.  Then Chris is about two
 6         years younger than her.
 7    Q.   And I know this is always impolite to ask a
 8         lady, but do you mind telling us how old you
 9         are?
10    A.   I'm twenty-one.
11    Q.   Now, I understand that -- When was the first
12         time you began to have any problems dealing
13         with your parents' authority?
14    A.   Probably when I started seventh grade.
15    Q.   Could you tell us a little bit about that,
16         please, ma'am.  How old would you have been at
17         that time?
18    A.   Thirteen, fourteen, somewhere around there.
19    Q.   Could you tell us about that.
20    A.   I just started hanging out with the wrong kind
21         of crowd at school who drank.  Some of them
22         did drugs.  Some of them didn't.  Some of them
23         were kind of rowdy boys.
24    Q.   Now, how did your parents react to that?
25    A.   They didn't like it at all.
```

```
 1   Q.   And how did you react to your parents'
 2        authority?
 3   A.   I didn't care.
 4   Q.   Were they able to curb whatever you were doing
 5        at that time or did you respect their
 6        authority?
 7   A.   At times I felt like I had no other choice to
 8        but at times I would find a way to sneak
 9        around it.
10   Q.   Let me ask you this.  Prior to that time, had
11        anyone ever told you about any sexual
12        allegations in your broader family group?
13   A.   Yes.
14   Q.   Could you tell me about that, please, ma'am.
15   A.   Well, my cousin Amber had come to me.
16   Q.   If you would, tell us where you were and your
17        age and Amber's approximate age when all this
18        conversation took place.
19   A.   I was probably about eleven.  We were living
20        in Plantersville near Dallas County High
21        School at the time.  My cousin Amber had
22        been -- We were at our grandmother's house.
23        She had told me that my grandfather was
24        messing with her sexually, touching her.  He
25        would come in her bedroom and wake her up in
```

```
 1          the middle of the night, you know, asking her
 2          to go to the bathroom with him.  And at that
 3          point, I went to my mom and my dad about it
 4          and told them.
 5     Q.   Was this your maternal grandfather or your --
 6          Was it your mother's father?
 7     A.   Yes, my mom's dad.
 8     Q.   What, if anything, did you tell your parents?
 9     A.   I told them exactly what she told me.
10     Q.   What was their reaction at the time?
11     A.   My dad was furious.  My mom didn't really say
12          much.  She listened, but my dad was the main
13          one.
14     Q.   Now, what, if anything, came of that
15          particular circumstance?
16     A.   From what I heard, he got two years probation
17          and he was to stay away from her.
18     Q.   Did you ever see your cousin after that time?
19     A.   No, I have not seen her since.
20     Q.   Now, I believe prior to you telling us about
21          this at age eleven, you were telling us around
22          the age of thirteen you began to run with a
23          crowd that your parents didn't approve of.
24     A.   Yes.
25     Q.   Could you generally describe some of the
```

```
 1            conduct you were involved in that your parents
 2            did not approve of?
 3      A.    I had been drinking a little, not much.  I
 4            didn't do drugs until after I left home.  Most
 5            of my behavior was about the boys.
 6      Q.    And could you be a little more explicit about
 7            your behavior with the boys.
 8      A.    There was really only one at the time that I
 9            thought I was head over heels for.  No matter
10            what my parents said, I wanted to see him.
11      Q.    Do you recall his name?
12      A.    Mark Duke.
13      Q.    All right.  And where did Mr. Duke live?
14      A.    Right on the other side of town.  Actually,
15            right there in town by Ace Hardware.
16      Q.    And how did you meet Mr. Duke?
17      A.    At the skating rink.
18      Q.    How old was Mr. Duke at that time?
19      A.    He was probably sixteen, fifteen, something
20            like that.
21      Q.    How old were you?
22      A.    Thirteen.
23      Q.    Did you have any conflict with your parents
24            concerning -- First of all, did they have any
25            concern about you seeing Mr. Duke?
```

```
 1   A.   Not at first.

 2   Q.   Okay.  When did it become a problem?

 3   A.   Probably a few weeks later after we started

 4        talking and meeting each other at the skating

 5        rink, things like that.

 6   Q.   Can you recall the first time that you were

 7        made aware that there was a problem with your

 8        parents and you seeing Mr. Duke?

 9   A.   No, I can't recall exactly what it was about

10        or anything like that.

11   Q.   Did your parents ever tell you they didn't

12        want you to see Mr. Duke?

13   A.   Yes.

14   Q.   Was that on one occasion or many occasions?

15   A.   Quite a few.

16   Q.   And do you recall any of the discussions that

17        took place between you and your parents while

18        y'all were talking about Mr. Duke?

19   A.   Mostly that they had heard that he was

20        trouble, that he did a lot of drugs, that he

21        was drinking, that he was part of a gang,

22        little things like that.

23   Q.   What was your response?

24   A.   I didn't believe them because he never done it

25        around me.  He never spoke of it around me, so
```

```
 1              I didn't believe them.

 2     Q.   Now, did your parents ever forbid you to see

 3          Mr. Duke?

 4     A.   Yes, more than once.

 5     Q.   And could you tell us specifically how they

 6          tried to enforce you not seeing Mr. Duke?

 7     A.   They basically just grounded me to the house.

 8          I wasn't allowed to go to the skating rink.  I

 9          wasn't allowed to stay the night over at

10          friends' houses, things like that.

11     Q.   And was that affective in stopping you from

12          seeing Mr. Duke?

13     A.   No.

14     Q.   Why wasn't it affective?

15     A.   Because I would have him come to the house

16          before my parents got home just to see him for

17          a moment, I mean, maybe fifteen minutes tops.

18          I rode home with a friend of mine, forged my

19          mom's signature on a note to ride the bus home

20          with a friend of mine so that I could see him

21          at her house.

22     Q.   Did your parents find out about that?

23     A.   Yes.

24     Q.   Can you tell us a little bit -- What was their

25          reaction when they found out that you had
```

```
 1            forged their signature to get off at somebody

 2            else's house?

 3    A.      I'm not sure if my mom knew that I had done

 4            that at first.  But she had arrived home

 5            before we were to get off the bus, so she was

 6            already there when I was supposed to have

 7            gotten off the bus.  By the time I got a ride

 8            back to my house, when I got home, my mom --

 9            my brother and my sister had told me that mama

10            was already out looking for me.

11    Q.      She didn't know your whereabouts?

12    A.      She had a feeling.  She figured she knew where

13            I was at.

14    Q.      Did she find you or did you get home before

15            she found you?

16    A.      I was home by the time she got there.

17    Q.      And what was the result and circumstances on

18            that occasion when she came home and found out

19            you had disobeyed?

20    A.      She beat the living crap out of me.

21    Q.      All right.  Now, at some point in time did

22            this become a major controversy between you

23            and your parents?

24    A.      Just arguing back and forth, yeah, just, you

25            know, their opinions of him and how I -- you
```

```
 1            know, I just told them it wasn't true.  That

 2            was it.

 3      Q.    Did you continue to see Mr. Duke?

 4      A.    After my mom?

 5      Q.    Yes, ma'am.

 6      A.    No.

 7      Q.    Did you have any communication with him during

 8            that period of time?

 9      A.    After that day me and my mom got into it?

10      Q.    Right.

11      A.    Yes.  The day after that happened is when I

12            left home.  I saw him maybe once after I left

13            home.

14      Q.    Now, when you say you left home, could you

15            tell us the circumstances around you leaving

16            home?

17      A.    I was at school and it was sometime probably

18            around lunch time.  Me and my friends at

19            school were in the bathroom.  I had showed

20            them some bruises from where my mom just let

21            me know how she felt about me leaving school

22            like I did and her not knowing where I was at.

23            I had told them the reason -- I told them the

24            reason mama and daddy didn't want me to see

25            Mark was because my dad wanted me all to
```

```
 1          himself.  They wanted to know why.  And at
 2          that time, only one of the people that were in
 3          the bathroom knew about the first time I had
 4          said something about it.  They told me that I
 5          needed to go to the counselor's office and let
 6          Mrs. Snyder know about it, which is the school
 7          counselor at Isabella.  So I went to her
 8          office.  I showed her the bruises.  I told her
 9          that -- She asked me what happened.  I told
10          her that my mom had beat on me because I had
11          went home with Catheryn and she found out I
12          was with Mark.  I told her about my dad
13          sexually touching me, having sex with me,
14          everything.  Right at that moment, she called
15          DHR, told them what she had.  She called my
16          sister and my brother in the office and then
17          my mom was called up there.
18     Q.   Now, you made a reference about an allegation
19          you made the first time.  Could you tell us
20          about that, please, ma'am.
21     A.   What had happened was my friend that I had
22          spent a lot of time with, we rode horses, her
23          brother -- we went to a rodeo together.  Her
24          brother had went and told a bunch of his
25          friends that he had had sex with me, which was
```

```
 1            not true.  And so I thought my way of getting

 2            back at him was, you know, to kind of spread

 3            the same kind of lie to get back at him.  I

 4            told some people that I was pregnant.  It got

 5            back to his aunt, the one that -- the person

 6            he was staying with.  She asked me about it.

 7            I didn't want to get in serious trouble with

 8            her about it, so I added on to the lie and

 9            said that the reason I had said that because I

10            didn't know whose baby it was.  I brought up

11            the fact that my dad was messing with me.

12      Q.    Now, how old were you at that time?

13      A.    Probably twelve.

14      Q.    Now, when you said -- when you made this

15            statement to him -- What was the lady's name

16            who was the aunt?

17      A.    Sue Pilkerton.

18      Q.    When you told Mrs. Pilkerton that your father

19            had been sexually molesting you, was that a

20            true statement?

21      A.    No.

22      Q.    Why would you tell something like that if it

23            wasn't true?

24      A.    Because me and my dad were having problems

25            getting along.
```

1    Q.    Had you and your father had a long history of

2          getting along?

3    A.    Yeah.  I mean, there was a long history, quite

4          a few years.  We played softball.  He taught

5          me how to do a lot of things.

6    Q.    And what -- How would you describe the basis

7          of the problems you had with your father?

8    A.    I just could not really have a social life.  I

9          had no privacy.  I kept lying and didn't

10         understand that if I kept lying, you know, I

11         wasn't going to have that.  I wasn't going to

12         have no trust.  I wasn't going to have any

13         freedom.

14   Q.    Is this the only lie that you told during that

15         period of time?

16   A.    No.

17   Q.    Would it be fair to say that on a number of

18         occasions you told untruths?

19   A.    Yes.  Little things like stuff to do with

20         school.

21   Q.    What, if anything, happened?  Going back to

22         this conversation you had with Mrs. Pilkerton,

23         what, if anything, happened after that

24         conversation?

25   A.    Like what?

1    Q.   Was there an investigation made?

2    A.   I know that -- I believe Sue had called

3         somebody.  I want to say she called my mom or

4         my mom called looking for me.  My friend and

5         her boyfriend and I took off in his truck, in

6         her boyfriend's truck, just took off riding

7         around because I didn't want to go home.

8    Q.   How old was your friend?

9    A.   She's about a year older than me.

10   Q.   She would have been thirteen?

11   A.   Yeah.

12   Q.   How old was her boyfriend?

13   A.   Scotty was probably about seventeen, something

14        like that.

15   Q.   Do you recall Scotty's last name?

16   A.   No, I can't remember.

17   Q.   All right.  Now, you understand today that

18        you're under oath?

19   A.   Yes.

20   Q.   You understand the significance of that?

21   A.   Right.

22   Q.   Can you tell the Court whether or not when you

23        made this allegation as a twelve-year-old

24        about your father sexually abusing you,

25        whether that was a true statement or not?

```
 1    A.    Yes.

 2    Q.    Could you tell the Court whether or not it was

 3          true?

 4    A.    It was not true.  I mean --

 5    Q.    To your knowledge, was the Department of Human

 6          Resources ever involved in that investigation?

 7    A.    Yes.  Mrs. Bates, I can't think of her first

 8          name, but Mrs. Bates was the social worker

 9          that was at the house.

10    Q.    Do you know whether or not DHR found that

11          particular allegation to be unfounded?

12    A.    No.  I had took my statement back.  I had

13          recanted my statement before we -- I mean, we

14          were never taken out of the house or anything

15          like that.  A counselor was sent, but I

16          recanted.

17    Q.    All right.  Now, I believe you -- I'm

18          moving -- I apologize.  I'm moving you back

19          and forth.  Let's go back to the time where

20          you're at school the day after your mother had

21          caught you sneaking off seeing Mr. Duke.  I

22          believe you said at that time you related to

23          one of your classmates or maybe several of

24          your classmates that your father was sexually

25          molesting you?
```

```
 1    A.   Right.

 2    Q.   What was the reason for making that statement?

 3    A.   The fact that my mom had beat on me.  She had

 4         never hit me before.  It just made me feel

 5         like they didn't want me there.  And on top of

 6         my dad and I arguing all the time.

 7    Q.   Could you tell us basically how you felt about

 8         how at that time your parents felt about you?

 9    A.   I just felt like they didn't care, you know,

10         that they really felt like I was a mistake.

11    Q.   Had you had that feeling for a long period of

12         time?

13    A.   Yeah.

14    Q.   Now, what happened after this conversation

15         you've told us about with your classmates?

16    A.   I went to the counselor's office, talked to

17         Mrs. Snyder about the same thing I told them,

18         about my dad sexually abusing me.  My mom had

19         hit on me quite a bit and left bruises.

20         That's when Mrs. Snyder had reported it to DHR

21         before school was even out.  She called my

22         sister and my brother up there to the office.

23         We stayed there until DHR, an officer showed

24         up.  Then my mom had showed up because she

25         couldn't figure out why we hadn't gotten home
```

1       on the bus yet.

2   Q.  Where did you go when you left school that

3       day?

4   A.  They escorted us to the house, me and my

5       sister, to get some clothes.  We were taken to

6       a foster home.

7   Q.  When you say they, who is that?

8   A.  Mrs. Bates, I believe, or it might have been

9       Kay Massler.  It was one of the two.  I can't

10      think of the officer's name, but he's still an

11      officer now with the county.

12  Q.  Prior to this conversation you had with your

13      classmates that particular day, had you ever

14      had any conversation with any of them about

15      living in DHR custody?

16  A.  After I left home, did I say anything to them

17      about staying where I was at?

18  Q.  Or did you know anything about what would

19      happen to you --

20  A.  No.

21  Q.  -- if DHR took you into custody?

22  A.  I just knew I wouldn't have to stay at home.

23  Q.  Was that something that you wanted to

24      accomplish, getting away from home?

25  A.  Yes.  I wanted to see Mark.

```
 1    Q.   Did you feel like your parents would not let
 2         you see Mark?
 3    A.   I knew they would try everything they could to
 4         keep us apart.
 5    Q.   Now, as far as that allegation you made -- and
 6         how old were you at that time?
 7    A.   I had -- It was after my fifteenth birthday.
 8    Q.   At that time the allegation you made about
 9         your father, was it true?
10    A.   No.
11    Q.   And you understand you're under oath today?
12    A.   Yes.
13    Q.   And why would you tell an untruth of that
14         nature about your father when you were
15         fifteen?
16    A.   Because I felt like Mark cared more about me
17         than what my dad did.
18    Q.   What happened to you after the policeman and
19         the DHR worker took you home and got your
20         clothes, where did you go?
21    A.   We went to a foster home.
22    Q.   How long were you at that foster home?
23    A.   Maybe a month.
24    Q.   While you were at the foster home, did you
25         have a conversation with anybody about these
```

```
 1        allegations?

 2   A.   No.  No one ever asked, no one ever

 3        volunteered any information.

 4   Q.   Where did you go after the foster home?

 5   A.   I went to an A-home, an attention home, in

 6        Alabaster.

 7   Q.   Let me ask you this.  Was your sister also

 8        removed from the home?

 9   A.   Yes.

10   Q.   During this period of time, did you have any

11        conversation with your sister?

12   A.   We might have had a few arguments.

13   Q.   What kind of arguments would you have had?

14   A.   She blamed me for being away from home.  She

15        claimed she only done it to help me get out.

16   Q.   That she claimed that she backed up your story

17        just to get you out of the house?

18   A.   Exactly.

19   Q.   But I believe she was also taken into DHR

20        custody?

21   A.   Right.  She didn't know it was going to happen

22        that way.

23   Q.   Would you say -- When you say arguments, I

24        assume that y'all took opposite positions?

25   A.   Yes.
```

```
 1   Q.   How long were you at the attention home in
 2        Alabaster?
 3   A.   I was there probably about eight months.
 4   Q.   Could you generally describe what took place
 5        while you were there.
 6   A.   Well, at the time that my sister was there
 7        with me, we constantly argued just about
 8        everyday.  It caused me to go up and down on
 9        the level system.  I became really aggressive,
10        throwing things, hitting walls.  When my
11        family came, they came to visit Crystal.  That
12        made things worse.  I just -- I started acting
13        out more.
14   Q.   Did that make you feel -- When they went to
15        see Crystal and didn't visit you, did that
16        make you feel again that you were not wanted?
17   A.   Yes.
18   Q.   What happened when you left the attention home
19        in Alabaster?
20   A.   I'm trying to think.  I've been through so
21        many placements.  I'm trying to think of where
22        I went then.  I believe I went to Montgomery
23        to another short-term home.
24   Q.   Could you tell us a little bit about that.
25   A.   Well, I was there maybe a few weeks.  I
```

25

```
 1            attended school in Montgomery.  I really never

 2            had any problems there other than a male staff

 3            member.  I didn't have no problem getting

 4            along with anybody or anything like that.

 5     Q.     Did you make an allegation about a male staff

 6            member?

 7     A.     Yes.

 8     Q.     Of a sexual nature?

 9     A.     Yes.

10     Q.     Were you transferred after that?

11     A.     Yes.

12     Q.     And where were you transferred?

13     A.     I went to Birmingham.  I went to Gateway.

14     Q.     Okay.  How long were you at Gateway?

15     A.     Well, at first I was in their emergency

16            cottage where they just kept people for at

17            least two weeks until they found another

18            placement.  Then they transferred me on as a

19            resident there.

20     Q.     While you were at Gateway, did you have an

21            occasion to talk to anybody about these

22            allegations you had made?

23     A.     Yes.

24     Q.     Who did you talk to?

25     A.     I had made a few friends.  I had went through
```

```
 1            two counselors on that campus.  And then I --
 2            they were our counselors.  We were to talk to
 3            them and nobody else as far as staff went.
 4            There might have been a couple of staff
 5            members that I opened up to.
 6    Q.     And did you advise any of those people that
 7            your statement about your father had not been
 8            true?
 9    A.     The first counselor, no.  Mr. Bowman I did.
10    Q.     What did you tell Mr. Bowman?
11    A.     I told him that it never happened, that my dad
12            never touched me.  He never made any kind of
13            move towards me.
14    Q.     Why did you tell Mr. Bowman that?
15    A.     Because I wanted to go home.  I mean, because
16            it wasn't true, which I told him that, but I
17            wanted to go home.  I got tired of being in
18            DHR's custody.
19    Q.     Now, you raise an interesting point there.  At
20            any time did you recant what you said about
21            your father to gain any advantage?
22    A.     No, other than just to go home.
23    Q.     Now, today has anybody made any promises to
24            you or made any offers or inducements to you
25            for you to come testify?
```

```
 1   A.   No.   There's no need to.

 2   Q.   Do you live with your parents?

 3   A.   No.

 4   Q.   Do your parents support you?

 5   A.   No.

 6   Q.   Now, could you tell us after you talked to

 7        Mr. Bowman, did you have -- did you make any

 8        friends there?

 9   A.   Yes.  I made quite a few.

10   Q.   Let me go back.  Did you have an occasion to

11        have any further correspondence with Mr. Duke

12        during any of this period of time we were

13        talking about?

14   A.   Yes.  We were writing back and forth.

15   Q.   Was this before or after Mr. Duke had been

16        charged with capital murder?

17   A.   This was after.

18   Q.   What correspondence did you have?

19   A.   Just writing until they stopped the letters.

20        I mean, there wasn't nothing.  I never saw

21        him, never talked to him.  We just wrote back

22        and forth for a few months.

23   Q.   Could you sort of summarize some of that

24        correspondence for us?

25   A.   Like how?
```

```
 1    Q.   Could you sort of tell us what you wrote him

 2         and what he wrote you?

 3    A.   Basically that we missed each other.  He had

 4         told me that my dad had threatened, you know,

 5         to hurt him if he didn't stay away from me.

 6         This was like before I left.  That we missed

 7         each other.  That he still thought about me.

 8         And that if things would have turned out

 9         differently, he probably wouldn't be where he

10         was at.  The fact that I had mentioned in one

11         of my letters, the last letter I wrote to him,

12         that we pretty much should have off'd my dad

13         when we had the chance.

14    Q.   When you say off your dad --

15    A.   Kill him.

16    Q.   I believe you said previous in your

17         conversation there was a period of time that

18         you were involved in some gang activity?

19    A.   Yes.

20    Q.   Can you tell us about that, please, ma'am?

21    A.   I wasn't really involved in it because I was

22         in a group home.  You know, we didn't come and

23         go as we pleased.  When I was in Alabaster is

24         when I come known of it.

25    Q.   And did that particular gang have a means of
```

```
 1            communication?

 2    A.     Sometimes, yeah.  I mean, just letters or

 3            briefly meeting at the pool or something, just

 4            little things, nothing ever serious.

 5    Q.     Was there any symbolism that y'all used to

 6            identify each other as members of the gang?

 7    A.     Yes.  Some had certain tattoos.  Some had

 8            certain carvings on them.  They had a certain

 9            hand -- you know, sign language.

10    Q.     Was Mr. Duke a part of this particular gang?

11    A.     No, not this one.

12    Q.     But was he a member of a gang?

13    A.     Yes.

14    Q.     And do you recall which gang he was a member

15            of?

16    A.     At the time that he was still here in Clanton,

17            it was a gang called Dukes.  That wasn't the

18            same one he was in whenever we were writing.

19    Q.     What gang was he in when y'all communicating?

20    A.     He was a Folk.

21    Q.     Now, you indicated to him that you still had

22            some animosity toward your father?

23    A.     Yes.

24    Q.     What was the basis of that animosity?

25    A.     Basically that my dad had told him to stay
```

```
1           away.  I just kept thinking about the problems

2           that my dad caused for me and him.

3    Q.     Would it be a fair statement to say during

4           that period of time you still had a great deal

5           of affection for Mr. Duke?

6    A.     Yes.

7    Q.     Did you have an occasion while you were at

8           Gateway to form any other romantic

9           attachments?

10   A.     Yes.  There was one on campus.

11   Q.     Could you tell us briefly about that, please,

12          ma'am.

13   A.     He reminded me a lot of Mark.  He had his

14          little thug attitude type.  He just -- nothing

15          could stop him, nothing could hurt him.  You

16          know, he thought he was all that.  He seemed

17          to really care about me.  I cared for him as

18          if I thought it was Mark.

19   Q.     Do you recall his name?

20   A.     His name is Bruce.

21   Q.     How long were you involved with Bruce?

22   A.     Practically the whole time I was there on

23          Gateway Campus, a little over a year.

24   Q.     What happened after you left Gateway?  Where

25          did you go next?
```

```
 1    A.   I went to Gadsden, I think.

 2    Q.   Do you recall where you were in Gadsden?

 3    A.   It was just some children's home.  I don't --

 4         I only stayed there a day.

 5    Q.   Was there any particular reason you only

 6         stayed a day?

 7    A.   I wasn't going to go to school there.  There

 8         was eleven year olds in the house.  There was

 9         no one there my age.

10    Q.   So you just refused to --

11    A.   Go to school, so they had to release me.

12    Q.   Where did you go after that?

13    A.   I believe I went to Selma.

14    Q.   Where did you go in Selma?

15    A.   To the Methodist home.

16    Q.   How long were you there?

17    A.   Maybe a couple of months.

18    Q.   Approximately how old are you by now?

19    A.   Seventeen, sixteen.

20    Q.   Where did you go after you left Selma?

21    A.   I went to Montgomery.  That's where I

22         became -- I was in an independent living

23         program.

24    Q.   Could you sort of explain to us how the

25         independent living program worked?
```

```
 1    A.    They basically were to help you get a job.
 2          They had apartments that were furnished that
 3          you and a roommate would stay in until you
 4          could prove to them that you were able to make
 5          it on your own.  You had rules, curfew.  But
 6          you were expected to get a job.  You were not
 7          allowed to have a vehicle.  You bought your
 8          own groceries, paid part of the bills.  It's
 9          basically just like living on your own but
10          with a little help.
11    Q.    But you did have a curfew?
12    A.    Yes.
13    Q.    During that period of time, did you form any
14          romantic attachments?
15    A.    There were a couple.  Well, I would say one,
16          the first one that was really romantic.
17    Q.    And how long did this relationship go on?
18    A.    The first one?
19    Q.    Well, the most significant one of the two.
20    A.    Probably a couple of months.
21    Q.    During that period of time, did you have the
22          occasion to break curfew?
23    A.    Yes.
24    Q.    Could you tell us about that, please, ma'am.
25    A.    I would be there when the alarms were set, but
```

1       I would leave a window cracked so that I could

2       sneak out when everybody left.

3  Q.  And would you basically stay out all night and

4       then come back before you got checked?

5  A.  I would be back before I knew what time they

6       were supposed to be there before school would

7       start.

8  Q.  Would you think it a fair statement to say

9       that basically throughout your young adulthood

10      that you had a continuing pattern of basically

11      violating rules whenever you wanted to see --

12      whenever you had a romantic attachment?

13  A.  Yes.

14  Q.  Now, how long were you at Montgomery?

15  A.  Maybe six months, something like that.

16  Q.  And after that, where did you go?

17  A.  They released me after that.  DHR released me

18      to go back home.

19  Q.  Released you to go back and live with your

20      father?

21  A.  They released me back into my mom and dad's

22      custody.

23  Q.  So DHR at that time, even though you had made

24      these allegations that started this -- How

25      long were you in DHR's custody?

```
 1    A.    About three years.

 2    Q.    They ultimately released you back to your

 3          father's house?

 4    A.    Right.

 5    Q.    Did you have any problems with going back to

 6          your father's house?

 7    A.    No.  I mean, I was ready to go home.  I was

 8          having sort of a situation at the time that

 9          they released me about the second guy that I

10          was seeing that I was ready to get out there

11          so I could have the freedom to go see him.

12    Q.    Did you have any problems with your parents'

13          supervision once you went back home?

14    A.    Not at first.

15    Q.    At some point in time, did you develop some

16          problems?

17    A.    Yes.

18    Q.    Could you just briefly sort of tell us about

19          those?

20    A.    Well, there was a week of school that me and

21          my sister both skipped, which I don't think

22          they knew about that until afterwards.  After

23          a while, my sister was -- I was told not to

24          see my sister because of what she had done a

25          couple of years before.  My mom and dad felt
```

```
 1            really hurt by it.  My dad told me not to see
 2            her.  I went and seen her.  I never called
 3            them to tell them where I was at.  So my dad
 4            thought I was off doing drugs.
 5     Q.     What had transpired about your sister that had
 6            caused your dad's concern?
 7     A.     There was some kind of deal made.  I don't
 8            know.  It had something to do with her getting
 9            married.  I really don't know how all that
10            went.  I don't know what was said, what was
11            done.  I know that it really upset daddy.
12     Q.     During this period of time you're telling us
13            about, after DHR released you back to your
14            parents' custody, did you have any physical
15            confrontation with your parents?  Were you
16            spanked or anything?
17     A.     No.  Except the day I did come back home from
18            staying with my sister for a while, me and my
19            dad got into a real bad argument.  That was
20            the last day I stayed home.
21     Q.     All right.  Would it be fair to say that y'all
22            pretty much parted on --
23     A.     Yes.  He told me to leave.
24     Q.     -- rather poor terms.  Was that before his
25            trial?
```

1    A.    Yes.  Before the final one, yes.

2    Q.    Now, do you recall where you were called to

3          testify against your father?

4    A.    Yes.

5    Q.    Do you recall what you said?

6    A.    From the things that I was asked, I was asked

7          specific things, you know, what my dad done to

8          me and I answered them saying that he did have

9          sex with me.  I briefly described him coming

10         in my room and waking me up in the middle of

11         the night after everybody else went to bed.

12         Things that they had asked, I answered to.

13   Q.    Was your testimony at that time truthful?

14   A.    No.

15   Q.    Why did you give untruthful testimony at that

16         time?

17   A.    Because after I left home, I just -- I never

18         had anything else to do with my mom and dad.

19         But also because every time I recanted my

20         story, I was told that it was against the law

21         to be under oath and lie.  I was scared of

22         being -- of going to jail from what I was

23         told.

24   Q.    Did you ever have a discussion with anybody

25         concerning -- say a lawyer concerning

1      recanting your story?

2   A.   Yes, there was a couple.  When I had recanted

3        saying that my dad never did do anything that

4        I said he had done, where I was at would call

5        Elizabeth Moorehead.  They would call her.

6        They would call DHR to let them know I

7        recanted, what I was saying.  I would

8        eventually have a meeting with them.

9   Q.   What took place at those meetings?

10  A.   I had told them that it was not true, whoever

11       DHR had sent and Elizabeth.  I told them it

12       was not true and that I wanted to go home.  It

13       would be said, you know, that it was against

14       the law to lie under oath, this and that.

15       That, you know, there was a chance I could go

16       to jail for lying if it was not true.

17  Q.   And your lawyer told you that?

18  A.   Yes.

19  Q.   Now, did you ever have an opportunity to have

20       a discussion with Jennifer Jordan of the

21       District Attorney's office?

22  A.   Yes, on one occasion.

23  Q.   And on that occasion, did you advise

24       Ms. Jordan that your story was not true?

25  A.   Yes.

1    Q.    What, if anything, did Ms. Jordan tell you at

2          that time?

3    A.    The same thing.  You know, that it was against

4          the law and that I could go to jail for lying

5          on the stand.

6    Q.    And did that have any impact on your decision

7          to testify against your father untruthfully?

8    A.    Yes.  I did not want to go to jail.

9    Q.    Now, since that time, can you just sort of

10         briefly tell us what has happened in your

11         life?

12   A.    Well, since I left home, the guy I'm married

13         to now, my husband, we've been together three

14         years.  We have a daughter that is a year and

15         a half old.  Since my daughter was born, I've

16         had quite a bit of contact with my mom and my

17         dad.

18   Q.    Now, do you consider yourself more mature

19         today than you were back when all this took

20         place?

21   A.    Yes.

22   Q.    And I believe you've told us you've got a

23         child of your own?

24   A.    Yes.

25   Q.    Now, I believe when you and I had our first

```
 1            discussions that I advised you that I wanted
 2            you to tell the truth?
 3   A.    Yes.
 4   Q.    And can you look at the Judge and tell him
 5            what is the truth about the situation -- about
 6            the allegations you made on at least two
 7            occasions about your father?
 8   A.    Yes.  My daddy -- I lied about my dad having
 9            sex with me.  Everything that I testified
10            about before at the last court hearing was not
11            true.
12            MR. HILL:  I believe that's all we've
13            got, Your Honor.
14            THE COURT:  Mr. Hayden.
15                      CROSS-EXAMINATION
16   BY MR. HAYDEN:
17   Q.    Now, you are the same person that did testify
18            against James Walker when this case was tried
19            by Judge Reynolds back in, I believe it was,
20            1999?
21   A.    Physically yes, mentally no.
22   Q.    Just answer --
23            MR. HAYDEN:  Judge, would you instruct
24            her to answer the questions.  I don't need any
25            of her showmanship.
```

```
 1   Q.   You have manipulated the court systems ever
 2        since you first started this, haven't you?
 3   A.   Yes.
 4   Q.   Now, you gave a statement last year that first
 5        brought -- a sworn statement in September of
 6        2001 as to basically the things that you're
 7        telling us here today; is that correct?
 8   A.   Yes.
 9   Q.   And at that time, did you know that the person
10        who was -- You gave that statement at
11        Mr. Hill's office, didn't you?
12   A.   Yes.
13   Q.   But at that time, another lawyer was
14        representing your daddy.  Did you know that?
15   A.   Yes.  I don't know who, but --
16   Q.   Did you know based on that statement, they
17        filed a motion with the Supreme Court to
18        reconsider the case?
19   A.   Yes.
20   Q.   And they didn't let him out then, did they?
21   A.   No.
22   Q.   But when it came time for the trial of the
23        case in this case, you came in and you took
24        the stand and you told Judge Reynolds certain
25        things that your father had done to you,
```

41

```
 1          didn't you?
 2     A.   Yes.
 3     Q.   Now, do you ever recall talking to David Karn,
 4          who was your father's attorney at the time of
 5          trial?
 6     A.   No.
 7     Q.   You didn't talk to Mr. Karn?
 8     A.   Not that I remember, no.
 9     Q.   Do you remember him questioning you during the
10          trial?
11     A.   Yes.
12     Q.   He cross examined you after you were examined
13          by the State?
14     A.   Right.
15     Q.   Now, you told us about your past and a little
16          bit about your present.  It's true that you
17          and your husband have had trouble since y'all
18          have been going together and been married,
19          isn't it?
20     A.   We've had one occasion, yes.
21               MR. HAYDEN:  I believe that's all.
22               MR. HILL:  No further questions of this
23          witness.
24               THE COURT:  You may stand down.  Call
25          your next witness.
```

```
 1              MR. HILL:  I would call Crystal Williams.

 2              THE COURT:  Let the Record reflect that

 3         Crystal Williams has been called.  Raise your

 4         right hand.

 5                    * * * * * * * *

 6                    CRYSTAL WILLIAMS

 7              The witness, called by the Defendant,

 8    after having first been duly sworn to speak the

 9    truth, the whole truth, and nothing but the truth,

10    took the stand and testified as follows:

11                   DIRECT EXAMINATION

12    BY MR. HILL:

13    Q.    Tell us your name, please, ma'am.

14    A.    Crystal Elaine Williams.

15    Q.    And do you know this gentleman seated over

16          here in white?

17    A.    Yes.

18    Q.    Who is he, please, ma'am?

19    A.    He's my dad.

20    Q.    And did you hear your sister Jennifer testify?

21    A.    Yes, I did.

22    Q.    Would it be fair to say you're her little

23          sister?

24    A.    Yes.

25    Q.    Are you married?
```

```
 1    A.    Yes.

 2    Q.    How long have you been married, please, ma'am?

 3    A.    Almost four years.

 4    Q.    Are you employed?

 5    A.    Yes.

 6    Q.    How are you employed?

 7    A.    Through the United States Navy.

 8    Q.    Congratulations.

 9    A.    Thank you.

10    Q.    I want to bring you back in time to a period

11          when you were questioned at the school

12          concerning some allegations your sister made.

13          Do you recall that time period?

14    A.    Yes, sir.

15    Q.    Could you tell us a little bit about what

16          happened.

17    A.    Well, I was sitting in Home Ec class.  I was

18          called to the officer to talk to the

19          counselor, Mrs. Snyder.  She pulled us in the

20          office.  Jennifer went to talking and I --

21    Q.    Let me ask you this.  Who was present at this

22          conversation?  I mean, who all was in the

23          room?

24    A.    Me, Jennifer, and the counselor, Mrs. Snyder.

25    Q.    It was all three of you together?
```

```
 1    A.   Yes.

 2    Q.   And prior to that time, had Jennifer and your

 3         parents had any problems?

 4    A.   Yes.

 5    Q.   Could you tell us about those, please, ma'am.

 6    A.   Well, it's pretty much just like what Jennifer

 7         said basically.  She was into boys,

 8         particularly one that was into a lot of

 9         trouble, into drugs.  She liked him so much

10         that she decided not to believe that and

11         decided to think that he was just God

12         almighty.  So she had a lot of problems with

13         my mom and dad with that issue.  It got to the

14         point where she felt that she didn't have to

15         abide by the rules.  She was going to do what

16         she wanted to.

17    Q.   And I gather that that brought a good deal of

18         disharmony to your house?

19    A.   Yes.

20    Q.   Now, if you could, tell us about this

21         conversation that took place when you, your

22         sister, Jennifer, and school counselor were

23         present?

24    A.   Jennifer just continued telling Mrs. Snyder

25         about some things.  Mrs. Snyder turned to me
```

| | | |
|---|---|---|
| 1 | | and asked me, you know, if I knew anything. |
| 2 | | But prior to this, me and Jennifer had had a |
| 3 | | discussion.  She was crying.  She was sexually |
| 4 | | active with this boy and thought she was |
| 5 | | pregnant at the time.  She just wanted so bad |
| 6 | | to leave home. |
| 7 | Q. | Let me ask you this.  When did that |
| 8 | | conversation with your sister take place in |
| 9 | | relationship to being in the counselor's |
| 10 | | office? |
| 11 | A. | The day prior when she had had a big blow up |
| 12 | | with my mom and dad about this boy. |
| 13 | Q. | What did Jennifer tell you at that time? |
| 14 | A. | She just -- She told me that my dad had made |
| 15 | | advances toward her and that she just wanted |
| 16 | | to get out of the house because she wanted to |
| 17 | | go live with this boy.  But my dad would never |
| 18 | | do that because he just didn't want Jennifer |
| 19 | | to be with anybody.  So this -- She could only |
| 20 | | see that this was the only way that she would |
| 21 | | be able to get out of the house. |
| 22 | Q. | How old were you at that time? |
| 23 | A. | Like ten. |
| 24 | Q. | How old was she at the time? |
| 25 | A. | About twelve, because I believe I had a |

|   |    |                                                        |
|---|----|--------------------------------------------------------|
| 1 |    | birthday right after.                                  |
| 2 | Q. | Prior to that time, had you ever seen any              |
| 3 |    | evidence growing up in your household that             |
| 4 |    | your father had done anything inappropriate            |
| 5 |    | with your sister?                                      |
| 6 | A. | Not that I know of.                                    |
| 7 | Q. | Did you ever have any problems with your               |
| 8 |    | father doing anything inappropriate with you?          |
| 9 | A. | No.                                                    |
| 10 | Q. | What did you tell the counselor that day?             |
| 11 | A. | I just told her what Jennifer had told me,           |
| 12 |    | that our dad had made sexual advances, this           |
| 13 |    | that and the other.  I just told some of the         |
| 14 |    | stuff that Jennifer told me or had said to me.       |
| 15 | Q. | Did you question whether Jennifer was telling         |
| 16 |    | you the truth when you first heard those             |
| 17 |    | statements?                                           |
| 18 | A. | Yes, I asked her.  We talked about it.  But I        |
| 19 |    | was ten years old.  I didn't -- I mean, I was        |
| 20 |    | into cheerleading and softball.  I didn't           |
| 21 |    | really care about problems like that.               |
| 22 | Q. | All right.  What, if anything, happened after        |
| 23 |    | this conversation in the counselor's office?        |
| 24 | A. | We had to sit there and wait until DHR, I           |
| 25 |    | think her name was Kay Massler, showed up.          |

```
 1          She questioned us and next --
 2    Q.    Let me ask you this.  Were you always
 3          questioned when both of you were in the room?
 4    A.    No.  They made us write down statements with a
 5          police officer.  Then our mom showed up.  They
 6          explained to her what had happened and what
 7          was going on.  They took us to our house to
 8          get some clothes.  Then they proceeded to take
 9          us to a foster home right in town.
10    Q.    And how -- Were you placed under DHR's
11          custody?
12    A.    Yes.
13    Q.    How many years were you under DHR's custody?
14    A.    Somewhere between three and a half to four.
15    Q.    Did you and your sister ever have any
16          discussions about you being taken out of the
17          home?
18    A.    Yes.  To begin with, we fought a lot about it
19          because I was pretty, I would say, ticked off
20          about it.
21    Q.    Why were you ticked off?
22    A.    Because I didn't want to have to be away from
23          my family.
24    Q.    Were you afraid of your father?
25    A.    No.
```

```
 1    Q.   Were you concerned with going back home?

 2    A.   No.

 3    Q.   Was that part of the argument, the fact that

 4         you wanted to go back home and you couldn't

 5         because of Jennifer's allegations?

 6    A.   Yes.

 7    Q.   How long did you stay in DHR custody?

 8    A.   Just about the same, about three and a half,

 9         four years.

10    Q.   What happened when you came out of DHR

11         custody?

12    A.   Well, it was kind of a mix up.  They put me

13         back into my parents' custody.  And but from

14         there, I was put back into foster care and

15         then proceeded to be married.

16    Q.   So DHR placed you back in your father's

17         home --

18    A.   Yes.

19    Q.   -- at some point in time?

20    A.   Yes.

21    Q.   And then later you were married?

22    A.   Yes.

23    Q.   And I believe you've told us you have been

24         married for about four years?

25    A.   Yes.
```

1    Q.    How old are you now?

2    A.    Nineteen.

3    Q.    Did you ever see -- Besides what Jennifer told

4          you, have you ever seen any other evidence

5          that would lead you to believe that your

6          father has molested your sister?

7    A.    No.

8    Q.    Do you have any reason to doubt that your

9          sister's statements were untrue?

10   A.    No.  I just never paid attention to anything

11         like that.  I was hardly ever at home.

12   Q.    But as far as you know, you didn't see

13         anything that would lead you to believe that

14         those were true?

15   A.    No.

16   Q.    You never had any problems with your father

17         yourself?

18   A.    No.

19              MR. HILL:  I believe that's all.

20                   CROSS-EXAMINATION

21   BY MR. HAYDEN:

22   Q.    Mrs. Williams, you didn't testify when the

23         case was actually tried against your father by

24         Jennifer, did you?

25   A.    No.  I was in Florida at the time.

```
 1    Q.    And did anybody contact you wanting you to

 2          testify for either side?

 3    A.    No.

 4    Q.    Were you in contact with Jennifer at that

 5          time?

 6    A.    No.  I was not in any contact with any of my

 7          family at that time.

 8              MR. HAYDEN:  I believe that's all.

 9                    REDIRECT EXAMINATION

10    BY MR. HILL:

11    Q.    Would you have been willing to come and

12          testify if somebody had contacted you to

13          testify in your father's trial?

14    A.    Yes.

15              MR. HILL:  I believe that's all of this

16          witness.

17              THE COURT:  You may stand down.

18              MR. HILL:  We would call Elizabeth

19          Moorehead.

20                    * * * * * * * * *

21                    ELIZABETH MOOREHEAD

22          The witness, called by the Defendant, took

23    the stand and testified as follows:

24              THE COURT:  Let the record reflect that

25          Elizabeth Moorehead has been offered as a
```

```
 1              witness.  She's a member of the Chilton County

 2              Bar and recognized as an officer of the Court.

 3              State your name please ma'am.

 4                   THE WITNESS:  Elizabeth Barnes Moorehead.

 5                        DIRECT EXAMINATION

 6     BY MR. HILL:

 7     Q.   Are you licensed to practice law,

 8          Mrs. Moorehead?

 9     A.   Yes, I am.

10     Q.   As part of your practice as an attorney, have

11          you had the occasion to represent a Jennifer

12          Walker Mims?

13     A.   Yes, I have.

14     Q.   Could you tell us what that occasion was,

15          please.

16     A.   I was appointed as her guardian ad litem in

17          the Juvenile Court of Chilton County.

18     Q.   Did you ever have any occasion to discuss with

19          her the allegation she made that her father

20          had sexually abused her?

21              MRS. MOOREHEAD:  Your Honor, I ask for

22          guidance on this in that apparently Mr. Hill

23          is asking for attorney-client privileged

24          information.  I certainly have no problem if

25          my client instructs me that I can speak about
```

```
 1        this; otherwise, I really don't know how to

 2        handle that.

 3              MR. HILL:  I think since her client has

 4        already testified under oath --

 5              THE COURT:  Until her client waives it.

 6              MR. HILL:  Do you have any problems with

 7        her?

 8              MRS. JENNIFER WALKER MIMS:  No, I do not.

 9              MR. HILL:  Come put it on the record.

10              THE COURT:  Let the Record reflect that

11        Jennifer Walker Mims is present.  She has

12        previously been a client by appointment of

13        Mrs. Moorehead.

14              You have the opportunity to independently

15        waive the attorney-client relationship that

16        you have with Mrs. Moorehead which would

17        affectively allow her to say everything or

18        anything that you have said to Mrs. Moorehead.

19              MRS. JENNIFER WALKER MIMS:  I understand.

20              THE COURT:  Now, that gets past one

21        issue, but that doesn't get past all issues.

22        Do you wish to waive Mrs. Moorehead's -- your

23        privilege of her not testifying about anything

24        you have told her?

25              MRS. JENNIFER WALKER MIMS:  Do I waive?
```

```
 1              THE COURT:  Do you wish for
 2       Mrs. Moorehead to reveal to the Court anything
 3       and everything that you have said to her
 4       concerning her representation of you?  Now, if
 5       you say you don't waive it, she can't testify.
 6       If you say I do waive it, she can testify.
 7       She can tell me everything that you have said.
 8              MRS. JENNIFER WALKER MIMS:  I do waive
 9       it.
10              THE COURT:  You do waive it?
11              MRS. JENNIFER WALKER MIMS:  Yes.
12              THE COURT:  Anything further.
13              MR. HILL:  No, sir.
14              MR. HAYDEN:  No.
15              THE COURT:  Thank you.  Go ahead,
16       Mrs. Moorehead.
17   Q.  Do you recall any conversations you had with
18       her concerning the allegation she made about
19       her father?
20   A.  Yes, sir.
21   Q.  Were they on one or more occasions?
22   A.  Several occasions.
23   Q.  Do you recall any conversations you had with
24       her wherein she indicated that she was not
25       telling the truth about her father sexually
```

```
 1           abusing her?

 2    A.     Yes, sir.

 3    Q.     Could you tell us the circumstances

 4           surrounding that conversation.

 5    A.     To the best of my knowledge -- It's been

 6           several years ago.  But to the best of my

 7           knowledge, Crystal and Jennifer, Jennifer

 8           specifically, wanted to go home and said that

 9           she had made it up and it wasn't true.

10    Q.     What, if anything, did you do with that

11           information?

12    A.     It was revealed to DHR.  It was revealed to

13           the Juvenile Court.  That's all that was done.

14    Q.     Did she ever recant to you on more than that

15           one occasion you've told us about?

16    A.     I don't recall any other time.

17    Q.     Do you have a time frame roughly when that

18           would have been?

19    A.     No.  I'm sorry, I really don't.  I believe --

20           When I was listening to her testimony earlier,

21           I remember when she was in the Methodist home

22           in Selma.  I believe that's when it was, but

23           I'm not positive.

24    Q.     But you communicated that information to the

25           Juvenile Court?
```

```
1    A.    Yes, sir.

2    Q.    And to the Department of Human Resources?

3    A.    Yes, sir.

4    Q.    And I assume to the juvenile probation office?

5    A.    No, sir, not the juvenile probation office.

6          DHR and the Juvenile Judge, Judge Speaks, at

7          that time.

8                MR. HILL:  I believe that's all.

9                THE COURT:  Anything, Mr. Hayden?

10                    CROSS-EXAMINATION

11   BY MR. HAYDEN:

12   Q.    Mrs. Moorehead, were there times when Jennifer

13         told you that these things that she alleged

14         happened to her father actually happened?

15   A.    Yes, sir.

16                MR. HAYDEN:  That's all.

17                THE COURT:  Anything further?

18                MR. HILL:  Nothing, Judge.

19                THE COURT:  You may stand down.

20                MRS. MOOREHEAD:  Thank you, Judge.  May I

21         be excused?

22                THE COURT:  You may.

23                MR. HILL:  Judge, I think Mr. Karn is

24         next door.

25                    * * * * * * * *
```

1              **DAVID KARN**

2              The witness, called by the Defendant, took

3      the stand and testified as follows:

4              THE COURT:  Let the Record reflect that

5              David Karn has been called as a witness.  He's

6              a member of the Chilton County Bar, recognized

7              as a member of the Alabama State Bar and an

8              officer of the Court.  Would you state your

9              name.

10             THE WITNESS:  David Karn.

11             <u>DIRECT EXAMINATION</u>

12     <u>BY MR. HILL</u>:

13     Q.   Mr. Karn, have you had the occasion to

14          represent a Christopher Walker -- I'm sorry.

15     A.   James Walker, yes, sir.

16     Q.   James Walker.  I apologize.  It's been a long

17          day.

18     A.   Yes, sir.

19     Q.   What was that occasion, please, sir?

20     A.   The case where he was accused of rape and

21          sexual abuse on his daughter.

22             MR. HILL:  Your Honor, it's my

23          understanding by filing the 32 that he has in

24          effect waived that.  But if you would like to,

25          we can have Mr. Walker waive his

1        attorney-client privilege on the record.

2            THE COURT:  Let the Record reflect that

3        Mr. Walker is before the Court.  He is

4        represented by Billy Hill.

5            Mr. Walker, do you waive any

6        attorney-client privilege that you have

7        between yourself and David Karn, therefore,

8        affectively allowing him to testify at length

9        on anything that was discussed between you and

10        Mr. Karn?

11            THE DEFENDANT:  Yes, sir, I do.

12            THE COURT:  Thank you.

13            Mr. Karn, you're released from the

14        attorney-client privilege.

15  Q.  Do you recall when you first became involved

16      in this case?

17  A.  As I recall, I think I was representing James

18      in the juvenile proceedings prior to the

19      indictment, which was issued against him.  So

20      I was involved with some juvenile proceedings

21      prior to the indictment.  But I don't think he

22      went through a preliminary hearing or

23      anything.  I think it went straight through an

24      indictment as far as this case goes.  When the

25      indictment was handed down, I think in '97,

```
 1              would have been when I first got involved with

 2              James' case.

 3        Q.    Do you recall when his case was tried?

 4        A.    December of '99.

 5        Q.    So would it be fair to say there was

 6              approximately a two-year gap between time that

 7              you first became involved and you actually

 8              tried the case?

 9        A.    Right, yes.

10        Q.    During that period of time, did you have an

11              occasion to meet with Mr. Walker?

12        A.    Yes.

13        Q.    And could you give us an idea roughly how many

14              times you met?

15        A.    It would be a guess.  But twenty-five, twenty,

16              twenty-five times.  More so than probably I

17              would say in a normal case.

18        Q.    And was there any particular reason why you

19              spent more time with Mr. Walker than most

20              clients?

21        A.    Mr. Walker had obviously a very keen interest

22              in the outcome of his case.  So it was fairly

23              frequent for him to stay in touch with me

24              unlike some clients that I have.

25        Q.    Did you have an occasion to make an
```

```
 1          investigation into the underlying facts of
 2          this particular case?
 3    A.    Well, with assistance, yes.
 4    Q.    Could you sort of explain that for us, please,
 5          sir.
 6    A.    Well, you say investigation.  Obviously, I'm
 7          the attorney, not the investigator.  As you
 8          also know when you're a sole practitioner,
 9          sometimes you are both.  But James has a
10          friend by the name of Bill Roberts.  Bill is a
11          practicing -- Well, I don't know if he is
12          practicing or not.  He's an attorney from the
13          Birmingham area.  I think it is Bill, isn't
14          it -- Jim Roberts, that's right.  I have an
15          attorney in Prattville named Bill Roberts.
16          Sorry.  Jim Roberts was introduced to James at
17          some point.  I'm not sure the nature of the --
18          I think that relationship started from James
19          Walker's employer, Frank Skinner, introduced
20          them.  I think Jim kind of became very
21          interested in James' case, felt like he was
22          being railroaded.  And so Mr. Roberts hired, I
23          think, a couple of retired FBI agents.  They
24          had some sort of investigative background.
25          They did most of all the leg work and then
```

```
 1           brought the information to me.

 2    Q.     So would it be fair to say that you had a

 3           fairly extensive investigation in this case?

 4    A.     Yes, much more so than normal.

 5    Q.     Were you able to identify as part of that

 6           investigation any known history of emotional

 7           instability of Jennifer?

 8    A.     Yes.

 9    Q.     Could you tell us briefly about that, please,

10           sir.

11    A.     Through the appointment in Juvenile Court and

12           the information that was -- that I learned

13           along the way in representing James in

14           Juvenile Court, emotional instability -- I'm

15           not real sure you mean.

16    Q.     Let me ask you this.  Did you find that there

17           were a number of people who indicated that

18           Jennifer on occasion told untruths?

19    A.     Yes.  I called several of them as witnesses at

20           his trial.  I got that information from these

21           investigators as well.  They brought these

22           folks to me, friends of hers, and I think a

23           former foster parent of hers, five or six

24           people that came and testified at trial.

25    Q.     And these were peers her same age group?
```

1   A.   Some of them were, yeah.

2   Q.   Now, did you ever discover any evidence of

3        bias on the part of Jennifer against her

4        father?

5   A.   Yes.

6   Q.   Could you tell us about that, please, sir.

7   A.   Well, I mean, there's obvious bias by the fact

8        that she was testifying against him.  So I'm

9        not real sure what you mean by the word bias.

10       If you're making reference to the letter that

11       was uncovered during the course of the

12       investigation, the letter that she wrote to

13       Mark Duke.  There were some very strong bias

14       language contained in that letter.

15  Q.   And when did you obtain information about that

16       particular letter?

17  A.   I'm going to make reference to -- I'm pulling

18       a letter out of the file that I have that I

19       brought from my office.  What was your

20       question?

21  Q.   When did you find out about this Duke letter

22       where she had made these statements?

23  A.   I learned of its existence sometime in, I want

24       to say, October or November prior to the

25       trial.

1    Q.    How did you learn about it?

2    A.    Seems to me Mr. Roberts had gotten

3          information.  He told me that one of his

4          investigators had located something in the

5          DA's file in Mark Duke case in Shelby County.

6          That information came to me sometime in

7          October, because I got a letter from

8          Mr. Roberts dated November the 3rd, a fax from

9          him November 3rd of '99.  It makes reference

10         to a letter, that letter.

11   Q.    This was November 3rd of '99?

12   A.    Right.

13   Q.    And that was approximately a month before the

14         trial?

15   A.    That's right.

16   Q.    At that time, did you actually have a copy of

17         the letter in your possession?

18   A.    I did not.  I received that letter -- seems to

19         me there was some procedural quirks in getting

20         the letter.  The DA's office in Shelby County

21         didn't want to release it.  I think we had to

22         subpoena it.  Anyway, I didn't actually get my

23         hands on it until -- I'm using this letter in

24         refreshing my memory.  It says December the

25         11th or 12th.  That would have been as I

```
 1            recall when I got it in my hand.  It was faxed
 2            to my office.
 3     Q.     You started making attempts to gain it in
 4            November?
 5     A.     Right, yes.
 6     Q.     But because of the difficulty you had with the
 7            Shelby County District Attorney's office you
 8            were not able to obtain it until, I believe
 9            you said, December 12th?
10     A.     I think it was faxed to my office sometime
11            over the weekend.  I probably was not there,
12            physically there when it came in.  So I
13            couldn't tell you.
14     Q.     Now, when you speak of the weekend that it was
15            faxed, what was the relationship between that
16            weekend and the time this case was set for
17            trial?
18     A.     I think it was set for trial the next --
19            December 13th.
20     Q.     Which would have been that Monday morning?
21     A.     Yes.
22     Q.     So basically you only obtained this letter
23            pretty much the same day of trial?
24     A.     Yeah.
25     Q.     Had you ever made any request to the Chilton
```

```
 1           County District Attorney's office to obtain

 2           that letter?

 3     A.    I don't recall making any specific request.  I

 4           think Jennifer Jordan and I had some

 5           conversation about it.  But I can't recall any

 6           specifics of any conversation or when they

 7           might have taken place.

 8     Q.    Was Jennifer Jordan the principal prosecutor

 9           in this case?

10     A.    Yes.

11     Q.    Were you able to introduce that letter into

12           evidence?

13     A.    No.

14     Q.    And I believe there were objections made that

15           are on the record?

16     A.    Yes.

17     Q.    Of the trial of the case itself?

18     A.    Yes.

19     Q.    Did you ever have any discussion with

20           Mr. Walker concerning -- I understand this

21           case was tried non-jury?

22     A.    Yes.

23     Q.    Could you sort of tell us the circumstances

24           around that, please, sir?

25     A.    Well, it had been set for trial a couple of
```

```
 1          times.  And as I recall, as is the practice in

 2          this county, we didn't reach the case or it

 3          was continued for other reasons once or twice,

 4          maybe three times.  And on the morning of that

 5          fall's trial week, probably was October or

 6          November of '99, on the morning of trial I was

 7          prepared to go forward with the trial but had

 8          not received a good bit of the information

 9          that was -- that came from these

10          investigators.  In fact, I don't think they

11          were hired until after that date.  I don't

12          know because I didn't hire them.  But

13          Mr. Roberts approached me.  I don't know if

14          James was present.  I know he was present

15          during some of these conversations.

16          Mr. Roberts approached me and said if you can

17          buy me some more time, we will -- I will get

18          some investigators on this.  I will hire them

19          myself and we will investigate this case.

20     Q.   I'm assuming then that your decision to go

21          non-jury was for the purpose of gaining a

22          continuance?

23     A.   Yes.

24     Q.   And that was the strategic decision you made

25          because you felt like there may be other
```

```
 1            evidence out there?

 2   A.       Yes.

 3   Q.       Some of the evidence that turned up would be,

 4            in fact, this letter we just discussed?

 5   A.       Absolutely.

 6   Q.       Do you recall any other relevant testimony or

 7            investigation that came out of that

 8            circumstance?

 9   A.       Investigation?

10   Q.       Any other relevant facts that you turned up

11            between September when the case was continued

12            and December when it was tried?

13   A.       I couldn't specify what I learned -- whether

14            it was before the trial, the jury trial date

15            or not Billy.  Nothing comes to mind right

16            off.

17   Q.       Based on your testimony, it's my understanding

18            that these witnesses who came in and testified

19            about questioning the character and the

20            veracity of Jennifer were discovered during

21            that period of time?

22   A.       Yes.

23   Q.       I assume that you discussed with Mr. Walker

24            and he understood that he was waiving his

25            right to a jury trial?
```

```
 1   A.   Yes.  I had a discussion with him about what
 2        it meant to waive his right to trial by jury.
 3   Q.   Now, during any of your involvement, whether
 4        it was in Juvenile Court or in preparation of
 5        this particular case, did you ever discover
 6        any testimony that indicated that on some
 7        occasions Jennifer had recanted her story and
 8        said her testimony -- her statements about her
 9        father were not true?
10   A.   Yes.  I'm trying to remember.  It seems like
11        there was a letter from her sister Crystal.
12        Crystal had said that she had a conversation
13        with Jennifer.  Essence of that conversation
14        was that she was recanting her testimony.
15        Directly from Jennifer, I don't recall.  There
16        may be a letter or something.  I just don't
17        recall off the top of my head.
18   Q.   Let me ask you this.  Did you have the
19        occasion to have Mr. Walker subjected to a
20        polygraph exam?
21   A.   He took a polygraph.
22   Q.   Do you recall about when that took place?
23   A.   I don't.
24   Q.   Do you recall any of the circumstances
25        surrounding that?
```

1    A.    Mr. Roberts set all of that up.  I remember

2          getting the results and that they -- he had

3          passed.

4                MR. HAYDEN:  I object, Judge.  That is

5          irrelevant.

6                THE COURT:  Sustained.

7                MR. HAYDEN:  Not admissible.

8    Q.    Did you advise the State at that particular

9          period of time that your client had subjected

10         himself to a polygraph exam?

11   A.    Yes.  Any prosecutor I talked with about the

12         case knew that there was a polygraph test and

13         what the results were.

14   Q.    And approximately how long before the trial

15         did you advise them of that?

16   A.    Probably right after I found out he passed,

17         but I don't recall.

18   Q.    Do you have -- I mean, is this in the last

19         year before trial or earlier?  Do you recall?

20   A.    A good bit in time before.  I probably have a

21         copy of the thing in here somewhere.

22   Q.    David, let me show you what appears to be a

23         report from Sprayberry Polygraph

24         Investigators.  This may have refresh your

25         recollection.

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | What date does that appear? |
| 3 | A. | May of -- May 15th, '98. |
| 4 | Q. | What date was this case actually tried? |
| 5 | A. | December '99. |
| 6 | Q. | So that's -- Would it be a fair statement to |
| 7 | | say that was approximately almost a year and a |
| 8 | | half? |
| 9 | A. | Yeah. |
| 10 | Q. | And it's your testimony that you advised the |
| 11 | | State that you had a polygraph exam which |
| 12 | | indicated that your client was telling the |
| 13 | | truth? |
| 14 | A. | Yes. |
| 15 | Q. | Did the State ever offer to do their own |
| 16 | | polygraph test? |
| 17 | A. | I don't remember if they offered to.  I'm |
| 18 | | pretty sure that I said something, we will be |
| 19 | | glad to let him take a polygraph with whoever |
| 20 | | you want him to take it with. |
| 21 | Q. | But you made that opportunity and |
| 22 | | representation to the State? |
| 23 | A. | Yes. |
| 24 | Q. | And I'm assuming you made it with sufficient |
| 25 | | time that they could have done that testing |

```
 1          had they desired to?
 2    A.    I'm sure I made it right in context with the
 3          May date when I found out he passed it.  I
 4          probably got on the phone and talked to -- I
 5          just don't recall doing that, though.
 6    Q.    Did you ever do any research as to the
 7          admissibility of polygraph exams?
 8    A.    Yes.
 9    Q.    What research did you do?
10    A.    Actually, I didn't.  Mr. Roberts did it and
11          sent it to me.  He sent me about fifty cases
12          dealing with the issue.
13    Q.    Specifically did he bring to your attention
14          case of United States of America versus Julio
15          Piccinonna?
16    A.    I think so.  That name rings a bell.  I could
17          look at my discovery.
18    Q.    Would it be fair to say that at the time this
19          case was tried that you were aware that there
20          was some case law that indicated under certain
21          circumstances polygraphs could be admissible?
22    A.    Yeah.  I'm pretty sure it was all Federal
23          Court case law.  I remember there being some
24          groundwork laid for that.
25    Q.    And it's your recollection that you offered
```

```
 1            your client to be examined by any examiner the

 2            State chose?

 3   A.    Yes.

 4   Q.    Let me ask you this.  Besides the testimony of

 5            Jennifer Jordan -- excuse me -- Jennifer

 6            Walker, was there any physical evidence or

 7            scientific evidence to link the defendant in

 8            this case?

 9   A.    Not that I recall.

10   Q.    Do you recall anybody from the Department of

11            Forensic Science testifying, anything like

12            that?

13   A.    There wasn't.

14   Q.    There was not?

15   A.    There was not.

16   Q.    Did you offer this polygraph exam at trial?

17   A.    I don't remember, Billy.

18   Q.    But I assume the record would reflect it?

19   A.    Absolutely.

20   Q.    Let me ask you this.  Did you ever -- Did the

21            State ever advise you that Jennifer Walker had

22            recanted to one of the assistant district

23            attorney's?

24   A.    I seem to recall there being a conversation.

25            I don't remember with who.  I thought maybe
```

```
 1              that conversation took place with Jennifer.

 2              Her response was more like, well --

 3      Q.      Which Jennifer are we talking about?

 4      A.      Jennifer Jordan.  Her response was more like,

 5              well, I don't care what she says now.  I'm

 6              going forward with the prosecution.  That was

 7              her -- she probably didn't use words to that

 8              affect, but that was the general --

 9      Q.      Specifically did Jennifer Jordan ever tell

10              that you Jennifer Walker had recanted her

11              statement to Jennifer Jordan?

12      A.      I can't specifically say.  Due to the fact

13              that the letter was out there and it was just

14              kind of -- it became generally accepted

15              knowledge from the defense standpoint that,

16              yes, she had recanted her testimony along the

17              way.

18      Q.      But specifically I'm asking you whether or not

19              Jennifer Jordan ever told you that she had

20              personal -- that Jennifer Walker had

21              personally recanted to Jennifer Jordan?

22      A.      I can't tell you that I had any kind of

23              conversation with that -- with Jennifer Jordan

24              to that effect.

25      Q.      Would you have considered that a pretty
```

1              important piece of evidence?

2    A.   Well, yeah.

3    Q.   I assume that had you known that, you

4         certainly at trial would have used that as

5         cross examination?

6    A.   Yes.

7    Q.   Do you recall cross-examining Jennifer Walker

8         on the issue of whether or not she had told

9         the State she had lied?

10   A.   I'm pretty sure I cross examined her on her

11        changing her story.  Again, the record would

12        reflect what I asked her.

13             MR. HILL:  I believe that's all I have of

14        this witness.

15             THE COURT:  Mr. Hayden?

16                  CROSS-EXAMINATION

17   BY MR. HAYDEN:

18   Q.   David, the exhibits are in the court file.

19        Defendant's Exhibit One is a letter dated

20        April 7th of '97.  It's a to whom it may

21        concern letter by Jennifer Walker.  And in it

22        she does, you know, tell a different story

23        than apparently she told for the prosecution.

24        If that's a Defendant's Exhibit, that would

25        have been something you presented during the

```
 1         trial?

 2    A.   Yes.

 3    Q.   Then there are other exhibits with --

 4              THE COURT:  Mr. Hayden, it's very

 5         possible if that's the letter that was faxed

 6         from the DA's office in Shelby County to

 7         Mr. Karn --

 8              THE WITNESS:  It is not.

 9              MR. HAYDEN:  No.  This is a handwritten

10         letter.

11    Q.   Then there are some other items marked not

12         admitted.  They are just Defendant's Exhibits

13         that were identified.  Two is the faxed

14         letter.  Four is the polygraph letter.  So

15         there was nothing that you were not privy to

16         before the trial; is that correct?

17    A.   Out of those items.  Obviously I had them

18         before trial or I wouldn't have been able to

19         mark them and offer them.  I think I offered

20         all of those.  I think that the Court ruled on

21         each one of them.  Admitted one and not the

22         others.

23    Q.   And you've already testified here today that

24         besides yourself as an attorney, you had other

25         people who were assisting Mr. Walker in giving
```

1          you information -- another attorney and an

2          investigator that were assisting you preparing

3          his defense; isn't that right?

4    A.   Yes.

5    Q.   And during the trial there were -- you did

6          call -- you called witnesses to rebut Jennifer

7          Walker's character or her situation, didn't

8          you?

9    A.   Yes.

10   Q.   And you've testified today there was never any

11         issue about any -- there wasn't any forensic

12         evidence as to the rapes or sodomies or

13         anything like that?

14   A.   That's right.

15   Q.   And isn't it true that the issue about the

16         waiver of the jury trial has been gone over

17         and motions for new trial and appeal and other

18         types of proceedings?

19   A.   Yes.

20   Q.   And you did cross-examine all the witnesses

21         that were called by the State; is that

22         correct?

23   A.   Yes.

24   Q.   And you've been an attorney for how long?

25   A.   Eighteen years.

```
1    Q.   And what has been the -- What has been your

2         experience as a lawyer since 1984?

3    A.   First ten years, I was an assistant attorney

4         general.  The last eight years, I've been in

5         private practice, a sole practitioner.

6    Q.   During the eight years that you -- when you

7         came back to Clanton, have you always done

8         criminal defense work?

9    A.   Yes.

10   Q.   So your whole eighteen year legal career has

11        been working in criminal law?

12   A.   Yes.

13             MR. HAYDEN:  That's all.

14             MR. HILL:  Just a couple of things.

15                  REDIRECT EXAMINATION

16   BY MR. HILL:

17   Q.   I believe you told us on direct examination

18        that Jennifer Jordan told you and as I recall

19        your words, I don't care what Jennifer Walker

20        is saying now I'm going to prosecute this

21        case?

22   A.   That's what the general attitude was, Billy.

23        As I said, I don't think that I heard those

24        words, you know, exactly like that.  It's just

25        the general, well, I don't care because that
```

1       letter -- now that my memory is slightly

2       refreshed.  There was that letter of

3       recantation available.  So the general

4       attitude was from Jennifer Jordan in spite of

5       this recantation and this letter and whatever

6       else she might have said I'm going forward

7       with the prosecution because apparently

8       Jennifer Walker's testimony at trial was

9       probably in line with what she had told

10      Jennifer Jordan the week leading up to trial.

11      That's just an assumption.

12   Q.  Can you look through your file for me and see

13      any pretrial discovery that the State turned

14      over to you?  Do you have that in a section

15      where you could identify it?

16   A.  No.  I'm not sure where the letter that Walter

17      made reference to a minute ago came from.  I

18      don't know if it came from the State or if it

19      came from some other source.  I really -- I

20      don't know.  I don't have it segregated out.

21      I've got a ton of stuff in here, though.

22   Q.  Would it be a fair statement to say at the

23      time that the State made the decision to

24      prosecute this case in December 1999 that you

25      had made them aware that your client had

```
 1              passed a polygraph test?

 2    A.   Yes.

 3    Q.   Would it be a fair statement to say at the

 4         time the State decided to prosecute this case

 5         in December of '99, they were aware of at

 6         least this one written recantation letter,

 7         which is Defendant's Exhibit One in the court

 8         record?

 9    A.   Yes.

10    Q.   And I believe you've told us your general

11         impression was that they intended to prosecute

12         this case notwithstanding?

13    A.   Yes.

14    Q.   And just to make sure that I understand, you

15         don't ever recall Jennifer Jordan telling you

16         that Jennifer Walker had ever recanted her

17         statement to her personally?

18    A.   No.  I wouldn't expect her to.  That probably

19         falls in the context of attorney-client

20         privilege.  She might have used -- that's why

21         I tell you in a general sense that was her

22         attitude.  I can't tell you she ever used

23         those words.  Well, yeah, she told me she had

24         changed her story, but I don't care.

25              MR. HILL:  That's all.
```

1        MR. HAYDEN:  Nothing further.

2        THE COURT:  You may stand down.  Any

3   further witnesses?

4        MR. HILL:  Yes, sir.  I've got two more.

5        THE COURT:  Call them.

6        MR. HILL:  I call Chief Sprayberry.

7        MR. HAYDEN:  Judge, if he's for the

8   purpose of this letter, there's a copy in the

9   court file.

10                * * * * * * * *

11              **JESSE SPRAYBERRY**

12        The witness, called by the Defendant,

13   after having first been duly sworn to speak the

14   truth, the whole truth, and nothing but the truth,

15   took the stand and testified as follows:

16        MR. HAYDEN:  Mr. Hill, I want to tell you

17   something.  Do you not realize this letter is

18   in the court file?

19        MR. HILL:  No.

20        MR. HAYDEN:  This letter is in the court

21   file marked as Defendant's Exhibit Four from

22   the trial.

23        MR. HILL:  It wasn't admitted.

24        MR. HAYDEN:  It's under a -- you're

25   saying it wasn't admitted?  This is a letter

1    from the polygraph.

2       THE COURT:  It's not admitted.

3       MR. HILL:  Judge, let me make an offer of

4    proof.

5       THE COURT:  Let me do this.  You can make

6    an offer of proof, but that needs to be -- For

7    the purpose of the Rule 32, if there's an

8    appeal from the Rule 32 hearing, that needs to

9    be in an envelope where the results of that

10    are not given in an effort to influence the

11    Court's decision.

12       MR. HILL:  Judge, I'm not trying to

13    influence the Court's decision.  But one of

14    the specific grounds that we've raised in our

15    Rule 32 petition was that there was a

16    polygraph examination and no effort was made

17    to introduce it and that Mr. Sprayberry was

18    not called as a witness.

19       MR. HAYDEN:  Judge, the Court's record

20    contains that letter.  It is marked

21    Defendant's Exhibit Four.  You're now saying

22    it was not admitted.  I didn't try the case.

23    I'm not sure.  It's in the court file.

24       THE COURT:  It's here.  It is right

25    there.

```
 1              MR. HILL:  Your Honor, what I want to do

 2       is put this witness on, put his background and

 3       make an offer of proof of what his examination

 4       revealed.  My understanding is Defendant's

 5       Four was not admitted.

 6              THE COURT:  Right.  The reason it would

 7       not be admitted because they are not commonly

 8       accepted.

 9              MR. HILL:  I understand, Your Honor.  But

10       that's the issue we're wanting to raise, that

11       possibly the Court could have erred.  I

12       apologize.  It was my understanding it wasn't

13       introduced.

14              THE COURT:  Watch this.  Didn't it all go

15       up on appeal?

16              MR. HILL:  Yes.  Not on this particular

17       issue, it didn't go up on appeal.

18              THE COURT:  I thought once -- didn't past

19       Criminal Appeals Justice Bowen help with it?

20              MR. HILL:  He did, in fact, Your Honor.

21       But the United States Supreme Court in Ring

22       overturned a decision in Walton which ten

23       years ago was exactly the opposite.  Our

24       position is, Your Honor, there's an emerging

25       theory of law that says this may be relevant,
```

```
 1          particularly under these circumstances.
 2               MR. HAYDEN:  We object to the polygraph.
 3          I mean, Your Honor didn't admit it at the
 4          trial of the case.  I don't see -- I don't
 5          think it's something upon which you can rely
 6          on here in a Rule 32 petition.  We object to
 7          it.  Like I say, you are in better shape --
 8          Mr. Hill is in better shape just referring to
 9          the court file like he did at first because
10          that's the open letter.  It's in there.
11               THE COURT:  Just do your offer of proof.
12                      DIRECT EXAMINATION
13     BY MR. HILL:
14     Q.   Tell us your name, please, sir?
15     A.   Jesse Sprayberry.
16     Q.   Mr. Sprayberry, how are you employed?
17     A.   I'm the chief-of-police of Tarrant Police
18          Department.
19     Q.   How long have you been involved in law
20          enforcement?
21     A.   Forty-three years.
22     Q.   Could you basically give us your background in
23          law enforcement?
24     A.   I worked for the Birmingham Police Department
25          for over thirty years.  I retired from there
```

1    in 1990 and transferred to the Tarrant Police

2    Department as the chief-of-police.  I've been

3    involved in investigations since 1968.  I've

4    been administering polygraph examinations

5    since 1969.

6  Q.  Could you tell us your training for the

7    administration of polygraph exams?

8  A.  I attended the Backster Polygraph Institute in

9    the City of New York, New York in the spring

10    of 1969.  After completing my basic training,

11    I served as an intern for about six months.

12    And after that, I was given a license by the

13    State of Alabama to administer polygraph

14    examinations.

15  Q.  Have you had the occasion to administer

16    polygraph examinations?

17  A.  Yes, sir.

18  Q.  On few or many occasions?

19  A.  I would say at least ten thousand times.

20  Q.  And were any of those examinations done on

21    behalf of the State of Alabama?

22  A.  Yes, sir.  I have testified in court on behalf

23    of cases in the past.

24  Q.  On behalf of the State?

25  A.  Yes, sir.

1    Q.    Now, could you basically explain to us the

2          scientific basis underlying a polygraph exam?

3    A.    The basic premise of a polygraph examination

4          is based on the psychological set of the

5          individual who is being tested.  He is

6          interviewed about the incident in question.

7          The questions are then formulated and reviewed

8          with him.  And after reviewing the questions

9          with him, the procedure is explained and the

10         test is administered several times.  And after

11         completing a satisfactory number of tests and

12         the examiner evaluates the tests and makes or

13         renders a decision or an opinion.

14   Q.    Is that underlying science commonly accepted

15         in the field of law enforcement investigation?

16   A.    Yes, it is.

17   Q.    And could you tell the Court some of the areas

18         in which it is used?

19   A.    We commonly use polygraphs in all phases of

20         investigation, especially where we have a

21         number of suspects and we want to eliminate

22         the innocent.  It has happened in all types of

23         cases up to and including homicide, domestic

24         relations.  And then other cases that I have

25         polygraphed and been involved with disputes,

```
 1              labor disputes.

 2    Q.        How do you -- Is there a mechanical device

 3              used in this examination?

 4    A.        There's an instrument called a polygraph

 5              because it has more than two components.  One

 6              of them measures the heart rate, the pulse

 7              beat.  The other measures the respiration and

 8              another measures the skin response or the

 9              electrical impulses from the body.

10    Q.        How are those recorded, please, sir?

11    A.        They are recorded on a continuous chart that

12              runs at a predetermined speed on a

13              tomograph.  It takes approximately forty-five

14              minutes to complete one test.  After each

15              test, the person is allowed to relax for a few

16              minutes, and then the test is administered

17              until the examiner has sufficient charts.

18    Q.        Is there any control mechanism in this

19              particular examination?

20    A.        Yes.  There are several types of questions

21              involved.  There are relevant questions,

22              control questions, and irrelevant questions.

23    Q.        Could you sort of explain that in layman's

24              terms for us, please, sir.

25    A.        The relevant questions deal explicitly with
```

1       the incident at hand.  The control questions

2       deal with similar but irrelevant situations

3       which allows an innocent person to show

4       reactions as opposed to a guilty person.

5   Q.  How do you determine whether or not, in your

6       opinion, someone is telling the truth?

7   A.  My opinion is rendered after I examine the

8       test charts and make a numerical evaluation.

9       I compare the relevance against the control

10      questions.  My premise is on the -- whichever

11      question they showed the most response to is

12      in my opinion the result of the test, whether

13      innocent or lying.

14  Q.  And the test results that you're examining are

15      actually scientific data of the body's

16      reaction, the pulse and that sort of thing?

17  A.  Right.

18  Q.  Did you have an occasion to make an

19      examination of Mr. James Walker?

20  A.  Yes, sir, I did.

21  Q.  Do you recall when you made that examination?

22  A.  Yes, sir.  I believe that was about four years

23      ago, a little over four years ago.

24  Q.  Would May 14th, 1998 seem to be correct to

25      you?

```
 1    A.    Yes, sir.

 2    Q.    Could you tell us basically what you did that

 3          day to make the examination of Mr. Walker.

 4    A.    I interviewed Mr. Walker as he had been

 5          accused of molesting his daughter.  We talked

 6          about the incident for some time.  I gained

 7          enough information that I could formulate

 8          questions to determine if Mr. Walker was being

 9          truthful or attempting deception about

10          molesting his daughter.

11    Q.    Did you ask him any specific questions that

12          you recall?

13    A.    Yes, I did.

14    Q.    Could you tell us about that, please, sir.

15    A.    Yes.  I have a list of those questions.

16    Q.    State those for us, please, sir.

17    A.    Let me get my glasses.  One of the questions I

18          asked Mr. Walker was, have you ever had sexual

19          intercourse with Jennifer?  He answered no.

20          The number two question was, have you ever had

21          oral sex with Jennifer?  And he answered no.

22          Number three question was, have you ever

23          sodomized Jennifer?  His answer was no.

24          Number four question was, have you ever

25          sexually abused Jennifer in any way?  His
```

1       answer was no.

2   Q.   After you asked those questions, did you have

3       the occasion to view the machine readings that

4       you had taken at that time?

5   A.   Yes, sir.  I did evaluate the test charts.

6   Q.   And based on those test charts, did you form

7       an opinion as to whether or not he was telling

8       the truth?

9   A.   Yes, I did.

10   Q.   What was your opinion, please, sir?

11   A.   My opinion was that Mr. Walker answered the

12       questions truthfully.

13          MR. HILL:  That's all.

14               CROSS-EXAMINATION

15  BY MR. HAYDEN:

16   Q.   The results that you're talking about is the

17       same thing that is shown right here, this an

18       original, what's marked Defendant's Exhibit

19       Four that is in the court file from the

20       original trial?

21   A.   Yes, that's the original.

22   Q.   And when you perform this service for

23       defendants, do you charge a fee?

24   A.   Yes, I do.

25   Q.   What is that fee?

```
 1    A.    Four hundred dollars.

 2    Q.    Is that what was charged for this incident?

 3    A.    Yes, sir.

 4              MR. HAYDEN:  I believe that's all.

 5              THE COURT:  Anything further?

 6              MR. HILL:  Nothing, Your Honor.

 7              THE COURT:  You may stand down.  Thank

 8         you.  You're free to go.

 9              MR. HILL:  Judge, for the record, our

10         offer of proof in this particular case is

11         that, as we alleged in our Rule 32, this

12         evidence would have been admissible under the

13         theory of United States versus Julio

14         Piccinonna cited at 885 F.2d 1529.

15              THE COURT:  When is that dated?

16              MR. HILL:  1989.

17              THE COURT:  Would you spell that name.

18              MR. HILL:  Yes, sir.

19         P-i-c-c-i-n-o-n-n-a.  I have an extra copy for

20         the Court if the Court would like to see it.

21              THE COURT:  Anything further?

22              MR. HILL:  Just one more witness, Your

23         Honor.  Dr. Kim Ackerson.

24                   * * * * * * * *

25                        KIM ACKERSON
```

1          The witness, called by the Defendant,

2     after having first been duly sworn to speak the

3     truth, the whole truth, and nothing but the truth,

4     took the stand and testified as follows:

5               THE COURT:  State your name.

6               THE WITNESS:  Kimberly Spec, S-p-e-c,

7          Ackerson.

8                    DIRECT EXAMINATION

9     BY MR. HILL:

10    Q.   Mrs. Ackerson, are you employed?

11    A.   Yes, sir.

12    Q.   How are you employed?

13    A.   I'm a clinical forensic psychologist in

14         private practice in Birmingham, Alabama.

15    Q.   And would you be kind enough to briefly give

16         us your educational background.

17    A.   Yes, sir.  I received a bachelor's degree from

18         Lawrence University in Appleton, Wisconsin in

19         1986, a Backster degree with a mayor in

20         psychology.  In 1988, I received a master's

21         degree in forensic psychology from City

22         University of New York, John K. College of

23         Criminal Justice.  I received my doctorate

24         degree from the University of Alabama

25         specializing in clinical psychology with a

```
 1            subspecialty of psychology in law.  As part of

 2            the requirement for the doctoral program, I

 3            completed an internship at Arkansas State

 4            Hospital.  I then elected to do a year

 5            post-doctoral of fellowship in forensic

 6            psychology in the University of Massachusetts.

 7    Q.      Are you a member of any national organizations

 8            concerning your profession?

 9    A.      Nationally, yes, I belong to the American

10            Psychological Association.

11    Q.      Have you ever been recognized as an expert in

12            the field of forensic psychology in the

13            circuit courts of Alabama?

14    A.      Yes, I have.

15    Q.      On few or many occasions?

16    A.      I would say we're probably up to about a

17            hundred times now.

18    Q.      Have you ever had an occasion to do any work

19            for the State of Alabama?

20    A.      I'm not quite sure what you mean by that.  I

21            did have a contract that was through the

22            Alabama Department of Mental Health Mental

23            Retardation.  I was sometimes accused of

24            having worked for the State, but actually what

25            I was was a contract provider.  I did
```

1          evaluations under court order, not for the

2          State per se.

3     Q.   And where did you make those evaluations?

4     A.   The majority of the evaluations were in the

5          circuit courts of Jefferson County.

6     Q.   Was that part of the Taylor-Hardin program?

7     A.   Yes, it was.

8     Q.   Now, have you had an occasion to talk to a

9          client by the name of Jennifer Walker Mims?

10    A.   Yes, I did.

11    Q.   And when was that occasion, please, ma'am?

12    A.   I met her on two occasions.  The first time

13         was on January 25th of this year, and the

14         second occasion was on May 8th of this year.

15    Q.   What, if anything, did you do on the first

16         occasion?

17    A.   On the first occasion, I spent approximately

18         six hours with Mrs. Mims doing a clinical

19         history and a very significant social history,

20         obtaining significant background history on

21         her, conducted a clinical interview and also

22         conducted an interview related to her

23         competence to testify.

24    Q.   Did you do any further testing of Mrs. Mims?

25    A.   Yes.  I did do -- I did some testing on May

```
 1          8th.  I had her complete, on that day, the

 2          Minnesota Multi-phasic Personality Inventory,

 3          which is a test commonly used among

 4          psychologists for obtaining information about

 5          personality in psychopathology.  I also had

 6          her take the diagnostic assessment of

 7          post-traumatic stress disorder.

 8    Q.    As part of your discussion -- And

 9          approximately how many hours did you spend

10          with Mrs. Mims?

11    A.    As I said, the first occasion we spoke for

12          approximately six hours.  On the second

13          occasion, I believe we spoke for about an hour

14          and a half.  The remainder of the time she

15          spent taking these particular tests I

16          mentioned.

17    Q.    Approximately how long did it take her to take

18          those tests?

19    A.    I believe Mrs. Mims took about an hour, hour

20          and a half to finish the MMPI.  And the   DAPS

21          was about twenty, twenty-five minutes.

22    Q.    During in entire period that you dealt with

23          Mrs. Mims, did you have the occasion to

24          discuss with her some allegations she had made

25          about her father?
```

| | | |
|---|---|---|
| 1 | A. | Yes, I did. |
| 2 | Q. | Could you briefly summarize your findings of |
| 3 | | what she told you? |
| 4 | A. | Yes.  Mrs. Mims stated that when she was |
| 5 | | approximately fourteen, fifteen years of age |
| 6 | | she made some allegations against her father, |
| 7 | | Mr. James Walker, that he had sexually abused |
| 8 | | her.  She stated at the time that we met that |
| 9 | | that was not true, that she had recanted early |
| 10 | | on and that she again had hoped to come to |
| 11 | | court to retract her statement. |
| 12 | Q. | Now, based first on the six-hour interview you |
| 13 | | had basically of her social history, did you |
| 14 | | find anything of relevance during that |
| 15 | | conversation with Ms. Walker? |
| 16 | A. | In regards to what?  I'm sorry. |
| 17 | Q. | The statements she had made about her father. |
| 18 | A. | Yes.  Mrs. Mims offered an explanation as to |
| 19 | | why she made the allegation. |
| 20 | Q. | Could you relate that for us, please, ma'am. |
| 21 | A. | Yes.  She stated at the time that her parents |
| 22 | | were withholding opportunities for her to meet |
| 23 | | with a particular young man who she was quite |
| 24 | | engaged with and was very insistent on wanting |
| 25 | | to see. |

```
 1    Q.    Based on her having told you that was the

 2          basis of her having falsely made these

 3          allegations, did you find anything else of

 4          relevance and importance based on your first

 5          interview with Mrs. Walker?

 6    A.    Mrs. Walker was, I felt, very open with me,

 7          shared a number of experiences that she had in

 8          the various foster homes, group homes,

 9          treatment facilities that she was in during

10          the course of her having been in the custody

11          of DHR.  She indicated that during the time

12          that she was in custody, that she would recant

13          her recantation, and that she did so when she

14          was frustrated or upset, usually over her

15          mother not doing something she wanted such as

16          visiting or bringing her something, and that

17          she felt that her parents overall did not

18          particularly care for her.  She did not feel

19          that they wanted her around.  She didn't feel

20          supported.  She also indicated she was jealous

21          of her younger sister and felt her younger

22          sister received a lot more attention.  She

23          related that as one of the reasons she became

24          very angry and upset with her parents.

25    Q.    Did the social history that you took on that
```

```
 1              first six-hour session, was it consistent with

 2              the statements you just told us about?

 3    A.    Yes.  The statements were consistent with the

 4              information also that I had received in terms

 5              of the number of facilities she was in.  She

 6              was able to name the majority of those.  Was

 7              able to provide information in chronological

 8              order, provide details which were reflected in

 9              the reports.

10    Q.    Did she relate to you anything else in that

11              first session that you felt like was relevant

12              as to the question of these allegations she

13              had made toward her father?

14    A.    In addition to her rapport, one of the things

15              that I watched was her affect, namely her

16              emotional expression during the time in which

17              she was discussing those.  In the course of

18              the interview, Mrs. Mims cried at times,

19              became very tearful, was sad, also expressed

20              continued anger and resentment for some of the

21              things that she had dealt with in her

22              childhood.  So one of the things that I also

23              noted was that her affect was very much in

24              keeping with the information that she was

25              presenting to me.
```

```
 1    Q.    Would it be a fair statement that her affect

 2          was appropriate to the statement she was

 3          making?

 4    A.    Yes, it would.

 5    Q.    Was anything else of significance that you

 6          noted on that first day we haven't talked

 7          about?

 8    A.    Yes.  One of the things, again, I looked at

 9          was her competence to testify, to come on to

10          the stand and understand what testifying

11          involves and what it means.  Mrs. Mims

12          understood, in my opinion, the situation.  She

13          also understood the seriousness of the

14          situation in particular.  She related to me

15          fears that she might be charged with perjury.

16          She indicated to me she understood that was a

17          possibility and stated to me that was

18          something she was willing to face.  During my

19          entire six hours with her, she understood

20          questions without difficulty.  She responded

21          appropriately.  What I mean by that is her

22          responses were consistent and appropriate to

23          the questions.  She didn't go off on tangents.

24          She was able to remain focused on discussion,

25          provide details, elaborate.  She elaborated
```

```
 1            when asked to do so.  Despite becoming

 2            tearful, she was able to maintain enough

 3            control that she was able to communicate and

 4            discuss things and answer questions.  She did

 5            not display any problem behavior in terms of

 6            hostility or overt anger that disrupted the

 7            interview process, especially our

 8            communication.  Those are things that I look

 9            for to see whether somebody could testify.

10    Q.      Based on your first conversation of the first

11            six hours as well as your second testing and

12            meeting with Mrs. Mims, were you able to form

13            any conclusions concerning her psychological

14            state when she was fourteen and fifteen?

15    A.      Yes, I believe I was or I did.

16    Q.      What would that be?

17    A.      In my opinion, at the age of fourteen and

18            fifteen, Mrs. Mims displayed symptoms and

19            traits that would be -- that would warrant a

20            diagnoses of both conduct disorder and

21            oppositional defiant disorder.

22    Q.      Could you in layman's language sort of explain

23            those two for me, please, ma'am.

24    A.      These are behavior disorders, disorders in

25            which the individual is engaging in
```

| | | |
|---|---|---|
| 1 | | problematic behaviors.  These include -- can |
| 2 | | include physical verbal aggression.  They tend |
| 3 | | to be argumentative, defiant toward authority, |
| 4 | | disrespectful, lying, deceitful.  There can be |
| 5 | | symptoms, other symptoms that I did not |
| 6 | | particularly see in this case, such as setting |
| 7 | | fires, hurting animals.  One thing that I did |
| 8 | | note that Mrs. Mims told me directly that she |
| 9 | | often would sneak out of the home, violate |
| 10 | | curfew, would run away.  These are consistent |
| 11 | | with conduct disorder. |
| 12 | Q. | Did you find this diagnosis to have any |
| 13 | | relevance to the question of whether or not |
| 14 | | her present testimony that she was -- she has |
| 15 | | stated a falsehood against her father, would |
| 16 | | that be consistent with what she is now |
| 17 | | testifying to? |
| 18 | | MR. HAYDEN:  Judge, I'm going to object |
| 19 | | now.  You're the one that has got to decide |
| 20 | | was she telling the truth then or now or was |
| 21 | | she lying then or now.  There is not any kind |
| 22 | | of doctor that can come in here and be |
| 23 | | qualified and can make that decision for you. |
| 24 | | MR. HILL:  I'm not saying the decision, |
| 25 | | Judge.  I'm just asking her whether her |

1    findings are consistent with Mrs. Mims' now

2    position that she was not telling the truth at

3    the time. She will either yes or no and tell

4    us what it is based on. I think she has a

5    right to testify to that. And then his honor

6    can make the decision.

7        MR. HAYDEN: I think this whole witness

8    is really irrelevant. This type testimony

9    might be helpful, like I say, at a time when

10   if Mrs. Mims becomes charged with perjury to

11   decide was she telling the truth now or

12   telling the truth, you know, at some other

13   time.

14       THE COURT: Sustained. Next question.

15   Q.  Based on your examination of Mrs. Mims on both

16   occasions -- First let me, I believe you've

17   told us about some testing. Did you find any

18   relevant information in your testing?

19   A.  The testing that I conducted, the MMPI, was

20   not considered valid. The validity profile

21   indicated that Mrs. Mims was not responding

22   consistently to the items; therefore, I was

23   not able to derive any clinical information

24   from it specifically. What I was able to

25   notes was that the profile pattern was very

```
 1              similar to a profile pattern that she had
 2              demonstrated when she took the MMPI, I
 3              believe, in 1997.  There were -- it was a
 4              similar looking profile.  That was all I was
 5              able to tell from the MMPI.  From the
 6              diagnostic assessment of the post-traumatic
 7              stress disorder, it showed some -- that
 8              Mrs. Mims was experiencing by her reports some
 9              symptoms of post-traumatic stress disorder.
10              The ones that I was most concerned about that
11              I felt would be relevant for the purposes of
12              determining her ability to testify were things
13              such as dissociating or depersonalizing.  This
14              would be more of a concern about her ability
15              to remain in tact in terms of reality.  She
16              did not show those symptoms.
17      Q.      So it's my understanding that she appeared to
18              be able to testify and understand what she was
19              saying?
20      A.      In the interview with me, I felt that the
21              entire time I was with her she clearly
22              understood what I was saying and was able to
23              process the information and respond to the
24              questions.
25      Q.      I believe the testing you just told us about
```

| | | |
|---|---|---|
| 1 | | was also consistent with that? |
| 2 | A. | Again, that particular testing wouldn't |
| 3 | | necessarily address those issues.  I |
| 4 | | administered the MMPI looking for the |
| 5 | | possibility of a serious mental illness on her |
| 6 | | part or perhaps a problem with personality |
| 7 | | traits.  The reason I did that was to check |
| 8 | | myself to see if I had missed anything. |
| 9 | | That's why those tests were administered. |
| 10 | Q. | Did any of the testing that you did raise any |
| 11 | | questions of the validity of your prior |
| 12 | | diagnosis about her disorders? |
| 13 | A. | No, it did not. |
| 14 | | MR. HILL:  I believe that's all. |
| 15 | | MR. HAYDEN:  I don't have any questions. |
| 16 | | MR. HILL:  May this witness be excused? |
| 17 | | THE COURT:  Let me ask.  Generally when |
| 18 | | you have a diagnosis of post-traumatic stress, |
| 19 | | do you determine whether there was trauma or |
| 20 | | whether it was post-traumatic stress disorder |
| 21 | | without trauma? |
| 22 | | THE WITNESS:  You can do one of two |
| 23 | | things.  What I did is after she took the |
| 24 | | test, I noted to see which particular life |
| 25 | | event she was viewing as traumatic.  What she |

1    reported from on the particular test and with

2    the -- through my interview was a traumatic

3    experience that she had recently had with her

4    husband in which I had understood there was

5    some physical aggression, and that she felt

6    threatened by him.  That was what she was

7    reporting to be trauma.

8         THE COURT:  So your testing -- the

9    results has influence of the events since the

10   alleged act of her father?

11        THE WITNESS:  Very much so, yes, sir.

12        THE COURT:  We don't have anything to

13   gauge what the status was in 1999, do we, her

14   status in 1999 when she testified.

15        THE WITNESS:  In 1999, not at that

16   particular year as I understand it.  I believe

17   she was evaluated in 1997 by a psychologist,

18   but I don't recall that there were any others.

19        THE COURT:  How did you know that?

20        THE WITNESS:  It was provided in the

21   records.

22        THE COURT:  Who had those?

23        MR. HILL:  I think we got them through

24   some discovery.  Basically, we just found

25   them.  They were done -- I think they were

1        done while she was in DHR's custody.

2               To be honest with you, Judge, I didn't

3        try the case.  I'm coming in later.  We found

4        them.

5               THE COURT:  Thank you.

6    BY MR. HILL:

7    Q.   Let me ask you this.  Did you see anything in

8         the -- You didn't do the 1997 examination?

9    A.   No, I did not.

10   Q.   Do you know whether or not there was an

11        examination made at that time of

12        post-traumatic symptoms?

13   A.   I did read the report.  I believe Dr. Parker

14        felt there was some post-traumatic stress

15        disorder.  My concern, however, is that the

16        symptoms and the behavior she was reporting

17        and the symptoms and diagnosis she came up

18        with, what was not included in her report was

19        what she did to rule out other alternative

20        explanations for the diagnoses that she came

21        up with.  So I did not put a lot of emphasis

22        in that report because I did not see how

23        Dr. Parker had, as I said, disqualified other

24        possible explanations for the behavior

25        patterns and traits that she noted she had

1       seen at that time.

2    Q.  I believe you indicated that based on your

3       results that you found single rate of stress

4       in her life was something was going on in her

5       marriage?

6    A.  That's what she had reported.

7    Q.  Your testing was consistent with?

8    A.  Well, that's what she reported through the

9       testing.

10          MR. HILL:  That's all.

11          MR. HAYDEN:  Nothing.

12          THE COURT:  Thank you.  Anything further?

13          MR. HILL:  Nothing, Your Honor.

14          THE COURT:  Anything further from the

15       State?

16          MR. HAYDEN:  Yes, sir.  I have a motion

17       to dismiss pending.  Now that he has put on

18       his evidence, I would just like to speak to

19       that just very shortly.  He had two grounds.

20       The conviction was obtained through the

21       unconstitutional failure of the prosecution to

22       disclose to the defendant evidence favorable

23       to the defendant.  I would submit that that

24       ground doesn't have any merit.  That all the

25       testimony that has come through today has

1    shown that, you know, this woman had, you

2    know, told a story and recanted it.  And as

3    this doctor just said, recanted the recant.

4    Somebody used that term.  But unfortunately,

5    it came a time where you had to decide if she

6    was telling the truth or not.  You've had

7    evidence today that there were exhibits of the

8    defendant at trial, a letter that she wrote to

9    him that may concern where she was

10   manipulating.  That was a time she was

11   recanting.  So there was evidence on both

12   sides.  But I would submit that Mr. Hill has

13   failed to prove that ground.

14        Then the denial of the effective

15   assistance of counsel.  I'd submit he has

16   failed to prove that.  David told us what all

17   he did, that he had the assistance of another

18   attorney and an investigator who gave him

19   information.  He told us, you know, how he

20   tried the case.  Mr. Hill, you know,

21   introduced and brought his witness on the

22   polygraph.  I hope the Court will look through

23   the court file where that letter is in your

24   court file where you denied it to be admitted

25   at the time of trial.

1    We would just submit that he has not

2    submitted any grounds to the Court today to

3    prove a basis upon which relief can be

4    granted.  We would ask you to dismiss the

5    petition.

6        MR. HILL:  Can I briefly respond?

7        THE COURT:  Yes, sir.

8        MR. HILL:  Your Honor, the most

9    fundamental duty of the prosecution is to seek

10   justice.  In this particular case if a

11   prosecutor had actual knowledge that they had

12   been told that this case was not based on

13   truthful testimony, and we have uncontested

14   sworn testimony today by Jennifer Walker that

15   she told the Assistant District Attorney

16   that's not true, and they don't communicate

17   that to the defense under Brady versus

18   Maryland, that is a violation of not only our

19   State laws, our State of Alabama Rules of

20   Criminal Procedure, but it fundamentally

21   affects the due process rights under the 5th,

22   6th, and 14th amendments of the federal

23   constitution.  Therefore, I don't think

24   there's any question we have shown that

25   ground.

1          As far as ineffective assistance of

2     counsel, Your Honor, in a case where there is

3     nothing but essentially a swearing contest

4     where the scientific tests -- where a

5     polygraph was made available to the State some

6     year and a half before trial, where they could

7     have examined him, the offer was made to

8     examine him, where there is no other evidence,

9     I think clearly cited under this particular

10    case we cited to you, that it should have been

11    made admissible.  As Mr. Karn indicated, he

12    did not bring Mr. Sprayberry down to testify.

13    I think there's also questions, Your Honor, as

14    to his general investigation in this case and

15    the fact that he admitted that he waived the

16    defendant's jury trial in effect to do more

17    investigation.  I think all of those raise

18    clearly questions that are before the Court to

19    be considered.

20          THE COURT:  I will get an order out.

21          MR. HILL:  Thank you, Judge.

22

23          *  *  *  *  *  *  *  *  *  *  *  *

24              END OF PROCEEDINGS

25          *  *  *  *  *  *  *  *  *  *  *  *

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP 13 | CERTIFICATE OF COMPLETION<br>REPORTER'S TRANSCRIPT | Page Number<br><br>109 |
| --- | --- | --- |

TO:   The Clerk of the Court of Criminal Appeals                    Fax: (334) 242-4689
         P. O. Box 301555
         Montgomery, Alabama 36130-1555

Criminal Appeals Case Number         CR  01  -  2524

  James Wilbert Walker                                     v.   State of Alabama
**Appellant's Name**                                              **Appellee**

On appeal from the:  [xxx]  Circuit Court of

                     [    ]  District Court of    _Chilton_  County

                     [    ]  Juvenile Court of


**Trial Court Case Number**   CC-97-239.60


**Notice of Appeal Date**   9-16-02


         I,  _____Deborah Moses Sharman_____, certify that I have this date completed and filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings in the above referenced case that were reported by me and were specifically designated by the appellant for inclusion on the Reporter's Transcript Order.  The transcript, which is numbered serially in the upper right-hand corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and the testimony of the witnesses.  The original transcript concludes with the original of this notice and the copies of the transcript conclude with copies of this notice.  The page number appearing in the upper right-hand corner of this certificate is the last page of my portion of the transcript in this case.


         Done this the  _2nd_  day of _December_ , _2002_ .

_Deborah Moses Sharman_
Court Reporter

**FILING AND SERVICE OF THIS FORM:**    Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on the municipal prosecutor rather than the attorney general and district attorney.

| State of Alabama<br>Unified Judicial System<br><br>ⁿ   ᴀRAP-14        Rev. 11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number<br>*CR-01-2524*<br>*CC-97-239.60* |
|---|---|---|

| TO: THE CLERK OF<br>    THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:   *9-16-02* |
|---|---|

**APPELLANT**

*James W. Walker Jr.*

v.   **STATE OF ALABAMA**

---

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _*143*_ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this _____*6*_____ day of *December* , *2002* .

_____*Mike Smith*_____ (*TC*)
Circuit Clerk